UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SANCOM, INC., a South Dakota corporation, | ) ) ) | CIV.  07-4147-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | ORDER DENYING PLAINTIFF'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIMS |
| QWEST COMMUNICATIONS CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Defendant. | ) ) ) | |

Plaintiff, Sancom, Inc., moves to dismiss the counterclaims asserted by

defendant, Qwest Communications Corporation (Qwest).  The motion is denied.

**FACTUAL BACKGROUND**

Viewed in the light most favorable to the nonmoving party and as alleged

in the counterclaim, the facts are as follows:  There are two types of telephone

calls: local calls and long distance calls.  Local calls originate and terminate

within one designated local calling area and local exchange carriers (LECs)

usually serve customers within a local calling area.  There are incumbent

LECs, which are traditional providers of local exchange services in an area and

competitive LECs, which are new entrants whose purpose is to offer local

services in competition with the incumbent LECs.  In contrast, long distance

calls are carried by a long distance carrier, known as an interexchange carrier

(IXC), from one local calling area to another local calling area.  When a

customer makes a long distance telephone call, the call is originated on wires and facilities owned by the LEC serving the end-user customer making the call and the call is terminated over wires and facilities owned by the LEC serving the end-user customer receiving the call.  Long distance companies pay "originating" access charges to the LECs that serve customers who initiate long distance calls within their local calling area and pay "terminating" access charges to the LECs that serve customers who receive long distance calls within their local calling area.  Local telephone companies obtain access charges from the IXCs to assist with the cost of the local plant used in the origination and termination of interstate calls.  Such access charges "are determined by tariffs which carriers file either with the Federal Communications Commission (FCC) (when the charges pertain to purely interstate communications) or the applicable state utility commissions (when the charges pertain to intrastate communications)."  Rural Iowa Independent Telephone Ass'n v. Iowa Utilities Board, 476 F.3d 572, 574 (8th Cir. 2007).

Turning to the specifics of this case, Sancom is a South Dakota competitive LEC that provides telecommunication services to its customers and originating and terminating access services to long distance companies.  Being an IXC that provides long distance services, Qwest utilizes the originating and terminating services provided by Sancom.  Because Sancom's access charges pertain to interstate and intrastate communications, Sancom filed tariffs with

both the FCC and the South Dakota Public Utilities Commission (SDPUC),
pursuant to federal and state regulations.

Qwest began purchasing tariffed access services from Sancom in 2005.
Sancom argues that Qwest unilaterally stopped paying for access services on
May 1, 2007.  As a result, Sancom filed suit against Qwest, seeking to collect
charges it alleges are due under the applicable tariffs.  In its answer to
Sancom's complaint, Qwest asserts ten counterclaims based upon both federal
and state law.  Qwest alleges that Sancom, together with the Free Calling
Service Companies (FCS companies), participated in a "traffic pumping
scheme," resulting in an increase in access charges billed to Qwest.

More specifically, Qwest alleges that Sancom has entered into business
relationships with the FCS companies to increase the long distance traffic
delivered through Sancom's switches, which forces Qwest to pay high
terminating access charges.  The FCS companies provide individuals with free
access to chat rooms, free conference bridge lines, free pornographic or other
adult content calls, free voice mail, free podcasts, and free international calling.
The FCS companies offer these services to the public for free and encourage
their customers to make long distance calls to a number assigned to Sancom in
South Dakota.  Qwest alleges that the FCS companies purposefully partnered
with Sancom because it is a competitive LEC and, therefore, is eligible to file a
higher tariff rate.  The higher revenue gained by Sancom as a result of the

increased long distance calling was partly redistributed to the FCS companies. Qwest also argues that its obligation to pay access charges for any of the traffic directed to the FCS companies is negated because the collection of access tariff revenue for the purpose of sharing that revenue with the FCS companies and through the "traffic pumping" scheme is inconsistent with the purpose of the access charges.

Further, Qwest asserts that it can refuse to deliver long distance calls destined for companies like the FCS companies, but that it must know the exact telephone numbers utilized by the FCS companies in order to refuse to deliver the calls.  Qwest asserts that Sancom routinely assigns different telephone numbers that their participants may call in order to obtain "free" services to prevent Qwest from tracking and refusing to deliver calls intended for the FCS companies.  Furthermore, Qwest alleges that because the FCS companies bridge multiple users from different locations together in a manner that does not terminate the call to a local customer in Sancom's local service area, Sancom is collecting terminating access revenue in violation of the law and its own tariffs.  Finally, Qwest argues that Sancom is discriminating against its other customers when it shares revenues on a preferential basis with the FCS companies.

## MOTION TO DISMISS STANDARD

In considering a motion to dismiss a counterclaim, the court assumes all facts alleged in the counterclaim are true, construes the counterclaim liberally in the light most favorable to the claimant, and should dismiss only if "it appears beyond a doubt that the [claimant] can prove no set of facts which would entitle the [claimant] to relief." Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994). "The issue is not whether a claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183, 191, 104 S. Ct. 3012, 3017, 82 L. Ed. 2d 139 (1984).

## DISCUSSION

Qwest responded to the complaint of Sancom with a set of ten counterclaims. In its motion to dismiss Qwest's counterclaims, Sancom argues that Qwest's claims are barred by the filed rate doctrine. Sancom further argues that dismissal of the counterclaims is appropriate in light of the recently issued decision of the FCC in Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Company, Mem. Op. & Order, File No. EB-07-MD-001, FCC 07-175 (Oct. 2, 2007). Sancom also argues that Qwest failed to state a claim with respect to each individual counterclaim.

5

## I.    Filed Tariff Doctrine

Section 203(a) of the Communications Act requires telecommunications carriers to file a tariff with the FCC "showing all charges" and "showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). Telecommunications carriers cannot "charge, demand, collect, or receive a greater or less or different compensation" for services subject to tariffs. 47 U.S.C. § 203(c). These provisions are modeled after provisions contained in the Interstate Commerce Act, and therefore, courts have found that the filed rate doctrine applies to telecommunications carriers. American Tel. & Tel. Co. v. Central Office Telephone, Inc., 524 U.S. 214, 221-22, 118 S. Ct. 1956, 141 L. Ed. 2d 222 (1998).

" 'Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer.' " Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1097 (8th Cir. 2006) (quoting Evanns v. AT & T Corp., 229 F.3d 837, 840 (9th Cir. 2000)) (alteration in original). The filed rate doctrine prohibits courts from granting relief that would have the effect of changing the rate charged for services rendered pursuant to a valid tariff. The filed rate doctrine is equally applicable to tariffs set by state regulatory

agencies.  See Teleconnect Co. v. US West Commc'ns, Inc., 508 N.W.2d 644, 647-48 (Iowa 1993).

### A.  Standing

Sancom argues that Qwest lacks Article III standing to assert its counterclaims because the filed rate doctrine prevents the court from altering the access charges that Qwest is required to pay for services.  Sancom also argues that under the filed rate doctrine, Qwest has suffered no cognizable injury because it has a duty to pay the rates set forth in Sancom's filed tariffs.  But, as explained below, Qwest is not challenging the reasonableness of the rates charged by Sancom.  Instead, Qwest is asserting that Sancom is billing it for services not set forth in the tariff.  Because Qwest does more than simply allege the tariffs are unreasonable, it has asserted a cognizable injury by virtue of being charged for services not provided for in the tariff.

### B.  Counterclaims

Sancom argues that Qwest's objective is to continue to obtain tariffed services from Sancom at rates different from the tariffed prices.  Thus, Sancom argues that the filed tariff doctrine acts to bar Qwest's counterclaims in this case.  In response, Qwest argues that the filed rate doctrine is not applicable, in part, because it alleges that Sancom did not provide the services contemplated by the tariff.  Qwest alleges that the services that it received and were billed for did not qualify as the services set forth in the tariffs and,

therefore, Sancom is attempting to charge the filed tariff rates for services that are not set forth in the tariffs.

"[T]he purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness of the rates; and (2) insure that regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004) (quoting H.J. Inc. v. Northwestern Bell Tel. Co., 954 F.2d 485, 488 (8th Cir. 1992)).  In other words, there are two principles underlying the filed rate doctrine: (1) nonjusticiability ("preserving the exclusive role of federal agencies in approving rates for telecommunications services that are 'reasonable' by keeping courts out of the rate-making process [which is] a function that the federal regulatory agencies are more competent to perform") and (2) nondiscrimination ("preventing carriers from engaging in price discrimination as between ratepayers.")  Marcus v. AT & T Corp., 138 F.3d 46, 58 (2d Cir. 1998).

The nonjusticiability principle acts to preserve the FCC's primary jurisdiction over determinations regarding the reasonableness of rates charged by regulated carriers.  Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577-78, 101 S. Ct. 2925, 69 L. Ed. 2d 856 (1981).  This principle "prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority."  Marcus, 138 F.3d at 61.  With respect to

8

Qwest's contention that Sancom attempted to charge the filed tariff rates for a service that is not set forth in the tariffs, the court does not find that this type of claim is barred by the filed rate doctrine.  In making this allegation, Qwest is not asking the court to modify the rates filed by Sancom with the FCC.  In the context of a motion to dismiss, the court must assume all facts alleged in Qwest's counterclaims are true, namely that Sancom charged Qwest the filed tariff rates for a service that is not set forth in the tariffs.  Because the action does not challenge the legality of the rate approved by the FCC, judicial relief in this case would not disturb the FCC's determination in relation to the reasonableness of the rates.  Accordingly, the court finds that these allegations and the claims related to these allegations do not violate the nonjusticiability principle under the filed rate doctrine.

The nondiscrimination principle ensures that all telecommunications customers are charged the same rate for their service—the rate filed with and approved by the FCC.  The filed rate doctrine prevents carriers from negotiating a lower rate with some customers and then charging a rate other than the rate filed with the FCC.  Central Office Telephone Inc., 524 U.S. at 223.  This explains why courts have no power to adjudicate claims that would "invalidate, alter, or add to the terms of the filed tariff."  Davel Commc'ns, Inc. v. Qwest Corp., 460 F.3d 1075, 1084 (9th Cir. 2006).  With respect to Qwest's contention that Sancom did not provide the services set forth in the tariff, the court does

not find that this type of claim is barred by the filed rate doctrine. Qwest is not challenging the validity of the rate, but rather it argues that the arrangement between Sancom and the FCS companies results in the provision of services not covered by the tariff. In the context of a motion to dismiss, the court must assume the allegations of Qwest to be true, that it was billed for tariffed services that it did not receive. A ruling in Qwest's favor would not result in Qwest paying rates different from other entities who obtained services properly categorized under the tariff from Sancom. The court therefore finds that these allegations and claims related to these allegations are not barred by the nondiscrimination principle pursuant to the filed rate doctrine.

Further, Sancom filed suit seeking to recover fees it alleges are owed under the tariff. To recover for amounts charged pursuant to a tariff, Sancom "must demonstrate (1) that they operated under a federally filed tariff and (2) that they provided services to the customer pursuant to that tariff." Advamtel LLC v. AT & T Corp., 118 F. Supp. 2d 680, 683 (E.D. Va. 2000). Under this second element, Sancom must show it provided services pursuant to the tariff, which is the converse of what Qwest alleges in its counterclaims. The court finds that because this determination is appropriately made by the fact-finder with respect to Sancom's claims, that further supports the court's finding that the allegations contained within the counterclaims, as discussed above, are not barred by the filed rate doctrine.

Although the filed rate doctrine does not bar Qwest's claims that Sancom charged it the filed tariff rates for a service that is not set forth in the tariffs and that Sancom billed it for tariffed services that it did not receive, the court does find that the filed rate doctrine does bar Qwest's assertions that the tariffs are "void ab initio" because Sancom is not a rural competitive LEC. Sancom has filed tariffs as a rural competitive LEC and Qwest's allegations are effectively a direct challenge to the validity of that rate. Further, there is no indication that Sancom's status has ever been questioned by the FCC. If the court were to invalidate the tariffs with respect to the services provided to Qwest and subsequently apply a different tariff rate to those services, the result of that determination would be that the court would be setting the rate and other long distance carriers would pay a different rate than Qwest. This is exactly what the nonjusticiability and discriminatory principles under the filed rate doctrine are intended to prevent. See, e.g., H.J. Inc., 954 F.2d at 489-92. Accordingly, to the extent that Qwest alleges that Sancom's tariffs are void because Sancom is not a "rural competitive LEC," that argument is dismissed by the court.

## II.   **Farmers**

Sancom also argues that Qwest's counterclaims are precluded by the FCC's recent decision in Farmers. The FCC's ruling in Farmers should be given deference by this court pursuant to Chevron U.S.A., Inc. v. Natural

11

Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d

694 (1984).[1]  In Farmers, the FCC faced a factual situation similar to the one

present in this case.  In that case, Qwest alleged that Farmers, a local

exchange carrier similar to Sancom, violated the Communications Act.

Farmers, ¶ 1.  Qwest alleged that Farmers intended to participate in a scheme,

which would increase traffic to its network through agreements with conference

calling companies.  Id.

A significant difference between Farmers and Sancom in this case is that

Farmers was an incumbent local exchange carrier rather than a competitive

local exchange carrier.  As an incumbent LEC, the tariff rate for Farmers was

determined by the rate of return it achieved in previous time periods.  The

essence of Qwest's complaint was that after establishing the tariff rate during a

period of low traffic, Farmers dramatically increased traffic through agreements

with the conference calling companies, thus earning an unreasonably high rate

of return.

The FCC determined that during the period in question, Farmers had

vastly exceeded its prescribed rate of return.  Id. at ¶ 25.  Despite this finding,

the FCC found that Farmers, although it "manipulated the Commission's rules

---

[1] The court notes that the FCC granted an order for reconsideration of the
Farmer decision in January of 2008 to allow further development of the factual
record.  See Qwest Communications Corp. v. Farmers & Merchants Mutual
Telephone Co., Order on Reconsideration, File No. EB-07-MD-001, FCC 08-29
(Jan. 29, 2008).

to achieve a result unintended by the rules," it did not act in an unlawful manner.  Id.  The FCC found that the conference calling companies were appropriately identified by Farmers as end users under the relevant tariff.  Id. at ¶ 35.  The FCC further found that Farmers' payment of "marketing fees" to the conference calling companies did not affect the status of those companies as customers of Farmers.  Id. at ¶ 38.

Although the issues that confronted the FCC in Farmers are similar to those at issue in this case, the court does not find that the FCC's findings are dispositive at this stage of the litigation.  In Farmers, both parties had the opportunity to conduct discovery, and the FCC relied on the developed record in determining that Farmers had acted lawfully under the tariff.  See id., ¶¶ 30-39.

Further, the claims made by Qwest in this case differ in some ways from the claims made by Qwest in Farmers.  Qwest alleges that most, if not all, of the services being provided to the FCS companies do not terminate in the local exchange area in which Sancom collects access charges.  Qwest alleges that the FCS companies provide a service that does not terminate a call at their equipment but simply facilitates communication between multiple parties, almost none of whom reside in Sancom's local service area. The court acknowledges that a similar argument was made before the FCC in Farmers and rejected.  But here, Qwest further alleges that Sancom is essentially

delivering traffic to the FCS companies and is not receiving terminating access charges for such services.  Qwest also alleges that the FCS companies' equipment is actually located outside of Sancom's service territory.  Finally, Qwest asserts that the FCC has specifically given long distance carriers, like Qwest, the ability to refuse to deliver long distance calls that are delivered to the FCS companies.  At this stage of the litigation, without a developed record regarding the relationship between the FCS companies and Sancom, the court must accept Qwest's allegations as true and therefore the situation faced by the FCC in <u>Farmers</u> is distinguishable.  For these reasons, the court finds that the FCC's ruling in <u>Farmers</u> does not mandate dismissal of Qwest's counterclaims.

## III.   **Individual Counterclaims**

### A.  **Violation of 47 U.S.C. § 201(b)**

Counterclaim 1 alleges that Sancom acted in violation of federal law, namely 47 U.S.C. § 201(b), by charging Qwest access tariffs for terminating long distance calls when Sancom did not in fact terminate such calls.  Sancom argues that this claim is prohibited by the filed rate doctrine because Qwest seeks a determination of the reasonableness of Sancom's tariffs, which are filed with the FCC.  Viewing the counterclaim in the context of a motion to dismiss, the court finds that Qwest has alleged that Sancom billed Qwest for services

14

that were not provided and thus has made allegations sufficient to state a claim for a violation of 47 U.S.C. § 201(b).

### B.  Violation of 47 U.S.C. § 201(b)

Counterclaim 2 similarly alleges that Sancom acted in violation of federal law, namely 47 U.S.C. § 201(b), by charging Qwest for access tariffs for terminating long distance calls when Sancom did not in fact terminate such calls.  Sancom argues that this claim is prohibited by the filed rate doctrine because Qwest seeks a determination of the reasonableness of Sancom's tariffs, which are filed with the FCC.  Assuming that all of the allegations in the counterclaim are true, as the court is required to do when considering a motion to dismiss, the court finds that Qwest has alleged that Sancom billed Qwest for services that were not provided.  As a result, Qwest has made allegations sufficient to state a claim for violation of 47 U.S.C. § 201(b).

### C.  Violation of 47 U.S.C. § 203(c)

Counterclaim 3 alleges that Sancom acted in violation of federal law, namely 47 U.S.C. § 203(c), by billing Qwest for services that it did not provide. Sancom argues that this claim is barred by the filed rate doctrine, because Qwest is asking the court to void Sancom's tariffs and apply a different rate. Viewing the counterclaim in the light most favorable to Qwest, the court finds that Qwest has successfully alleged that Sancom billed Qwest for tariffed services that were never provided and therefore has made allegations sufficient

15

to state a claim for a violation of 47 U.S.C. § 203(c).  Accordingly, Sancom's motion to dismiss is denied.

### D.  Common Law Fraudulent Concealment

Counterclaim 4 alleges that Sancom provided the FCS companies with different telephone numbers so that the FCS companies could repeatedly change their telephone numbers to prevent Qwest from discovering the phone numbers.  Qwest alleges Sancom did so because Qwest has a right to refuse to deliver calls destined for the FCS companies.  Based upon the above allegations, Qwest asserts that Sancom knowingly failed to disclose this information to Qwest with the intent to deceive and defraud Qwest, that Sancom had a duty to disclose this information to Qwest, and that Qwest relied on Sancom's representations because it was unable to refuse to deliver calls to the FCS companies.  Under South Dakota law, to successfully prove fraudulent concealment, the plaintiff must show: "(1) the suppression of a fact by one who is bound to disclose it, or (2) the suppression of a fact by one who gives information of other facts which are likely to mislead for want of communication of that fact."  Milligan v. Waldo, 620 N.W.2d 377, 380 (S.D. 2001).

Sancom argues that it has no duty to disclose to Qwest the identity of its end-user customers and that even if Sancom had disclosed the telephone numbers of Sancom's customers, it is unlawful for Qwest to refuse to deliver

16

the calls the FCS companies.  Qwest specifically pleaded in its counterclaim that Sancom had a duty to disclose the information to Qwest, that Sancom failed to do so with the intent to deceive and defraud Qwest, and that, as a result, Qwest was forced to deliver calls to the FCS companies.

Sancom also argues that fraudulent concealment is not a cause of action in South Dakota but rather a mechanism used to toll the statute of limitations. The court notes that the two cases cited by Sancom in this regard deal with medical malpractice and accountant malpractice claims.  See Bruske v. Hille, 567 N.W.2d 872, 875 (S.D. 1997) and Witte v. Goldey, 590 N.W.2d 266, 269 (S.D. 1999).  While fraudulent concealment may only act to toll the statute of limitations in the area of malpractice, the court has found no South Dakota authority that requires that such a claim be treated in a similar manner in the context of this case.  In fact, in Milligan, the South Dakota Supreme Court treated a claim for fraudulent concealment as a claim alleging deceit under SDCL 20-10-2(3).  Milligan, 620 N.W.2d at 379-380.

Sancom finally argues that this counterclaim violates the filed tariff doctrine.  As discussed above, Qwest asserts that Sancom billed it for services that Qwest did not receive.  Assuming all facts alleged in the complaint to be true, and construing the complaint liberally in the light most favorable to Qwest, the court finds Qwest has alleged sufficient facts to state a claim under the fourth counterclaim.

17

### E.  Common Law Unfair Competition

Counterclaim 5 alleges that Sancom has violated customary standards of business ethics, federal statutes, and state regulatory law.  More specifically, Qwest alleges that Sancom has misused its inherent and exclusive power over terminating access services by redistributing a certain portion of its profits to the FCS companies.  Under South Dakota law, "[t]he tort of unfair competition does not have specific elements."  Setliff v. Akins, 616 N.W.2d 878, 887 (S.D. 2000).  Rather, " 'it describes a general category of torts which courts recognize for the protection of commercial interest.' "  Id.  Thus, "damages for unfair competition results from satisfying the elements of an underlying tort."  Id. at 887-88.  For example, tortious interference with contract or improper use of trade secrets can serve as the basis for a claim for unfair competition.  See id.

Sancom argues that this counterclaim is barred by the filed rate doctrine because Qwest is attempting to avoid paying tariffed rates for the tariffed access services that Qwest received from Sancom.  As explained above, Qwest alleges that Sancom billed it for services that Sancom failed to provide.  Under the circumstances of this case, the court finds that Qwest may be able to prove a set of facts which would entitle it to relief and, thus, Sancom's motion to dismiss is denied.  Sancom further argues that this counterclaim fails to state a claim because under Farmers, Sancom's activities are lawful.  As discussed above, the court finds that the FCC's determinations in Farmers are not

dispositive at this state of the litigation.  Because the court finds that Qwest has alleged sufficient facts to withstand Sancom's motion to dismiss in relation to its eighth counterclaim, tortious interference with contract, as discussed below, Qwest's unfair competition counterclaim also withstands Sancom's motion to dismiss.

### F.  Civil Conspiracy

Counterclaim 6 alleges that Sancom conspired with the FCS companies to artificially increase the volume of long distance traffic that was routed to Sancom's networks in order to allow Sancom to charge an unlawful rate for services it did not perform.  Under South Dakota law, to prove a prima facie case of civil conspiracy, the plaintiff must prove the following five elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy."  Setliff, 616 N.W.2d at 889.

Sancom argues that Qwest has not properly alleged a claim for civil conspiracy because it has not alleged any unlawful acts.  In its counterclaim, however, Qwest alleges that Sancom was involved in an illegal scheme that resulted in charging Qwest for services not provided for in the applicable tariffs.  As discussed in more detail above with respect to the Farmers decision, Sancom's argument that the scheme was lawful based upon the FCC ruling are

19

not dispositive at this stage of the litigation.  Assuming all facts alleged in the counterclaim to be true, and construing the counterclaim liberally in the light most favorable to Qwest, the court finds Qwest has alleged sufficient facts to state a claim under the sixth counterclaim.  Thus, Sancom's motion to dismiss is denied.

### G.  Breach of Contract

Counterclaim 7 alleges a claim of breach of contract against Sancom. Qwest asserts that Sancom's federal and state tariffs constitute contracts between Sancom and any purchaser of terminating access services, which includes Qwest.  Qwest alleges that Sancom is liable for breach of contract because it billed Qwest for services it did not provide.  Sancom asserts that these claims are barred by the filed rate doctrine.  As discussed above, to the extent Qwest alleges that Sancom charged Qwest for services not covered by the tariff, and the tariff creates a valid contractual relationship, Qwest's individual claim is not barred by the filed rate doctrine.  The court finds that Qwest has alleged sufficient facts that, if true, give rise to its claim for breach of contract.  Accordingly, Sancom's motion to dismiss is denied.

### H.  Tortious Interference with Contract

Counterclaim 8 alleges that Sancom tortiously interfered with contracts between Qwest and other long distance carriers, including Global Crossing and Level 3, that specifically allowed Qwest to refuse to deliver calls that these

carriers handed to Qwest for delivery to Sancom.  Qwest alleges that Sancom entered into a scheme to prevent Qwest from learning the information necessary to make a decision about the appropriate calls to refuse to deliver. Qwest alleges that Sancom's tortious conduct intentionally and improperly interfered with Qwest's ability to take advantage of the rights extended to Qwest under the contracts.  Qwest further alleges that these contracts are common in the industry and thus Sancom knew or should have known of the existence and content of these contracts.

To prove a claim for tortious interference, Qwest must show: "(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectance was disrupted." St. Onge Livestock Co. v. Curtis, 650 N.W.2d 537, 541 (S.D. 2002).

Sancom argues that Qwest's counterclaim fails because a valid business relationship and expectancy between Qwest and other long distance carriers never existed.  In this regard, Sancom argues that Qwest could not have lawfully blocked the calls at issue here.  A review of Qwest's counterclaim, however, demonstrates that Qwest specifically alleges that the FCC has given long distance carriers, like Qwest, the ability to refuse to deliver long distance

21

calls destined for companies like the FCS companies.  Sancom also argues that

it did not intentionally and unjustifiably interfere with Qwest's contracts with

other long distance companies because it has no duty to volunteer to provide

Qwest with the numbers it assigns to a particular class of consumers.  In its

counterclaim, Qwest specifically alleges that Sancom's intentional actions

prevented it from learning the information it needed to know in order to

determine whether to deliver calls.  Assuming all allegations in the complaint to

be true, the court finds that Qwest's allegations are sufficient to state a claim

for tortious interference with contract.  Finally, Sancom argues that this

counterclaim is prohibited by the filed tariff doctrine.  As mentioned above,

because Qwest is not challenging the reasonableness of the rates, this doctrine

does not bar the specific claim made by Qwest in this case.  Accordingly,

Sancom's motion to dismiss is denied.

### I.   Unjust Enrichment

Counterclaim 9 alleges a claim for unjust enrichment against Sancom.

"Unjust enrichment occurs 'when one confers a benefit upon another who

accepts or acquiesces in that benefit, making it inequitable to retain that

benefit without paying.' " Hofeldt v. Mehling, 658 N.W.2d 783, 788 (S.D. 2003)

(quoting Parker v. Western Dakota Insurors, Inc., 605 N.W.2d 181, 187 (S.D.

2000)).  Qwest alleges that Sancom has received substantial profits from Qwest

under Sancom's tariffs and that it would be unjust for Sancom to enrich itself at the expense of Qwest.

Sancom argues that because an express contract exists between the parties, the equitable remedy of unjust enrichment cannot be relied upon by Qwest.  In support of this argument, plaintiffs cite Thurston v. Cedric Sanders Co., 125 N.W.2d 496, 498 (S.D. 1963), which held "where there is a valid express contract existing between parties in relation to a transaction fully fixing the rights of each, there is no room for an implied promise, or a suit on quantum meruit."  In this case, however, Qwest has alleged that the contract does not cover the services provided by Sancom.  Assuming the facts alleged by Qwest to be true, Qwest has successfully alleged that it is entitled to recover damages under a theory of unjust enrichment.  Accordingly, Sancom's motion to dismiss is denied.

### J.  Declaratory Judgment

Counterclaim 10 seeks a judicial determination that Qwest should not be required to pay the invoiced fees for services provided in connection with calls generated by the FCS companies.  Qwest also seeks declaratory judgment that Sancom is not providing terminating access services to Qwest with calls routed to the FCS companies and that the tariffed access rates charged by Sancom are unlawful.  Sancom argues that this attempt at relief is barred by the filed rate doctrine and the Farmers decision.

As discussed above, Qwest's allegations that it did not receive services under the tariff must be assumed to be true for purposes of a motion to dismiss.  If Qwest did not receive tariffed services, it has a valid claim for declaratory relief with respect to Sancom's invoices charging Qwest for those services.  Therefore, Sancom's motion to dismiss is denied.

Based on the foregoing, it is hereby

ORDERED that plaintiff's motion to dismiss (Docket 15) is denied.

IT IS FURTHER ORDERED that defendant's request for oral argument on motion to dismiss (Docket 25) is denied.

Dated June 26, 2008.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

24