UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SANCOM, INC., a South Dakota corporation, | ) ) ) | CIV. 07-4147-KES |
| Plaintiff and Counterclaim Defendant, | ) ) ) ) | ORDER ON QWEST COMMUNICATION'S |
| vs. | ) ) | MOTION TO COMPEL [DOCKET 76] |
| QWEST COMMUNICATIONS CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Defendant and Counterclaimant, | ) ) ) ) | |
| vs. | ) ) | |
| FREE CONFERENCE CORPORATION, a Nevada Corporation, | ) ) ) | |
| Counterclaim defendant. | ) | |

**INTRODUCTION**

Defendant and Counterclaimant Qwest Communications Corporation ("Qwest"), filed a motion seeking an order from the court compelling plaintiff and counterclaim defendant Sancom, Inc. ("Sancom") to provide responses to various requests for the production of documents and to provide answers to various interrogatories.  Sancom resists the motion.  The district court, the Honorable Karen E. Schreier, Chief Judge, referred this motion to this magistrate judge for determination pursuant to 28 U.S.C. § 636(b)(1)(A).

## FACTS

The facts, insofar as they are pertinent to the pending motion, are as follows.  Sancom brought suit to recover from Quest amounts required to be paid by federal and state tariffs for providing originating and terminating telephone access services.  The basis for jurisdiction is the diverse citizenship of the parties, with Sancom being a South Dakota corporation and Qwest being a Delaware corporation.

Sancom is a "local exchange carrier" ("LEC") and Qwest is a long distance company.  LECs usually hold the "real estate" in telecommunications:  the telephone lines that connect to users' telephones.  One of the things LECs do is to provide originating and terminating access services to long distance companies like Qwest, which allows Qwest to transmit long distance calls to customers in the LEC's area even though Qwest does not own or lease the telephone lines that connect to the customers' telephones.  Sancom alleges that it has provided Qwest with originating and terminating services in accordance with the applicable rates set forth in its tariffs filed with the Federal Communications Commission ("FCC") and the South Dakota Public Utilities Commission ("PUC").

Sancom alleges that Qwest has refused to pay Sancom for these services in the amount of $108,320.04.  Sancom asserts claims for breach of contract, breach of implied contract from violation of the tariffs, and unjust enrichment.

In Qwest's answer and counterclaim, Qwest acknowledges receiving the invoices from Sancom and refusing to pay the same.  Qwest denies that the unpaid invoices which are the subject of Sancom's complaint constitute charges for originating and terminating access service.  Qwest denies that switched access charges apply to the services at issue in the complaint.

Qwest also asserts counterclaims for affirmative relief.  In support of these claims, Qwest asserts that Sancom has engaged in "traffic pumping."  As Sancom set forth in its complaint, there are two types of phone companies: long distance carriers, like Qwest, and local exchange carriers, like Sancom. When a call originates and terminates within a single local calling area, the LEC handles the call exclusively.  But when a long distance call is placed from one local calling area to another, different, local calling area, the call is carried by a long distance carrier.

Sometimes a long distance carrier handles a call from origination to termination.  More frequently, because it is cheaper, the long distance carrier hands the call off to another carrier for completion.  When a long distance carrier hands the call off to an LEC for completion, the long distance carrier pays the LEC serving the user who is making the call an "originating switched access charge."  Similarly, the long distance carrier pays the LEC serving the user who is receiving the call a "terminating switched access charge."  These charges for switching access are the means by which the LEC gets

3

compensation for the use of its "real estate" (the telephone wires connecting users to the system) by long distance carriers.  It is helpful to think of the switched access charges as "rent" paid by the long distance carrier for temporary use of a physical property, the wires.

Significantly, an LEC can only charge a termination charge (or an origination charge) if it is actually terminating (or originating) a telephone call in its local calling area.  The amount that LECs are allowed to charge long distance carriers for switched access service is set forth in a tariff, which is set by the FCC or a PUC.

Qwest accuses Sancom of "traffic pumping," that is, charging Qwest a "terminating switched access charge" to which Sancom is not entitled under its federal and state tarrifs, for routing calls to companies that offer free phone services for things like voice mail, international calling, adult content calling, podcasts, and conference calls.  Qwest alleges that Sancom provides a portion of the "switched access fee" paid by Qwest to Sancom as a kickback to the free phone service companies to whom the calls are routed.

Qwest alleges that the traffic pumping scheme works like this.  A company which offers free services such as free international calling, free chat lines, free podcasts, free voice mail, and free conference calling will obtain a South Dakota telephone number within Sancom's local calling area.  The Free Calling Service Company (FCSC"), is not really located in South Dakota, but

they connect their equipment, such as an intelligent voice response system, to Sancom's network facilities.  The FCSC's voice recognition equipment is actually located outside of South Dakota.  The recipients of the telephone calls placed through the FCSC's telephone number are not located in South Dakota either.[1]

The FCSCs then advertise free phone services and encourage people to place calls through their South Dakota numbers assigned to Sancom. Although the calls are not directed to persons living in Sancom's local calling area, it dramatically "pumps up" the long distance traffic coming through Sancom's calling area, allowing Sancom to charge fees to Qwest and other long distance carriers that Sancom would not otherwise get to charge.  Sancom then splits the terminating switched access fees it receives from Qwest with its partner, the FCSC.  Sancom has thereby increased its income, maximizing the fact that it alone has exclusive access to the telephone facilities in its local

---

[1]Neither party indicates whether a terminating access charge is being charged both in South Dakota by Sancom, and also by the LEC in which the FCSC's customer's call is actually destined for.  For example, if a customer of one of Sancom's FCSCs in New York places a call through the South Dakota phone number issued to the FCSC by Sancom, and the call ultimately reaches a customer in California, is Qwest being charged two terminating access fees–one by Sancom and one by the California LEC?  Neither party has commented on this fact.  It would seem relevant in that Qwest would have to pay one terminating access fee in any event for this New York-to-California call. If only one such fee is being charged, and Qwest would have to pay one such charge in any event, how is Qwest being damaged?

calling area. The FCSC has just subsidized its "free" calling services that it would otherwise have to charge its customers for.

Qwest asserts that before Sancom began its traffic pumping scheme, a typical monthly bill for terminating switch access fees from Sancom to Qwest was $1,263, as it was in April, 2005. Qwest alleges that Sancom began traffic pumping after April 2005 and its terminating switched access fees rose dramatically. The highest such bill Qwest has received was in November, 2007, for $195,981.

Although the FCC has given Qwest and other long distance carriers permission to refuse to carry long distance calls destined to FCSCs, Qwest alleges that Sancom and the FCSCs frustrate this ability by frequently switching the telephone number assigned to the FCSCs, sometimes on a daily basis. Because Sancom is not actually terminating the FCSC's telephone calls in Sancom's local calling area, Qwest alleges, Sancom is not allowed to charge termination fees to Qwest, but it is doing so.

Qwest alleges federal question and supplemental jurisdiction for its counterclaims. Qwest asserts claims of violation of 47 U.S.C. §§ 201, 203, 206, and 207; and common law claims of fraudulent concealment; unfair competition; civil conspiracy; breach of contract; tortious interference with contract; and unjust enrichment.

6

Qwest served Sancom with various requests for the production of documents and interrogatories.  Sancom objected to interrogatory numbers 6(a) and 12 and to requests for production numbers 3 and 6.  The parties attempted in good faith to resolve these discovery disputes, but to no avail, a matter attested to by Qwest as required by the rules of civil procedure. Subsequently, Qwest filed this motion to compel.[2]  Each of the discovery requests will be discussed in turn.

## DISCOVERY

**A.    Scope of Discovery in a Civil Case**

The scope of discovery as set forth in Fed. R. Civ. P. 26(b)(1) is broad:

> Unless otherwise limited by a court order, the scope of discovery is as follows:  Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense–including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.  All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

See Fed. R. Civ. P. 26(b)(1).

---

[2]Qwest's motion to compel initially encompassed four separate requests for production of documents and three interrogatories.  While Qwest's motion was pending, the parties arrived at a resolution of all the discovery disputes except those discussed in the body of this opinion.

This broad scope of discovery is limited by subsection (b)(2)(C).  That

subsection provides that:

> On motion or on its own, the court must limit the frequency or
> extent of discovery otherwise allowed by these rules or by local rule
> if it determines that:
>
> > (i) the discovery sought is unreasonably cumulative or
> > duplicative, or can be obtained from some other source that
> > is more convenient, less burdensome, or less expensive;
>
> > (ii) the party seeking discovery has had ample opportunity to
> > obtain the information by discovery in the action; or
>
> > (iii) the burden or expense of the proposed discovery
> > outweighs its likely benefit, considering the needs of the
> > case, the amount in controversy, the parties' resources, the
> > importance of the issues at stake in the action, and the
> > importance of the discovery in resolving the issues.

See Fed. R. Civ. P. 26(b)(2)(C).

If a party fails to properly respond to discovery requests, the party

seeking the discovery is entitled to move for an order compelling disclosure.

See Fed. R. Civ. P. 37(a).

The scope of discovery under Rule 26(b) is extremely broad.  See 8

Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2007 (2d

ed. 1994) (hereinafter "Wright & Miller").   The reason for the broad scope of

discovery is that "[m]utual knowledge of all the relevant facts gathered by both

parties is essential to proper litigation.  To that end, either party may compel

the other to disgorge whatever facts he has in his possession."  8 Wright &

Miller, § 2007, 96 (quoting Hickman v. Taylor, 329 U.S. 495, 507-08, 67 S. Ct.

8

385, 392, 91 L. Ed. 2d 451 (1947)).  The Federal Rules distinguish between discoverability and admissibility of evidence.  Id. at 95; see also Fed. R. Civ. P. 26(b), 32, and 33.  Therefore, the rules of evidence assume the task of keeping out incompetent, unreliable, or prejudicial evidence at trial.  These considerations are not inherent barriers to discovery, however.

**B.     Application of the Law to the Discovery Disputes**

   **1.     Interrogatory 6(a)**

      Qwest's interrogatory number 6(a) and Sancom's answer to that interrogatory are as follows:

> **Interrogatory No. 6**: For each Free Calling Service Company for which you provide services, goods, or products, identify:
>
>> (a) The nature and a brief description of all services, goods, or products you provide to the Free Calling Service Company.
>
> **Answer**: Sancom offers Free Conference Corp. tariffed services, including tariffed terminating switched access services, and also provides it associated support, such as PSTN connectivity, telephone numbers, internet access, and rack space.

See Docket No. 78, exhibit no. 6, at page 5.

      The basis for Qwest's motion to compel is that, by producing a copy of its tarrif, Sancom has identified all of the services it *offered* to FCSCs, but the interrogatory asks Sancom to identify the services it actually *provided* to FCSCs.  Qwest analogizes that Sancom's answer is akin to producing a

catalogue in response to the question: "what items did your customer order from you?"

The court agrees.  Identification of the tariffed services Sancom *offered* to FCSCs does not answer the question actually posed by Qwest, which is what services did Sancom actually provide to FCSCs.  The court will grant Qwest's motion to compel Sancom to provide an answer to the question posed in interrogatory number 6.  If the services provided as listed in Sancom's answer to interrogatory number 6(a) are a complete and comprehensive list of the "services, goods, or products" which Sancom *actually provided* to FCSCs, then Sancom need only submit an answer under oath that makes that clear.  If, on the other hand, there are other goods, services or products which Sancom actually provided to FCSCs that are not currently listed in Sancom's answer, then Sancom must provide an amended answer that comprehensively lists all such goods, services and products actually provided to FCSCs by Sancom.

### 2.    Interrogatory 12

Qwest's interrogatory number 12 and Sancom's answer to that interrogatory are as follows:

> **<u>Interrogatory 12</u>**: Identify the profit margins that you have gained as a result of the volume of traffic that has been routed to you as a result of each individual Free Calling Service Company since January 1, 2005.

> **<u>Answer</u>**: Sancom objects on the grounds that profit margins gained from the volume of traffic that has been routed to Sancom as a result of each individual Free Calling Service Company with which

Sancom has entered a contract is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence, and is overly broad, unduly burdensome and oppressive. Sancom further objects on the grounds that any answer would be inherently speculative and potentially inaccurate insofar as it would require the separation of costs, both fixed and variable and short- and long-term, associated with calls delivered to Free Calling Service Companies since 205 versus calls delivered to all other types of subscribers over that time period.

See Docket No. 78, exhibit no. 6, at page 8.

Qwest argues that such information is relevant to "several of its claims," but identifies only two specific claims that the information is relevant to: (1) unjust and unreasonable practices under 47 U.S.C. § 201(b) and (2) common law unfair competition.  Qwest argues that it is entitled to an award of any gain that Sancom has obtained from traffic pumping to the extent any such damages are not duplicative of the harm that Qwest has experienced.

Sancom argues that information about its profit margins from individual FCSCs is irrelevant to any claims asserted by either party in this action. Moreover, Sancom argues that it is not able to calculate a profit margin as to a particular customer.  This is because, Sancom argues, although it can identify a stream of revenue as to a particular customer, it cannot accurately apportion costs among individual customers.  Thus, Sancom asserts, any attempt at calculating a "profit margin" on an individual FCCS would be rank guesswork.

In its original briefs, Qwest did not outline the elements of the claims it alleges this profit margin information is relevant to nor did Qwest cite any legal

authority that the calculation of damages for either of its identified claims include the defendant's profit for the alleged wrongful conduct.  Accordingly, the court issued an order requiring supplemental briefing that required Qwest to (1) outline the elements of these two claims; (2) provide legal authority on allowable damages for each claim, including how damages are calculated; and (3) explain how Sancom's profit margins are relevant to either the elements of its claims or its calculation of damages.

Qwest asserts a claim based on 47 U.S.C. § 201(b).  That statute provides as follows:

> (b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided*, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications: *Provided further*, That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or operating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: *Provided further*, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such sommon carrier is displayed along with such ship0 positions reports.  The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

<u>See</u> 47 U.S.C. § 201(b).

Sections 206 and 207 of the Communications Act authorize private right of actions.  The private right of action authorized by these sections is limited to damages caused by a "common carrier" who acted in violation of the Act or failed to do something mandated by the Act.  <u>See</u> 47 U.S.C. §§ 206, 207.

The Communications Act defines "common carrier" as follows:

> The term "common carrier" or "carrier" means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or in interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.

<u>See</u> 47 U.S.C. § 153(1).  Qwest asserts in its counterclaim that Sancom is a "common carrier."

Qwest asserts that the elements of its § 201(b) claim are as follows:

1.    that in connection with a communication service,

2.    Sancom engaged in a "charge, practice, classification, or regulation that is unjust or unreasonable," in light of the provisions of Title 47 and the FCC's rules and regulations promulgated thereunder.

Although Qwest cites to legal authority in support of the elements of its §201(b) claim, no legal authority is provided for the assertion that Sancom's profits are relevant to these elements.

Qwest did provide legal authority for the calculation of its damages under its § 201(b) claim, but that legal authority defined the damages as "the full

amount of damages *sustained* in consequence of any such violation of the provisions of this chapter." See 47 U.S.C. § 206 (emphasis added).  This provision obviously refers to the damage *inflicted on Qwest* as Qwest's measure of damage; not a disgorgement of *the benefit reaped by Sancom* as a result of its actions.  The court finds that Qwest has failed to provide legal authority to the court in support of its assertion that Sancom's profit is relevant to either the elements or the damages on its § 201(b) claim.

Qwest also, in response to the court's order for supplemental briefing, outlined the elements of its state common law claim for unfair competition. Again, Qwest has not provided legal authority for the proposition that Sancom's profits are relevant to the elements outlined (specifically, Qwest must prove some other underlying tort such as tortious interference with contract).

Qwest argues that the common law claim of unfair competition entitles Qwest to punitive or exemplary damages if it shows that Sancom acted with express or implied malice.  Qwest further asserts that if it is entitled to such damages, one factor that the jury is entitled to consider is the profit Sancom reaped as a result of its actions in traffic pumping as unfair competition.

Under South Dakota law, punitive damages are prohibited unless expressly authorized by statute.  See SDCL § 21-1-4.  Punitive damages in tort actions are authorized by South Dakota law.  See SDCL § 21-3-2.  A necessary element which the plaintiff must prove in order to submit a request for punitive

14

damages to the jury is that the defendant acted with malice, either actual or presumed.  See Holmes v. Wegman Oil Co., 492 N.W.2d 107, 112-113 (S.D. 1992); SDCL § 21-3-2.

Actual malice is denied as "a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person." Harter v. Plains Ins. Co., 579 N.W.2d 625, 634 (S.D. 1998).  Presumed malice is shown when a person acts willfully or wantonly to the injury of others.  Case v. Murdock, 488 N.W.2d 885, 891 (S.D. 1992). Presumed malice "implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations," Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991), or evidenced by a "reckless disregard for one's rights." Flockhart v. Wyant, 467 N.W.2d 473, 478 (S.D. 1991).  One purpose of punitive damages is to deter the defendant from repeating the wrongful conduct and to deter others from engaging in the same conduct.  Grynberg v. Citation Oil & Gas Corp., 573 N.W.2d 493, 504 (S.D. 1997).  Once a case has been made out for submission to the jury of a request for punitive damages, one element the jury is entitled to consider is the defendant's financial condition.  Roth v. Farner-Bocken Co., 667 N.W.2d 651, 665-666 (S.D. 2003).

South Dakota law also provides that before any discovery related to punitive damages may be had by the plaintiff, the court must hold an evidentiary hearing and may allow such discovery only after concluding that

the plaintiff showed by clear and convincing evidence that there is a reasonable basis to believe that there has been willful, wanton, or malicious conduct by the defendant.  <u>See</u> SDCL § 21-1-4.1.  Therefore, *if* § 21-1-4.1 applies to Qwest's punitive damages claim, it is not entitled to information about Sancom's profit margins unless Qwest first proves by clear and convincing evidence that there is a reasonable basis to believe that Sancom acted maliciously.

Substantive questions of law as to Qwest's state common law claim of unfair competition are governed by South Dakota law.  <u>See</u> <u>Erie R.R. v. Tompkins</u>, 304 U.S. 64, 78-79 (1938); <u>Smith v. Tenet Healthsystem SL, Inc.</u>, 436 F.3d 879, 886 (8th Cir. 2006).  However, matters of procedure are determined with reference to federal law.  <u>Tompkins</u>, 304 U.S. at 78-79.  Thus, the question as to the applicability of § 21-1-4.1 depends on whether that provision is substantive or procedural.

In one of the first cases to interpret § 21-1-4.1, the South Dakota Supreme Court was presented with the question of whether that statute could be applied retroactively.  <u>Dahl</u>, 474 N.W.2d at 901-902.  The court held that statutes which affect only procedural matters can be given full retroactive application to cases which were already pending at the time the statute was enacted, while statutes which are substantive in nature may only be applied prospectively.  <u>Id.</u>  Because § 21-1-4.1 did not alter the standard of proof

16

required to obtain punitive damages, but only required a particular showing be made prior to obtaining discovery about a defendant's net worth in order to prevent harassment, the South Dakota Supreme Court concluded that § 21-1-4.1 was procedural.  Id. at 902.  Accordingly, the court gave the statute full retroactive application.  Id.

Relying on Dahl, some district courts have taken the position that because § 21-1-4.1 is procedural for purposes of analyzing retroactivity, it is also procedural under Erie v. Tompkins and, thus, the statute has no application in federal court where state law supplies the rule of decision.  See, e.g. Ammann v. Massey-Ferguson, Ltd., 933 F. Supp. 840, 842-843 (D.S.D. 1996).  Furthermore, the Ammann court held that § 21-1-4.1, which it characterized as a "discovery barricade," directly conflicted with Fed. R. Civ. P. 26, which provides for broad discovery.  Id.  See also Friedl v. Ford Motor Co., 2005 WL 2044552 at **5-6 (D.S.D.  Aug. 25, 2005) (refusing the "clear and convincing proof of a reasonable basis" from § 21-1-4.1 in favor of a preponderance of the evidence standard because the clear-and-convincing standard from § 21-1-4.1 was procedural only).  Another district court apparently gave full application to § 21-1-4.1 in a federal case premised on diversity jurisdiction.  See Brown v. Youth Services Intern. of S.D., Inc., 89 F. Supp. 2d 1095, 1107 (D.S.D. 2000).

17

The Eighth Circuit addressed the standard for granting punitive damages under South Dakota law in Diesel Machinery, Inc. v. B.R. Lee Industries, Inc., 418 F.3d 820, 837-840 (8th Cir. 2005).  In that case, the defendant contended on appeal that the district court erred in submitting the issue of punitive damages to the jury.  Id. at 837.  The Eighth Circuit stated that, under South Dakota law, a court may submit the issue of punitive damages to a jury only "when clear and convincing evidence shows a 'reasonable basis' to believe there has been willful, wanton, or malicious conduct."  Id.  In so holding, the Eighth Circuit cited to a South Dakota Supreme Court decision, Isaac v. State Farm Mut. Auto Ins. Co., 522 N.W.2d 752, 761 (S.D. 1994).  However, although the Eighth Circuit cited the Isaac decision for authority, the language used by the Eighth Circuit in its opinion derived straight from § 21-1-4.1.  Compare Diesel Machinery, Inc., 418 F.3d at 837 (clear and convincing evidence shows a reasonable basis to believe there has been malice), with SDCL § 21-1-4.1 (clear and convincing evidence shows a reasonable basis to believe the defendant acted with malice).  The Isaac decision, which the Eighth Circuit cited as authority, was itself applying § 21-1-4.1.  See Isaac, 522 N.W.2d at 761 (citing and discussing SDCL § 21-1-4.1 as the standard for submission of punitive damages to a jury).  Thus, apparently, the Eighth Circuit applied SDCL § 21-1-4.1 to determine whether a federal court sitting in diversity properly submitted the issue of punitive damages to a jury.  Diesel Machinery, Inc., 418 F.3d at

18

837.  There are no subsequent cases in the Eighth Circuit or the District of South Dakota interpreting, applying, or expounding on this holding in <u>Diesel Machinery, Inc.</u>.

Decisions of the Eighth Circuit represent binding precedent on this court.  It is unclear whether <u>Diesel Machinery, Inc.</u> requires application of § 21-1-4.1 in this discovery dispute.  On the one hand, there is a distinction between a party's right to discovery–which is the issue here–and the issue of when punitive damages may be submitted to a jury–which was the issue in <u>Diesel Machinery, Inc.</u>.  Also, the Restatement (Second) Conflicts of Laws provides that, consistent with <u>Tomkins</u>, rules concerning whether a party has a right to a jury trial or a court trial, whether the judge has the power to comment on the evidence, and other rules as to how a trial is conducted are generally considered procedural.  <u>See</u> Restatement (2d) Conflicts of Laws § 122 (2008).  Thus, under <u>Tomkins</u> as well as <u>Dahl</u>, the rule in § 21-1-4.1 which concerns the manner in which discovery is conducted should be considered "procedural" and thus have no application in federal court.

Still, the language used by the Eighth Circuit in <u>Diesel Machinery, Inc.</u> is unavoidable:  it comes directly from the statute.  If the Eighth Circuit intended that the statute have no application whatsoever in federal court, why recite the standard set forth in the statute?

19

One thing courts *can* agree upon, whether they conclude that § 21-1-4.1 is applicable in federal court or not, the enactment of § 21-1-4.1 by the South Dakota legislature certainly represents a policy of protecting defendants from harassment through the discovery of net worth and other financial data where a *prima facie* case for punitive damages has not been made out.  See Bierle v. Liberty Mut. Ins. Co., 792 F. Supp. 687, 691-692 (D.S.D. 1992).

In this case, Qwest seeks discovery of Sancom's net profit on the basis that such discovery is relevant to punitive damages.  Although there are actions where this type of discovery was allowed without additional showing, those cases tend to be cases where the parties have finished discovery and have briefed the court on summary judgment motions.  See, e.g. O'Daniel v. Na, Civ. 05-5089, Docket No. 173 (D.S.D. Jan. 9, 2009).  In O'Daniel, the court granted a motion for discovery of financial information relevant to punitive damages under circumstances where the case had been pending for three and one-half years, trial was less than three months away, the discovery deadline had passed, and summary judgment motions had been fully briefed and decided.  In cases like O'Daniel, the parties and the court were fully aware of the evidence in the case before discovery on punitive damages was embarked upon and the court had the benefit of not only the complaint and answer, but also various affidavits, exhibits, and deposition testimony in determining whether punitive damages discovery was warranted.

20

By contrast, this case has been pending for only slightly more than a year.  In addition, although two motions to dismiss have been filed, these were pursuant to Fed. R. Civ. P. 12(b)(6) and do not depend upon the presentation of evidence for their determination.  Rather, arguments of a legal nature were asserted.  The facts adduced by the parties in the motions to dismiss and this present motion to compel come straight from the pleadings and, thus, do not enlighten the court any more than a simple reading of the complaint and answer would do.  In addition, the court notes that the discovery deadline is still three months in the future and no trial date has been set.  This case is not procedurally in the mature state that the court found the O'Daniel case when it allowed discovery of financial information for purposes of punitive damages.

The Eighth Circuit certainly seems to suggest in Diesel Machinery, Inc. that SDCL § 21-1-4.1 has some application in federal court actions in which South Dakota law supplies the rule of decision.  If so, this court presumes that the *prima facie* showing of malice could be done through a hearing, through pleadings, or through the liability evidence presented at trial.  Thus, a separate "mini-trial" on punitive damages would not be necessary in every case.  However, even if this court's reading of Diesel Machinery, Inc. is not correct and § 21-1-4.1 has no application in a federal diversity action, the court finds that discovery of punitive damages information at this juncture of this case is premature.  The court has authority to limit discovery on its own motion.  See

21

Fed. R. Civ. P. 26(b)(2)(C).  This court will exercise this authority at the present time and deny Qwest's motion to compel Sancom to answer interrogatory number 12.  When this case is "fully flowered" as the O'Daniel case was, and the parties and the court are more informed as to the facts in this case, the parties are free to revisit this issue and present arguments anew as to discovery of punitive damages information.

### 3.    Requests for Production Numbers 3 and 6

Qwest's request for production number 3 and Sancom's response to that request are as follows:

> **Request No. 3**: Produce all documents evidencing each payment made to or received from each Free Calling Service that you identified in your answer to Interrogatory Number 3, including but not limited to copies of all ledgers, registers, notes, checks, transfers, reports, invoices sent or received, or any other documentation reflecting in any manner every payment made to or received from Free Calling Service Companies.

> **Answer**: Sancom objects to this Request on the grounds that it seeks production of documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence, and is overly broad and unduly burdensome. Subject to and without waiving its Specific and General Objections, Sancom will produce responsive, reasonably accessible, non-privileged documents called for in this Request.

See Docket No. 78, exhibit no. 4, at pages 4-5.

From Sancom's responsive brief on this motion, the court infers that two such companies were identified by Sancom in response to interrogatory number 3 and one broker.

22

Qwest's request for production number 6 and Sancom's answer to that request are as follows:

> **Request No. 6**: Produce all documents that evidence, reflect, or otherwise identify the revenues you have received as a result of the volume of traffic that has been routed to you and/or sent to each individual Free Calling Service Company since January 1, 2005.

> **Answer**: Sancom objects on the grounds that this Request is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.  Sancom further objects to this Request on the grounds that it is overly broad and unduly burdensome and oppressive.  Subject to and without waiving its Specific and General Objections, Sancom will produce responsive, reasonably accessible, non-privileged documents called for in this Request.

See Docket No. 78, exhibit no. 4, at pages 5-6.

In response to requests number 3 and 6, Sancom states that it provided Qwest copies of all the checks in Sancom's possession that were paid to the Sancom customers at issue, which Sancom identifies as Free Conferencing and Ocean Bay.  Sancom also represents that it produced to Qwest its "minutes of use" reports for Free Conferencing, Ocean Bay, and Powerhouse Communications, a broker whose revenue is derivative of Free Conferencing's revenue.  In addition, Sancom has offered to produce, though it is unclear whether Sancom *actually has* produced, Sancom's audited, year-end financial statements from 2005-2007, its monthly ledger entries and supporting back-up for that same time period, and Sancom's annual reports to the PUC.  The

monthly ledger entries would show end user revenues, "CABS"[3] billing revenue, and revenue that is in collections.  The PUC reports would show end user revenues.

In addition to the documents Sancom has provided or offered to provide, Qwest also requests the court to order Sancom to produce four additional categories of documents:

1.   all documents relating to payment of end user customer line charges;

2.   all documents relating to payment of Universal Service Fund charges;

3.   all documents relating to payment of taxes and surcharges on end-user invoices; and

4.   all documents relating to the collection efforts against end-users who failed to timely pay invoices.

See Docket no. 87, at page 3.

Sancom characterizes Qwest's request as a demand for all its accounting documents for the period in question.  To the contrary, interrogatory number 3 simply asks for documents reflecting payments to FCSCs by Sancom, and payments from FCSCs to Sancom.  In particular, Qwest wants to know, in accordance with the above list of four categories of documents, whether Sancom charged and FCSCs paid end user customer line charges, Universal Service Fund charges, taxes and surcharges on end-user invoices and, in

---

[3]No party has favored the court with a definition for the acronym "CABS."

24

addition, whether Sancom pursued efforts to collect charges against FCSCs who failed to remit payment for items Sancom charged to them.

Given the very small number of FCSCs (two) and the single broker identified by Sancom, this task does not seem herculean.  Furthermore, whether Sancom treated the FCSCs as end-user customers by charging the FCSCs for things that Sancom would usually charge its end-user customers, goes to the heart of Qwests allegations that the FCSCs were not end-users and that Sancom could not legally charge Qwest terminating access charges for the FCSCs' calls routed through Sancom's network.  The information is highly relevant.  Furthermore, given the small number of FCSCs identified by Sancom, the case has not been made that production of the documents requested would be unduly burdensome or oppressive.

In addition, the court finds that the information produced and offered to be produced by Sancom is inadequate.  The checks reflect payments Sancom made to FCSCs, but that is only half the equation.  Qwest also seeks documentation of payments the FCSCs made to Sancom.  This has not been produced.  Furthermore, Sancom's offer to produce documents that show end-user revenues, while it may be helpful, does not reflect the individual payments made by FCSCs to Sancom.  Instead, it would appear to the court to lump all payments made by end-users, including individual persons and businesses who had phone lines in Sancom's LEC, into a single figure.  This does not

answer the question of whether FCSCs paid Sancom for the items Sancom normally bills its end-users for.  And, contrary to Sancom's assertion, this request *is* described with sufficient particularity in Qwest's requests for production.  The documents produced and offered to be produced by Sancom thus far do not address Qwest's request.  Qwest's request is reasonable and relevant.  Accordingly, the court will grant Qwest's motion for an order compelling Sancom to respond to requests for production 3 and 6.  Sancom should produce to Qwest the documents it offered to provide, as well as the four categories of documents Qwest specifically outlined as described above.

**C.      Sanctions**

Rule 37(a)(5) of the Federal Rules of Civil Procedure states that if the court grants a motion to compel, or if the requested discovery is provided after a motion to compel has been filed, "the court ***must***, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." See Fed. R. Civ. P. 37(a)(5) (emphasis supplied).  The award of expenses is mandatory unless the court finds that the moving party failed to confer in good faith with the responding party prior to filing the motion, the responding party's refusal to respond was substantially justified, or other circumstances make an award of expenses unjust.  Id.

26

Here, Qwest never requested that the court grant sanctions on its behalf in the event the court granted his motion to compel.  However, the court is required to consider the appropriateness of sanctions under Rule 37 even without a request from a party.

Given the state of the law as described above regarding the various matters in dispute between the parties, but especially the state of the law with regard to interrogatory number 12, the court will not order Sancom to pay sanctions.  Although it would certainly have been preferable for Sancom to have provided the discovery it volunteered *after* Qwest had filed the motion *before* Qwest had to resort to such an option, the extent of Sancom's compliance with Qwest's requests, coupled with some unsettled law, and the fact that Qwest does not seek sanctions convinces the court that Sancom's position was in part "substantially justified," and, in part, that other circumstances make the award unjust.  Specifically, although the court accepts the parties' representation that Qwest consulted with Sancom in a good faith effort to resolve their dispute prior to filing the instant motion, it is clear from reviewing the parties' e-mails that were exchanged *after* the motion was filed that the post-motion discussion was more searching and forth-coming on both parties' parts.

## CONCLUSION

The court grants in part and denies in part Qwest Communication Corporation's motion to compel [Docket No. 76].  As to those parts of Qwest's motion to compel that were granted, Sancom shall provide the requested discovery responses within 30 days from the date of this order.

## NOTICE TO PARTIES

Pursuant to 28 U.S.C. § 636(b)(1)(A), any party may seek reconsideration of this order before the district court upon a showing that the order is clearly erroneous or contrary to law.  The parties have ten (10) days after service of this order to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  See Fed. R. Civ. P. 72(a).  Failure to file timely objections will result in the waiver of the right to appeal matters not raised in the objections.  Id.  Objections must be timely and specific in order to require review by the district court.

Dated January 20, 2009.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE

28