| | | |
|---|---|---|
| SANCOM, INC., a South Dakota corporation, | ) ) | CIV. 07-4147-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) ) | ORDER GRANTING IN PART AND DENYING IN PART |
| QWEST COMMUNICATIONS CORPORATION, a Delaware corporation, | ) ) ) | DEFENDANT'S MOTION TO DISMISS AND STRIKE REQUESTS FOR DAMAGES |
| | ) | |
| Defendant and Counterclaimant, | ) ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SANCOM, INC., a South Dakota corporation; and FREE CONFERENCING CORPORATION, a Nevada corporation, | ) ) ) ) ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

Defendant, Qwest Communications Corporation (Qwest), moves to

dismiss Counts III, IV, V, and VII of plaintiff's First Amended Complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure[1] and to

---

[1] Sancom argues that Qwest should have brought its motion to dismiss Count III of the First Amended Complaint under Rule 12(c) rather than Rule 12(b)(6) because Count III was contained in the original complaint, to which Qwest filed an answer. Sancom admits, however, that "[a] defense of failure to state a claim upon which relief can be granted may be advanced in a motion for judgment on the pleadings under Rule 12(c)," and that a Rule 12(c) motion is reviewed under the same standard as a Rule 12(b)(6) motion. See Wecott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990) (internal quotation omitted). Thus, it is unnecessary for the court to determine which rule governs a motion to dismiss a claim brought in both

strike plaintiff's second through fifth requests for damages pursuant to Rule 12(f). Plaintiff, Sancom, Inc. (Sancom), opposes the motion.

## FACTUAL BACKGROUND

Viewed in the light most favorable to Sancom, the nonmoving party, the facts are as follows: Sancom is a competitive local exchange carrier (CLEC) that provides telecommunications services to its customers and originating and terminating access services to interexchange (IXC) carriers.[2] Qwest is an IXC that utilizes the originating and terminating access services provided by Sancom. Because Sancom's access charges pertain to interstate and intrastate communications, Sancom filed tariffs with both the FCC and the South Dakota Public Utilities Commission (SDPUC), pursuant to federal and state regulations. Sancom bills Qwest for originating and

the original and amended complaints.

[2] By way of background, there are two types of telecommunications providers, local exchange carriers (LECs) and IXCs. LECs provide the service and own the hardware that connects to individual customers in their local areas. By contrast, IXCs, commonly known as long-distance carriers, own the hardware that connects different local carriers. When an individual makes a long-distance telephone call, the call is originated on wires and facilities owned by the LEC serving the individual making the call and the call is terminated over wires and facilities owned by the LEC serving the individual receiving the call. IXCs pay "originating" and "terminating" access charges to the LECs that serve individuals who initiate and receive long-distance calls, respectively. The rates charged for access service are determined by the published tariff rate, which is filed with and reviewed by the Federal Communications Commission (FCC) (for purely interstate communications) or the applicable state utility commission (for intrastate communications).

terminating access services in accordance with the applicable rates set forth in Sancom's tariffs.

This lawsuit arises out of Qwest's identification of Sancom as an LEC that provides telecommunications services to a conference calling company and Qwest's subsequent refusal to pay Sancom for originating and terminating access services. Sancom entered into a contract with Free Conferencing Corporation (Free Conferencing), a conference calling business, under which Sancom provides tariffed services to Free Conferencing and allows it to collocate its conference call bridges at Sancom's central office in Mitchell, South Dakota.[3] Sancom terminates calls made to the telephone numbers assigned to Free Conferencing and collects the applicable tariffed rates from Free Conferencing. Under Sancom's and Free Conferencing's agreement, Sancom pays Free Conferencing a marketing fee based on the amount of traffic generated by Free Conferencing's teleconferencing services. This traffic generates revenue to Sancom in the form of terminating access charges collected from IXCs like Qwest.

---

[3] Free Conferencing provides conference calling services to its customers. Customers are given a telephone number to dial. They use their own IXCs to call the number, which connects them to a conference call bridge located on the Sancom network. Conference call participants are connected to each other at and by the bridge. Sancom then charges the IXC that transmitted the call to the bridge the normal terminating access fee.

Sancom alleges that in 2007, Qwest conspired with one or more IXCs to identify small LECs that deliver traffic to conference calling companies. After identifying these LECs, Qwest began charging its customers more for calls that would be terminated by these LECs because Qwest was obligated to pay more than it budgeted to deliver calls. Qwest also refused to pay terminating access charges to the small LECs altogether. Thus, after identifying Sancom as a carrier that terminates calls to conference calling company customers, and beginning on March 1, 2007, Quest refused to pay Sancom any of its invoiced charges, including both charges associated with delivery to Free Conferencing and charges associated with delivery to non-conference calling company customers. The total unpaid charges amount to $526,671.60. Sancom alleges that Qwest knowingly refused to pay Sancom's invoices in order to destroy the business relationship between Sancom and Free Conferencing and to prevent Sancom from establishing relationships with similar companies. Sancom further alleges that Qwest intended to and knew that it was interfering with Sancom's relationship with Free Conferencing by refusing to pay. Finally, Sancom alleges that Qwest delivered traffic for termination to Sancom, knowing that it would not pay the associated terminating access charges.

Sancom filed suit against Qwest, alleging breach of contract, breach of implied contract resulting from violation of tariffs, unjust enrichment, tortious interference with business relations, violation of § 37-24 of the

South Dakota Deceptive Trade Practices and Consumer Protection Act, violation of § 201(b) of the Communications Act, and civil conspiracy. Sancom seeks money damages in the amount of $526,671.60 plus applicable interest, fees, and penalties, as well as damages in an amount to be proven at trial resulting from Qwest's alleged unlawful interference with Sancom's business relationship with Free Conferencing, Qwest's alleged violation of the Deceptive Trade Practices and Consumer Protection Act, Qwest's alleged violation of § 201(b) of the Communications Act, and Qwest's alleged civil conspiracy with other IXCs. Qwest moves to dismiss Sancom's unjust enrichment, tortious interference, Deceptive Trade Practices and Consumer Protection Act, and civil conspiracy claims. Qwest also moves to strike several of Sancom's requests for damages.

**DISCUSSION**

**I.     Motion to Dismiss**

**A.     Standard**

In considering a motion to dismiss, the court assumes all facts alleged in the complaint are true, construes the complaint liberally in the light most favorable to the plaintiff, and should dismiss only if "it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief." Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994). "The issue is not whether a claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may

5

appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), <u>overruled on other grounds by</u> <u>Davis v. Scherer</u>, 468 U.S. 183, 191, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984).

**B.    Discussion**

**1.    Filed Rate Doctrine**

Qwest argues that Sancom's claims of unjust enrichment, violation of the Deceptive Trade Practices and Consumer Protection Act, tortious interference with business relations, and civil conspiracy are barred by the filed rate doctrine. "The filed rate doctrine, also known as the filed tariff doctrine, is derived from the tariff-filing requirements of the [Communications Act]." <u>Marcus v. AT & T Corp.</u>, 138 F.3d 46, 58 (2d Cir. 1998). Section 203(a) of the Communications Act requires telecommunications carriers to file a tariff with the FCC "showing all charges" and "showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). Telecommunications carriers cannot "charge, demand, collect, or receive a greater or less or different compensation" for services subject to tariffs. 47 U.S.C. § 203(c).

" 'Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer.' " <u>Iowa Network Servs., Inc. v.</u>

Qwest Corp., 466 F.3d 1091, 1097 (8th Cir. 2006) (quoting Evanns v. AT & T Corp., 229 F.3d 837, 840 (9th Cir. 2000)) (alteration in original).  The filed rate doctrine prohibits courts from granting relief that would have the effect of changing the rate charged for services rendered pursuant to a valid tariff.  See Firstcom, Inc. v. Qwest Corp., 555 F.3d 669, 681 (8th Cir. 2009).  The filed rate doctrine is equally applicable to rates filed with state regulatory agencies.  Id. at 679.

Sancom argues that the tariff-filing requirements in the Communications Act do not apply to CLECs like Sancom.  See Sancom's Brief in Opposition to Qwest's Motion to Dismiss and to Strike Requests for Damages, Docket 66, at 10-11 (citing In re Hyperion Telecomms., Inc., 12 F.C.C.R. 8596 (1997)).  The court need not address this issue because Sancom alleges that it has filed tariffs with the FCC and SDPUC and that these tariffs cover the originating and terminating access services in question here.  Once a tariff has been approved by the relevant regulatory commission, the terms of the tariff govern the relationship between the carrier and the customer.  Iowa Network Servs., 466 F.3d at 1097.  See also Advamtel, LLC v. AT & T Corp., 118 F. Supp. 2d 680, 688 n.24 (E.D. Va. 2000) ("Plaintiffs' reliance on FCC discussions of permissive detariffing as permitting off-tariff contracts fails . . . .  Permissive detariffing permits carriers to file tariffs and thus be bound by the rate established therein or, alternatively, to negotiate separate agreements *in lieu of*, or rather than,

7

filing tariffs.") (citing <u>Hyperion</u>, 12 F.C.C.R. 8596, at ¶ 27); <u>Freedom Ring</u>

<u>Communs., LLC v. AT & T Corp.</u>, 229 F. Supp. 2d 67, 70 (D.N.H. 2002)

("[Plaintiff] also argues that the filed rate doctrine has been 'fundamentally

changed' by recent FCC rulings, which apparently allow certain

communications carriers to enter negotiated agreements with other carriers

in lieu of filing tariffs.  Regardless of whether the application of the filed rate

doctrine is altered in such circumstances, an issue which I need not discuss

here, [plaintiff] simply does not allege that a non-tariff based, negotiated

agreement exists in this case.  To the contrary, [plaintiff] expressly states

that the rates, terms, and conditions of its filed tariffs govern the

contractual relationship between [plaintiff] and [defendant].").  Thus, the

filed rate doctrine applies to Sancom's claims.

"[T]he purpose of the filed rate doctrine is to: (1) preserve the

regulating agency's authority to determine the reasonableness of the rates;

and (2) insure that regulated entities charge only those rates that the

agency has approved or been made aware of as the law may require." <u>Qwest</u>

<u>Corp. v. Scott</u>, 380 F.3d 367, 375 (8th Cir. 2004) (quoting H.J. Inc. v.

Northwestern Bell Tel. Co., 954 F.2d 485, 488 (8th Cir. 1992)).  In other

words, there are two principles underlying the filed rate doctrine: (1)

nonjusticiability—"preserving the exclusive role of federal agencies in

approving rates for telecommunications services that are 'reasonable' by

keeping courts out of the rate-making process [which is] a function that the

federal regulatory agencies are more competent to perform"—and (2) nondiscrimination—"preventing carriers from engaging in price discrimination as between ratepayers." Marcus, 138 F.3d at 58.

The nonjusticiability principle acts to preserve the FCC's primary jurisdiction over determinations regarding the reasonableness of rates charged by regulated carriers. Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577-78, 101 S. Ct. 2925, 69 L. Ed. 2d 856 (1981). This principle "prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority." Marcus, 138 F.3d at 61. The nondiscrimination principle ensures that all telecommunications customers are charged the same rate for their service—the rate filed with and approved by the FCC. Hill v. BellSouth Telecomms., Inc., 364 F.3d 1308, 1316 (11th Cir. 2004). The filed rate doctrine prevents carriers from negotiating a lower rate with some customers and then charging a rate other than the rate filed with the FCC. American Tel. & Tel. Co. v. Central Office Telephone, Inc., 524 U.S. 214, 223, 118 S. Ct. 1956, 141 L. Ed. 2d 222 (1998). This explains why courts have no power to adjudicate claims that would "invalidate, alter, or add to the terms of the filed tariff." Davel Commc'ns, Inc. v. Qwest Corp., 460 F.3d 1075, 1084 (9th Cir. 2006).

The application of the filed rate doctrine does not depend on the nature of the cause of action the plaintiff seeks to bring. Marcus, 138 F.3d at 58. Rather, "the focus for determining whether the filed rate doctrine

applies is the impact the court's decision will have on agency procedures and rate determinations." <u>H.J. Inc.</u>, 954 F.2d at 489. The court should determine whether the nonjusticiability or nondiscrimination strands are implicated. <u>See</u> <u>Marcus</u>, 138 F.3d at 59. In order to properly consider the impact of the court's decision on each of Sancom's claims on agency procedures and rate determinations, the court must discuss the nature of the claim and the relief sought. In so doing, the court will address Qwest's argument that Sancom has failed to state a claim on each of the causes of action currently at issue.

### 2.    Unjust Enrichment

Sancom alleges that it is entitled to payment from Qwest pursuant to the doctrines of quantum meruit and unjust enrichment. Under South Dakota law, "[u]njust enrichment occurs 'when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying.' " <u>Hofeldt v. Mehling</u>, 658 N.W.2d 783, 788 (S.D. 2003) (quoting <u>Parker v. Western Dakota Insurors, Inc.</u>, 605 N.W.2d 181, 187 (S.D. 2000)). Sancom alleges that it originated and terminated long-distance calls for Qwest, which conferred a benefit upon Qwest because Qwest was able to collect from its customers for providing long-distance service. But, Sancom alleges, Qwest has not paid Sancom for providing these services, and it would be inequitable for Qwest to retain the

benefit of the services provided by Sancom without properly compensating Sancom.  First Amended Complaint, Docket 39, ¶¶ 22-23.

This claim, however, is barred by the filed rate doctrine.  In Count I of Sancom's First Amended Complaint, Sancom alleges that Qwest's refusal to pay Sancom for originating and terminating access services breaches the applicable tariffs filed with the FCC and the SDPUC.  Taking these allegations to be true, the tariffs cover the services provided by Sancom, and the terms of the tariffs conclusively and exclusively enumerate the rights and liabilities as between Sancom and Qwest.  See Iowa Network Servs., 466 F.3d at 1097; see also Firstcom, Inc., 555 F.3d at 680.[4]  Where the services in question are covered by the applicable tariff, the filed rate doctrine bars any request for damages pursuant to the doctrine of unjust enrichment. See id. at 1098 (finding that carrier cannot prevail on claim for unjust enrichment where the claim is covered by a tariff); Freedom Ring, 229 F. Supp. 2d at 69-70 (explaining that claim that defendant has been unjustly enriched because it failed to pay plaintiff for services rendered under its filed

---

[4] The Eighth Circuit decided Firstcom, Inc. after this court denied Sancom's motion to dismiss Quest's counterclaims of unjust enrichment, tortious interference with contract, and civil conspiracy as barred by the filed rate doctrine.  In Firstcom, Inc., the Eighth Circuit found that claims of promissory estoppel and fraud were barred by the filed rate doctrine because an award of monetary damages on these claims "would, in effect, vary the rates established by the interconnection agreements executed by the parties and filed with the [applicable regulatory agency]."  555 F.3d at 681.  The Eighth Circuit's reasoning in Firstcom, Inc. has altered this court's analysis of the filed rate doctrine.

tariffs is barred under the filed rate doctrine); <u>Advamtel, LLC</u>, 118 F. Supp. 2d at 688 ("[B]ecause the services in issue were covered by a filed tariff, it is not open to plaintiffs to claim that they are entitled to recover for the services on some quantum meruit basis that may differ from the tariff rate."). Thus, construing the First Amended Complaint in the light most favorable to Sancom, Sancom can prove no set of facts that would entitle it to relief on its unjust enrichment claim.

Sancom asserts that its unjust enrichment claim is in the alternative to its claim for breach of tariff. Generally, a party may plead in the alternative, but here Sancom's alternative unjust enrichment claim is also barred by the filed rate doctrine. Under Sancom's alternative theory of recovery, Sancom provided originating and terminating access services that were not covered by its filed tariffs. If Sancom were to prevail on its claim that Qwest would be unjustly enriched if it were allowed to retain the benefit of these services without compensating Sancom, the court would be required to determine the value of the services rendered. Indeed, the FCC has noted that "an award of *quantum meruit* would require the court to establish a value (i.e., set a rate) for the service provided in the past." <u>In re Petitions of Sprint PCS and AT&T Corp.</u>, 17 F.C.C.R. 13192, 13198 n.40 (2002). The FCC expressed concern that judicial determination of an award for unjust enrichment goes beyond the power of the courts under the Communications Act. <u>Id.</u> ("We note that there is a substantial question

12

whether a court may award *quantum meruit* or other equitable relief under

state law without running afoul of section 332(c)(3)(A).")

Indeed, both prongs of the filed rate doctrine would be implicated if

Sancom were allowed to proceed with its claim for unjust enrichment. First,

an award for unjust enrichment would require the court to determine the

value of originating and terminating access services, which amounts to

judicial rate-setting. It is well-settled that judicial rate-setting usurps the

exclusive role of federal agencies in determining reasonable rates for

telecommunications services. See Marcus, 138 F.3d at 58. Second, an

award for unjust enrichment would risk violating the nondiscrimination

principle. In determining the value of Sancom's originating and terminating

access services, the court could award Sancom an amount that would result

in Qwest paying more or less for these services than other Sancom

customers. The filed rate doctrine bars such rate discrimination.[5] See

Central Office Telephone Inc., 524 U.S. at 223. Having concluded that

---

[5] Sancom's argument that the nondiscrimination principle dictates a finding in favor of Sancom because otherwise Qwest would pay a rate of zero dollars for Sancom's terminating access services is unpersuasive. The court's focus at this stage is on the impact Sancom's claim would have on agency procedures and rate determinations, not the impact a finding in favor of Qwest would have on the nondiscrimination principle. See H.J., Inc., 954 F.2d at 489. Nor should the court consider Sancom's claim that the FCC has held that a service is not free simply because it is not in a tariff. This argument is inapposite to the court's analysis of whether the filed rate doctrine bars Sancom's claim for unjust enrichment. "While the filed rate doctrine may seem harsh in some circumstances, its strict application is necessary." Central Office Telephone, Inc., 524 U.S. at 223 (internal citation omitted).

Sancom's unjust enrichment claim implicates both the nonjusticiability and nondiscrimination principles of the filed rate doctrine, the court holds that Sancom can prove no set of facts that would entitle it to relief on its claim for unjust enrichment. Sancom's unjust enrichment claim (Count III) is dismissed.

### 3. Deceptive Trade Practices and Consumer Protection Act

Sancom alleges that Qwest engaged in deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Act. Under this Act, it is a deceptive act or practice for any person to

> knowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged thereby.

SDCL 37-24-6(1). And, "[a]ny person who claims to have been adversely affected by [such a deceptive act or practice] shall be permitted to bring a civil action for the recovery of actual damages suffered as a result of such act or practice." SDCL 37-24-31. To state a claim under § 37-21-31, Sancom must plead that its damages were proximately caused by Qwest's alleged violations of the Act. See Nygaard v. Sioux Valley Hosps. & Health Sys., 731 N.W.2d 184, 197 (S.D. 2007).

Here, Sancom alleges two deceptive acts: first, that "Qwest delivered Sancom traffic for termination that it knew Sancom was legally obligated to deliver and for which it also knew that it would not compensate Sancom," and second, that "Qwest . . . demanded higher prices from various originating carriers to which Qwest provides long-distance telephone services on a wholesale basis on the pretense that its tariffed costs to . . . Sancom became higher than it anticipated as a result of the increased traffic to certain of Sancom's customers" while "Qwest knew that it would refuse to pay Sancom for its termination of those calls." First Amended Complaint ¶ 36. Sancom also alleges that it "has sustained injury to its business or property by reason of the violations . . . described above. Id. ¶ 39. With respect to Sancom's first allegation, the court finds that Sancom has sufficiently alleged that it was adversely affected by an act or practice declared to be unlawful by § 37-24-6(1), and that such adverse effect—loss of the terminating access charges—was proximately caused by Qwest's act or practice.

Sancom's second allegation, that Qwest engaged in a deceptive act or practice by inducing its wholesale customers to pay more because its termination costs had increased when Qwest knew it would refuse to pay those termination costs, however, presents a closer question. In its First Amended Complaint, Sancom does not clearly allege that Qwest's representations to its wholesale customers aversely affected Sancom.

Rather, Sancom alleges that Qwest induced its "other victims" to rely on Qwest's deceptive acts and act to their detriment.  Id. ¶ 37 ("Qwest knowingly undertook these and other deceptive acts with the intent to induce Sancom and Qwest's other victims to rely and act upon Qwest's acts, and such acts did induce Sancom and Qwest's other victims to so rely and act to their detriment.").  But in Sancom's memorandum in opposition to Qwest's motion to dismiss, Sancom asserts that Qwest "directed . . . traffic that it had sought and acquired through agreement with these other long distance carriers . . . to Sancom, significantly increasing traffic to Sancom with the knowledge that Qwest would not pay Sancom the termination fees associated with this traffic."  Sancom's Brief in Opposition to Qwest's Motion to Dismiss Counts III, IV, V and VII, and to Strike Requests for Damages (¶¶ 2-5) from Sancom's Amended Complaint, Docket 66 at 20.  This allegation fleshes out the general allegation in the First Amended Complaint that Sancom sustained injury to its business or property because of Qwest's allegedly deceptive acts and practices, and as a result gives Qwest "fair notice of what the . . . claim is and the grounds upon which it rests," which is all that is required at the motion to dismiss stage.  Erickson v. Pardus, 551 U.S. 89, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (quoting Fed. R. Civ. P. 8(a)(2); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)).  Taking the First Amended Complaint in the light most favorable to Sancom, Sancom has alleged facts

to support its claim that Qwest violated the Deceptive Trade Practices and Consumer Protection Act with respect to Qwest's alleged deceptive acts toward both Sancom and Qwest's own customers.

But, the filed rate doctrine bars Sancom's claim that it was adversely affected by Qwest's allegedly deceptive acts or practices because this claim is wholly derivative of Sancom's claim of breach of tariff. That is, the injuries caused by Qwest's deceptive acts are loss of the terminating access charges associated with the traffic that Qwest delivered to Sancom knowing that it would not pay. Sancom does not allege that it incurred injuries outside of the unpaid terminating access charges, either in its First Amended Complaint or in its memorandum in opposition to Qwest's motion to dismiss.[6]

Allowing Sancom to pursue a cause of action for violation of the Deceptive Trade Practices and Consumer Protection Act where its only damages are loss of tariffed access charges would implicate the

---

[6] Even if Sancom's Deceptive Trade Practices and Consumer Protection Act claim involved damages outside the loss of terminating access charges, it would still be barred by the filed rate doctrine. In this case, Qwest would be ordered to pay Sancom more than the filed rate for the same services, implicating both the nonjusticiability and nondiscrimination prongs of the filed rate doctrine. Indeed, an award of damages to Sancom "would, effectively, change the rate paid by the customer to one [greater than] the filed rate paid by other customers," implicating the nondiscrimination principle. See Hill, 364 F.3d at 1316. And, an award of damages to Sancom "would, in effect, result in a judicial determination of the reasonableness of the rate that is prohibited under the filed rate doctrine." Id. at 1317.

nonjusticiability strand of the filed rate doctrine.  If Sancom were to prevail

on this claim, it would be entitled to an award of actual damages.  See SDCL

37-24-31.  Because Sancom's only damages are loss of terminating access

charges, the court would have to award the relevant unpaid access charges

as compensatory damages for Qwest's deceptive acts.  This would interfere

with agency rate-making authority.  The FCC and the SDPUC have approved

the applicable rates as compensation for the provision of access services,

not for compensation for the adverse effects of deceptive trade practices

engaged in by Sancom's customers.  Courts have routinely held that

"authorizing a court to award damages that would effectively impose a rate

different from that dictated by the tariff would usurp the FCC's authority to

determine what rate is reasonable."  See Bryan v. BellSouth Commc'ns, Inc.,

377 F.3d 424, 430 (4th Cir. 2004).  Likewise, authorizing a court to award

damages that would apply the filed rate to conduct other than the services

described in the tariff would interfere with the agencies' authority to set a

reasonable rate.  See Central Office Telephone, Inc., 524 U.S. at 223-24

("Rates, however, do not exist in isolation.  They have meaning only when

one knows the services to which they are attached.").  Thus, although

Sancom's Deceptive Trade Practices and Consumer Protection Act claim

would not require the court to engage in rate-setting per se, the court would

be required to engage in action which undermines agency rate-making

authority, which is precluded by the filed rate doctrine.  See Marcus, 138

F.3d at 61.  Sancom's deceptive trade practices claim (Count V) is dismissed.

### 4.    Tortious Interference with Business Relations

Sancom alleges that Qwest tortiously interfered with its business relations with Free Conferencing.  Under South Dakota law, the elements of this cause of action are: "(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference cause[d] the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted." Setliff v. Akins, 616 N.W.2d 878, 889 (S.D. 2000).

Qwest asserts that the act of interference must cause an actual breach of contract.  This proposition is unsupported by South Dakota law. Indeed, in Setliff, the Supreme Court of South Dakota explained, "none of these elements require the existence of an *express* . . . contract.  In fact, . . . [f]or this tort to occur, the business relationship . . . need not be cemented by written or verbal contract and, . . . it need not be intended that there be a contract."  Id. (internal quotation omitted) (emphasis in original).  Further, "[o]ne is liable for commission of this tort [if he] interferes with business relations of another, both existing and prospective, by inducing a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another."

19

Id.  Nothing in Setliff supports Qwest's assertion that the interference must cause an actual breach of contract.

Qwest's citation to Overholt Crop Insurance Co. v. Travis, 941 F.2d 1361 (8th Cir. 1991) is unavailing.  There, the Eighth Circuit found that the district court did not err in instructing the jury that "a party is liable for 'inducing or otherwise causing the third person not to perform the contract.' "  Id. at 1369.  The Eighth Circuit did not explain whether the district court instructed the jury that the plaintiff had to show that the defendant induced or otherwise caused a third person not to perform the contract in order to prevail, or whether this was one way in which the plaintiff could prove tortious interference.  Setliff, which postdates Overholt, makes clear that a person may have a claim for tortious interference with business relations where no contract was intended, and may show tortious interference by showing that the defendant induced a third person not to enter into a business relation with another, induced a third person not to continue a business relation with another, or prevented a third person from continuing a business relation with another.  See Setliff, 616 N.W.2d at 889. Setliff does not require proof of actual breach of contract, but merely interference with a business relationship.

Additionally, this court previously denied Sancom's motion to dismiss Qwest's counterclaim of tortious interference with contract by applying the same elements set out in Setliff and without requiring Qwest to plead an

actual breach of contract.  <u>See</u> Order Denying Plaintiff's Motion to Dismiss

Defendant's Counterclaims, Docket 31, at 20-22.  Unlike Sancom, which

entitled its cause of action "Tortious Interference with Business Relations,"

First Amended Complaint at 5 (Count IV), Qwest entitled its cause of action

"Tortious Interference with Contract," Defendant's Answer and

Counterclaim, Docket 4, at 24 (Count VIII), a distinction Qwest makes much

of in its reply brief.[7]  The court did not require Qwest to plead an actual

breach of contract to survive a motion to dismiss its claim of tortious

interference with contract, and the court will not interpret South Dakota law

as requiring Sancom to plead an actual breach of contract on its claim of

tortious interference with business relations.

Here, Sancom has stated a claim of tortious interference.  First,

Sancom alleges that it has a valid business relationship with Free

Conferencing in that the parties have entered into a valid contract.  First

Amended Complaint ¶ 26.  Second, Sancom alleges that Qwest knew about

this relationship, as evidenced by a letter Qwest sent to the FCC explaining

how it identified small LECs with conference calling company customers.

<u>Id.</u> ¶ 28.  Third, Sancom alleges that Qwest knowingly and unjustifiably

---

[7] Qwest incorrectly states that Sancom pleaded a claim of tortious
interference with *contract* rather than tortious interference with *business
relations*.  Defendant's Reply in Support of Motion to Dismiss counts III, IV,
V and VII, and to Strike Requests for Damages (¶¶ 2-5) from Sancom's
Amended Complaint, Docket 72 at 16.  In addressing a motion to dismiss,
the court looks at the substance of the claim and not its title.

refused to pay Sancom's terminating access charges with the intent to destroy Sancom's business relationship with Free Conferencing. Id. ¶ 30. Qwest's refusal to pay is the alleged act of interference. Fourth, Sancom alleges that this act of interference caused Free Conferencing to substantially reduce the volume of its business with Sancom. Id. ¶ 31. It is reasonable to infer from this allegation that Qwest's refusal to pay has induced Free Conferencing not to continue its business relationship with Sancom at the same level as before the interference began or has prevented Free Conferencing from continuing its business relationship with Sancom. Finally, Sancom alleges that it suffered damages as a result of Qwest's alleged interference. It is reasonable to infer that Qwest lost revenue due to Free Conferencing's substantial reduction of the volume of business with Sancom. Sancom has alleged facts to support each element of tortious interference with business relations, but this claim is barred by the filed rate doctrine.

The filed rate doctrine bars Sancom's claim of tortious interference because recovery on this claim would result in Qwest paying a higher rate for Sancom's terminating access services than is paid by Sancom's other customers. Although Sancom's tortious interference claim does not, on its face, attempt to challenge the filed rates, awarding Sancom damages beyond the amount to which it is entitled under the applicable tariffs as damages for Qwest's refusal to pay terminating access charges would in effect

22

increase the rate for those services. "[A]n award [of monetary damages] would, in effect, vary the rates established by the interconnection agreement executed by the parties and filed with the [applicable agencies]." <u>Firstcom, Inc.</u>, 555 F.3d at 681.

Sancom's tortious interference claim implicates both the nonjusticiability and nondiscrimination prongs of the filed rate doctrine. With respect to the nonjusticiability prong, "authorizing a court to award damages that would effectively impose a rate different from that dictated by the tariff would usurp the FCC's authority to determine what rate is reasonable." <u>Bryan</u>, 377 F.3d at 430. "Thus, even if a claim does not directly attack the filed rate, an award of damages . . . that would, in effect, result in a judicial determination of the reasonableness of that rate is prohibited under the filed rate doctrine." <u>Hill</u>, 364 F.3d at 1317. Here, the alleged act of interference for which Sancom seeks damages is Qwest's refusal to pay Sancom's terminating access charges. An award of damages on this tortious interference claim, then, would amount to a determination that the amount to which Sancom is entitled for terminating access services is greater than the rate filed with and approved by the FCC and the SDPUC. Thus, allowing Sancom's tortious interference claim would impermissibly undermine agency rate-making authority.

The purpose of the nondiscrimination prong "is to ensure that all telecommunications customers are charged the same rate for their

23

service—the rate filed with and approved by the FCC." Id. at 1316. For the reasons explained above, allowing Sancom's tortious interference claim would result in an award of damages for Qwest's failure to pay terminating access charges in an amount greater than that set out in Sancom's filed tariffs. That is, Qwest would pay more for the same services than Sancom's other customers. The filed rate doctrine bars claims that would result in some customers paying different rates than the rates filed with the FCC. See Central Office Telephone, Inc., 524 U.S. at 223.

Sancom cites Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d 694 (5th Cir. 1999) for the proposition that the filed rate doctrine does not preclude state-law claims for tortious interference. In Access Telecom, 197 F.3d at 711, the Fifth Circuit held that the plaintiff's claim of tortious interference was not barred by the filed rate doctrine because the claim was not derivative of a contract claim. Rather, the tortious interference claim was based on an allegation that the defendant released confidential information. Id. The Fifth Circuit reasoned, "[t]his claim is not derivative of a contract claim. It does not concern the provision of services which are covered by the filed tariff, but rather it concerns illegal actions outside the scope of the tariff and not derivative of any phone services." Id. The present case is distinguishable from Access Telecom. Here, Sancom's tortious interference claim is derivative of the breach of tariff claim because it concerns Qwest's refusal to pay the rates set out in the filed tariffs. The

alleged tortious interference—refusal to pay the terminating access charges in order to destroy Sancom's business relations with Free Conferencing—is not "outside the scope of the tariff," but rather involves failure to pay for the services under the rates set out in the tariff. Access Telecom does not support Sancom's argument that the filed rate doctrine does not bar the tortious interference claim at issue in this case.

The court therefore holds that Sancom's tortious interference claim violates the filed rate doctrine because the damages Sancom seeks violate the nonjusticiability and nondiscrimination principles underlying the doctrine. Sancom's tortious interference with business relations claim (Count IV) is dismissed.

### 5. Civil Conspiracy

Sancom alleges that Qwest engaged in a civil conspiracy with one or more IXCs to identify small LECs like Sancom that have customers that receive significant quantities of long-distance telephone calls and refuse to pay those LECs' invoices. In order to state a claim for civil conspiracy, Sancom must allege facts showing: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action to be taken; (4) the commission of one or more unlawful overt acts; and (5) damages as the proximate result of the conspiracy." Setliff, 616 N.W.2d at 889. "This is not an independent cause of action, but is sustainable only after the underlying tort claim has been established." Id. (internal quotation

omitted).  Because the court has dismissed all of Sancom's tort claims,[8] there is no underlying tort claim to support Sancom's cause of action for civil conspiracy, and Sancom has failed to state a claim upon which relief can be granted.  Sancom's civil conspiracy claim (Count VII) is dismissed.

## II.    Motion to Strike

Qwest moves to strike Sancom's second through fifth requests for damages pursuant to Rule 12(f).  Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter . . . on motion made by a party either before responding to the pleading or, if a response if not allowed, within 20 days after being served with the pleading."  Fed. R. Civ. P. 12(f)(2).  "Judges enjoy liberal discretion to strike pleadings under Rule 12(f). . . . Striking a party's pleading, however, is an extreme and disfavored measure."  BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 917 (8th Cir. 2007).

Sancom's second, third, and fifth requests for damages seek damages, in an amount to be proven at trial, resulting from Qwest's unlawful interference with Sancom's and Free Conferencing's business relationship, Qwest's violation of the South Dakota Deceptive Trade Practices and Consumer Protection Act, and Qwest's civil conspiracy with other long-distance carriers, respectively.  The claims underlying these requests for

---

[8] Sancom's remaining claims are breach of contract, breach of implied contract resulting from violation of tariffs, and violation of § 201(b) of the Communications Act.

damages are barred by the filed rate doctrine.  As a result, the requests are immaterial and Qwest's motion to strike the second, third, and fifth requests for damages is granted.

Sancom's fourth request for damages, however, requests damages, in an amount to be proven at trial, resulting from Qwest's violation of § 201(b) of the Communications Act.  Qwest did not move to dismiss the underlying count, and the parties have not addressed the issue of whether the filed rate doctrine bars an award of damages, in an amount to be proven at trial, for this claim.  Thus, Qwest's motion to strike Sancom's fourth request for damages is denied.

Based on the foregoing, it is hereby

ORDERED that Qwest's motion to dismiss Counts III, IV, V, and VII of Sancom's First Amended Complaint and motion to strike the second through fifth requests for damages (Docket 50) is granted in part and denied in part, as set forth in this order.

Dated June 19, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE