UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SANCOM, INC., a South Dakota corporation, | ) ) ) | CIV. 07-4147-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| QWEST COMMUNICATIONS CORPORATION, a Delaware corporation, | ) ) ) ) | ORDER |
| Defendant and Counterclaimant, | ) ) ) | |
| vs. | ) ) | |
| SANCOM, INC., a South Dakota corporation; and FREE CONFERENCING CORPORATION, a Nevada corporation, | ) ) ) ) ) ) | |
| Counterclaim Defendants. | ) | |

Plaintiff, Sancom, Inc. (Sancom), moves to strike substantial portions of

the expert disclosures and expert reports provided by defendant, Qwest

Communications Corporation (Qwest). Specifically, Sancom moves to strike

portions of Qwest's Rule 26(a)(2)(B) Disclosure, the Expert Report of Jeffrey D.

Owens, the Rebuttal and First Supplemental Report of Jeffrey D. Owens, the

Surrebuttal and Second Supplemental Report of Jeffrey D. Owens, and the

Expert Disclosure of Derek Canfield. Qwest opposes the motion.

## BACKGROUND

Qwest disclosed Jeffrey D. Owens (Owens) and Derek Canfield (Canfield) as expert witnesses that it intended to use at trial on March 27, 2009. <u>See</u> Docket 131-2. Qwest also disclosed the Expert Report of Jeffrey D. Owens (Owens Report), a 99-page report signed by Owens, and the Expert Disclosure of Derek Canfield (Canfield Report), a 12-page report signed by Canfield and dated March 27, 2009. <u>See</u> Owens Report, Docket 131-5; Canfield Report, Docket 131-9. After Sancom disclosed the report of its expert, Paul J. Calabro (Calabro), on March 27, 2009, Qwest disclosed the Rebuttal and 1st Supplemental Expert Report of Jeffrey D. Owens (Owens Rebuttal and First Supplemental Report). Owens Rebuttal and First Supplemental Report, Docket 131-6. Finally, after Sancom disclosed Calabro's rebuttal report on April 27, 2009, and Qwest deposed Calabro on June 11, 2009, Qwest disclosed the Surrebuttal and 2nd Supplemental Expert Report of Jeffrey D. Owens (Owens Surrebuttal and Second Supplemental Report) on July 28, 2009. Owens Surrebuttal and Second Supplemental Report, Docket 167-6. Sancom moves to strike portions of all four of Qwest's experts' reports.

## DISCUSSION

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Under Rule 702, the trial judge acts as a "gatekeeper" screening evidence for relevance and reliability. <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 589 (1993). Pursuant to Rule 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony. The rule clearly is one of admissibility rather than exclusion." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (internal quotations and citations omitted). "The exclusion of an expert's opinion is proper only if it is so fundamentally unsupported that it can offer no assistance to the jury." Wood v. Minn. Mining & Mfg. Co., 112 F.3d 306, 309 (8th Cir. 1997) (internal quotations and citation omitted).

The Eighth Circuit has determined that a district court should apply a three-part test when screening testimony under Rule 702.

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

Lauzon, 270 F.3d at 686 (internal citations and quotations omitted).

District courts have discretion in determining whether to admit expert witness testimony under Rule 702. See In re Air Crash at Little Rock

Arkansas, on June 1, 1999, 291 F.3d 503, 509 (8th Cir. 2002). Nonetheless, the proponent of expert testimony must prove its admissibility by a preponderance of the evidence. Daubert, 509 U.S. at 592 n.10.

## I.    Owens Report & Owens Rebuttal and First Supplemental Report

Sancom moves to strike the following portions of the Owens Report: Sections D, E, F, H, I, J, K, L, and M; portions of Summary Conclusion Nos. 1, 3, 4, 5, 6, and 7; summaries of Sections D, E, F, H, I J, K, L, and M; and "Summary of Findings" numbers 1, 3, 4, 6, 7, and 8. Sancom also moves to strike Sections D(4), D(5), E, and F of the Owens Rebuttal and First Supplemental Report. Sancom argues that Owens is not qualified to render the challenged opinions because they constitute impermissible legal conclusions and Owens is not competent to render such conclusions. The court finds that Owens is qualified within the meaning of Rule 702 based on his experience in the telecommunications industry. See Defendant's Rule 26(A)(2)(B) Disclosure of Jeffrey D. Owens, Docket 131-2 at 2-3. Sancom's challenge to Owens qualifications is just a restatement of Sancom's argument that Owens' opinions constitute impermissible legal conclusions, an argument the court considers in detail below.

Under Rule 704(a), "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). "This does not,

however, mean that all opinion testimony as to ultimate issues is admissible." Kostelecky v. NL Acme Tool/NL Indus., Inc., 837 F.2d 828, 830 (8th Cir. 1988). Indeed "expert testimony on legal matters is not admissible." Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003). This is because opinion testimony that is couched as a legal conclusion or that merely tells the factfinder what result to reach is not helpful to the finder of fact. Hogan v. American Tel. & Tel. Co., 812 F.2d 409, 411 (8th Cir. 1987); see also Farmland Indus. v. Frazier-Parrott Commodities, Inc., 871 F.2d 1402, 1409 (8th Cir. 1989) ("The special legal knowledge of the judge makes the witness' testimony superfluous."). "Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." Southern Pine, 320 F.3d at 841.

On the other hand, "[c]ourts have frequently recognized the value of expert testimony defining terms of a technical nature and testifying as to whether such terms have acquired a well-recognized meaning in the business or industry." Nucor Corp. v. Nebraska Pub. Power Dist., 891 F.2d 1343, 1350 (8th Cir. 1989); see also Southern Pine, 320 F.3d at 841 (explaining that "industry practice or standards may often be relevant . . . and expert or fact testimony on what these are is often admissible"). For example, in Nucor, which involved a claim that a power company charged unfair, unreasonable, and discriminatory rates, the Eighth Circuit found that the district court did

5

not err in admitting expert testimony on the meaning of terms of art such as "fair," "reasonable," and "non-discriminatory," and on whether the power company's ratemaking methods were used elsewhere in the industry.  Nucor, 891 F.2d at 1350.  And in Cedar Hill Hardware and Constr. Supply, Inc. v. Insurance Corp. Of Hannover, 563 F.3d 329, 343 (8th Cir. 2009), a case involving a dispute over insurance coverage, the Eighth Circuit found that expert testimony on underwriting standards, the materiality of mortgage information on underwriting decisions, and proper claims handling was properly admissible as relevant to provide an industry-standard context for other case-specific testimony about these topics.

In contrast, in Police Retirement System of St. Louis v. Midwest Investment Advisory Service, Inc., 940 F.2d 351, 357 (8th Cir. 1991), a case involving breach of fiduciary duty claims and a related shelter provision under § 28(e) of the Securities Exchange Act of 1934, the Eighth Circuit found that the expert testimony went too far and should have been excluded.  There, the expert "lectured the jury on what § 28 meant [and] gave extended explanations of why the defendants' conduct was completely sheltered by that provision." Id.  The Eighth Circuit reasoned that the trial court erred in admitting the testimony because the expert's testimony about the reach and meaning of § 28(e) usurped the role of the judge in explaining the law.  Id.

Under these cases, the line between admissible expert testimony and inadmissible testimony on legal matters is difficult to draw. The United States District Court for the District of Nebraska reconciled <u>Nucor</u> and <u>Police Retirement System</u> as follows:

> In sum, expert testimony that purports to *explain the legal meaning of a term* is forbidden pursuant to <u>Police Retirement System of St. Louis</u> and <u>Farmland Industries</u>, but testimony *defining a term of art* as it is used within a given field may be allowed. In addition, testimony that *a specific item or event fits within the meaning of a statutory term* may be admissible under Federal Rule of Evidence 702 even if it embraces an "ultimate issue."

<u>Ways v. City of Lincoln</u>, 206 F. Supp. 2d 978, 991 (D. Neb. 2002) (citing Fed. R. Evid. 704, emphasis in original). The court finds that the United States District Court for the District of Nebraska has correctly formulated the standard for the admissibility of expert testimony defining and explaining terms and provisions of law, and it will apply that standard to the expert testimony offered by Qwest.

**A.    Owens Report**

**1.    Section D: Communications Act of 1934 and the Telecommunications Act of 1996**

In Section D of the Owens Report, Owens set out the definitions of "local exchange carrier" in the Communications Act of 1934 and the Telecommunications Act of 1996 as well as the definition of "telecommunications service" in the Communications Act. Owens Report at 30. Owens then stated the requirements for these terms in his own words and

explained why he felt that the free calling service company services that Sancom provided to Free Conference and Ocean Bay Marketing, Inc. (Ocean Bay) did not qualify as telecommunications services and that Sancom did not provide Qwest with telephone exchange service or exchange access. Id. at 30-31.

The court will provide the jury with the relevant definitions and will not allow Owens to explain the definitions of "local exchange carrier" and "telecommunications service" under the applicable federal laws at trial. But Owens' analysis of why Sancom did not provide telecommunications service to Free Conference and Ocean Bay, and as a result did not provide telephone exchange service or exchange access to Qwest is permissible testimony that a specific set of facts does not fit within the meaning of the statutory terms. See Ways, 206 F. Supp. 2d at 991.

Sancom argues that the court should follow the United States District Court for the Northern District of New York's decision in TC Systems Inc. v. Town of Colonie, New York, 213 F. Supp. 2d 171 (N.D.N.Y. 2002), and strike Owens' discussion in Section D. But TC Systems is not binding on this court and, moreover, it is distinguishable. In TC Systems, the court struck portions of the expert's report because the expert's review of FCC rulings and regulations impermissibly usurped the role of the judge in determining the relevant law. 213 F. Supp. 2d at 182. As the court explained, "[w]hile portions

of her report refer to FCC criteria, [the expert] fails to establish any nexus between these criteria and her ultimate opinion." Id. As a result, the court excluded a portion of the expert's report for the purposes of the anticipated summary judgment motions. But for the purposes of the expert's testimony at trial, the court did not preclude all testimony regarding FCC criteria. Rather, the court found that "[i]f a proper foundation is laid and [the expert] can establish a nexus between the FCC criteria and the facts here, her testimony may be appropriate. Any testimony as to the intent of the Telecommunications Act or FCC regulations or how the jury should ultimately decide this case, however, is inappropriate." Id. Here, unlike the expert in TC Systems, Owens has established a nexus between the statutory definitions of "local exchange carrier" and "telecommunications service" and the facts of this case. Thus, the reasoning in TC Systems does not apply,[1] and Sancom's motion to strike Section D of the Owens Report is denied.

---

[1] Although TC Systems is not binding on this court, the court's ruling on the remainder of Sancom's motion to strike is consistent with TC Systems. The court has stricken portions of the Owens Report that merely set out statutes, FCC regulations and rulings, and tariff terms and do not explain the connection between the law and the facts of this case. Where Owens has established the nexus between the applicable statement of law and the facts of this case, however, the court has denied Sancom's motion to strike.

### 2. Section E: Modified Final Judgment–The Origin and Purpose of Access Charges

In Section E, Owens explained the modified final judgment that established the switched access structure. Owens Report at 31-32. He explained that the modified final judgment expanded the definition of "exchange access" to provide for interexchange traffic originating and terminating within the exchange area. Id. at 32. Owens also opined that the conference calls generated by Free Conference did not terminate in South Dakota within the meaning of the modified final judgment. Id.

Again, while the court will not allow Owens to testify about the legal meaning of "exchange access" at trial, his analysis of whether the terminating access charges for the conference calls generated by Free Conference terminated within Sancom's exchange area and were properly charged to Qwest is permissible expert testimony. Ways, 206 F. Supp. 2d at 991. Sancom's motion to strike Section E of the Owens Report is denied.

### 3. Section F: The Setting of Sancom's Rate for Switched Access

In Section F, Owens explained the rules governing a competitive local exchange carrier (CLEC) operating in a rural exchange. Owens explained the general rule for rate-setting by CLECs and the special requirements for setting higher rates under the "rural exemption." Owens Report at 32-33. Owens also set out facts about Free Conference and Ocean Bay to support his opinion that

10

Sancom did not satisfy one of the requirements for the "rural exemption." Id. at 34-35.

The court finds that Section F provides background information that would be helpful to the trier of fact. While Owens' explanation of the Federal Communications Commission (FCC)'s regulations regarding rural carriers may be inadmissible in a different context, the question of whether Sancom is a rural carrier will not be an ultimate issue before the jury at trial.[2] As a result, the court considers Owens' discussion in Section F to be admissible testimony regarding the industry context for his case-specific discussion of Sancom's relationships with Free Conference and Ocean Bay. An industry-standard context for case-specific testimony is properly admissible. Cedar Hill, 563 F.3d at 343. Sancom's motion to strike Section F is denied.

---

[2] Qwest has not challenged Sancom's status as a rural carrier, but rather has argued that the services Sancom provided to Qwest with respect to the free calling service company traffic do not fall under the tariffs Sancom filed as a rural CLEC. If Qwest were to allege that Sancom is not a rural CLEC, Qwest would effectively be challenging the validity of Sancom's rates. Such a challenge would be barred by the filed rate doctrine. Iowa Network Servs. v. Qwest Corp., 466 F.3d 1091, 1097 (8th Cir. 2006) ("Under the [filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be the law and to therefore conclusively and exclusively enumerate the rights and liabilities as between the carrier and the customer."); Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004) (explaining that the filed rate doctrine preserves the regulating agency's authority to determine the reasonableness of rates and ensures that regulated entities charge only those rates the agency has approved). Thus, the issue of whether Sancom is a rural carrier will not be before the jury in this case.

### 4. Section H: FCSC Service is Not Provided Pursuant to Tariff

In Section H, Owens set out the relevant tariff provisions and opined that Sancom did not provide legitimate local exchange services to Free Conference and Ocean Bay. Owens compared the details of Sancom's relationship and arrangement with Free Conference and Ocean Bay with the applicable terms of Sancom's interstate and local exchange tariffs with regard to the provision of ISDN Primary Rate Interface Service, DS1 to DS3 multiplexing, DSI and DS3 Channel Terminations, 800 Database Queries, collocation, electrical power, 911 service, and directory listings. Owens Report at 43-49. Owens concluded that Sancom did not provide these services in accordance with its tariffs, either because the applicable tariffs did not cover the service or because Sancom's provision of the service to these companies was inconsistent with the terms of its tariffs. Rather, Owens concluded, Sancom's free calling service company service was a form of contract carriage. Id. at 49. Owens also opined that Sancom's free calling service company services were not offered pursuant to Sancom's tariffs because Free Conference and Ocean Bay did not complete the order form Sancom required its local exchange customers to complete, Sancom did not invoice Free Conference and Ocean Bay in accordance with its certificate of authority and tariffs, Sancom did not charge Free Conference or Ocean Bay for the taxes and fees that Sancom is required to charge its local exchange customers, and Sancom did not file its agreements with Free

12

Conference and Ocean Bay with the South Dakota Public Utilities Commission or offer free calling service company services to the public.  Id. at 49-60.

Sancom argues that Section H is improper because the application of a tariff is a question of law, an expert witness cannot testify as to legal standards, and Owens' testimony is an improper legal opinion.  It is true that "where . . . there is no issue of fact and the words of the tariff are used in their ordinary meaning with no particular connotation in the expert field . . . then the interpretation of a tariff ordinarily presents a question of law." Penn Central Co. v. General Mills, Inc., 439 F.2d 1338, 1341 (8th Cir. 1971) (discussing tariff on file with Interstate Commerce Commission).  Here, the court will determine whether there are any issues of fact or ambiguities in Sancom's tariffs when ruling on the parties' summary judgment motions, and in doing so, the court will exercise its own judgment in determining the applicable law.  That is, if the application of Sancom's tariffs is a pure question of law, as asserted by Sancom, then Owens will not have the opportunity to testify before the jury about whether Sancom provided local exchange services to Free Conference and Sancom.  But if there are disputed issues of material fact, or if the terms of the tariffs have a particular connotation in the telecommunications field, then Owens' proposed testimony will be proper and helpful to the jury.

After reviewing Section H, the court finds that Owens did much more than set out legal standards and state a legal conclusion about whether Sancom's tariffs applied to the traffic at issue. Owens did not merely tell the factfinder what result to reach. Contra Hogan, 812 F.2d at 411 (explaining that testimony that merely tells the factfinder what result to reach is not helpful to the trier of fact). Instead, Owens identified the relevant facts about the Sancom-Free Conference and Sancom-Ocean Bay relationships to explain why he believed that Sancom did not provide these companies local exchange services pursuant to its tariffs. This evidence is admissible. Cf. Fed R. Evid. 704 advisory committee's note ("[T]he question, 'Did T have capacity to make a will?' would be excluded, while the question, "Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed."). Indeed, Sancom's own expert set out the definition of switched access service in the applicable tariff and explained why he believed that the services Sancom provided to Free Conference and Ocean Bay constituted services within Sancom's tariff. Report Prepared for the Purpose of Clarifying Various Issues Involved in Litigation in the United States District Court for the District of South Dakota, Southern District in Connection with Case Civ. 07-4147, Docket 131-7 at 12-16. Sancom's motion to strike Section H is denied.

**5.     Section I: Sancom's Contracts with Free Conference and Ocean Bay**

In Section I, Owens summarized the key provisions of Sancom's contracts with Free Conference and Ocean Bay. Owens explained that Sancom shared access revenues with Free Conference at a rate of 2 cents per minute and with Ocean Bay at a rate of 1.2 cents per call, that Sancom only shared access revenues if the long-distance carrier paid Sancom's access charges, that Sancom provided DS1 or DS3 service, collocation space, power, and telephone numbers to Free Conference and Ocean Bay, that Sancom allowed Free Conference and Ocean Bay to place equipment in Sancom's central office, that Sancom did not charge Free Conference or Ocean Bay anything for local exchange service, collocation, or power, and that Sancom, Free Conference, and Ocean Bay were required to keep the terms of their agreements confidential. Owens Report at 68. Owens also identified issues on which the agreements were silent. Id. at 69. After summarizing the terms of the agreements, Owens concluded that Free Conference and Ocean Bay were partners, not customers, of Sancom, and as a result, Sancom cannot assess access charges. Id.

Expert testimony on the meaning of a contract containing technical terms may be admissible. See Nucor, 891 F.2d at 1350 ("Nebraska Power asserts that the district court erred in permitting the jury to construe the terms of the contract and the statute in issue . . . because the terms in issue were not

15

ambiguous. We believe there was no error. The contract, which incorporated the language of the statute, used words that were ambiguous in the sense that they were of a sufficiently technical nature to be the subject of expert testimony. Both parties presented expert testimony that offered the jury differing views of the terminology. Under the circumstances, it was proper for the jury, aided by expert testimony, to consider the terminology in issue here."). Here, Owens' proposed testimony would identify the relevant terms of Sancom's contracts with Free Conference and Ocean Bay, identify the topics that were not covered by these contracts, and explain how the terms (and the issues not covered in the contracts) affect the issues before the jury. This testimony would be helpful to the finder of fact, and Owens' conclusion that these agreements are more consistent with a partnership relationship than with an access provider-customer relationship does not state an impermissible legal conclusion. Sancom's motion to strike Section I is denied.

### 6. Section J: Sancom's Switched Access Tariffs Do Not Apply to FCSC Traffic

In Section J, Owens opined that Sancom's involvement in the routing of Qwest traffic to and from the equipment Free Conference and Ocean Bay placed in Sancom's central office did not constitute switched access service, as defined by the terms and conditions of Sancom's switched access tariffs. Owens Report at 69. Because each subsection of Section J contains a different type of expert testimony, the court will examine each subsection individually.

16

In Section J(1), Owens set out the definition of "end user" in Sancom's tariffs and argued that Sancom's free calling service company partners were not end users because the services Sancom provided to these companies were not provided for a fee, Sancom's services were not available to the public, ISDN Primary Rate Interface Services was not available in Sancom's local exchange tariff, Sancom never billed Free Conference or Ocean Bay for the Federal Universal Service Charge required under Sancom's interstate tariff, and Sancom personnel distinguished between "end users" and the free calling service companies. Id. at 71-75. Owens' discussion in Section J(1) identifies and explains facts and circumstances that he believes are relevant to the question of whether Free Conference and Ocean Bay were "end users" within the meaning of Sancom's tariffs. Assuming that the court finds these facts and circumstances to be relevant, Owens' testimony about the meaning of the industry-specific term, "end user," will be admissible at trial. See Nucor, 891 F.2d at 1350 (finding expert testimony on the meaning of terms of art admissible). And Owens' conclusion that in this case, Free Conference and Ocean Bay were not "end users" is admissible testimony because it opines that a particular set of facts does not fit within the meaning of a term. Cf. Ways, 206 F. Supp. 2d at 991 (stating that testimony that a specific event fits within the meaning of a statutory term may be admissible under Rule 702). Section J(1) is admissible.

In Section J(2), Owens set out the tariff definitions of "switched access service" and "access minutes," which contain the term "end user,"and argued that Sancom did not provide switched access service to Free Conference and Ocean Bay because these companies were not end users. Owens Report at 76-77. Owens' testimony identifies the relevant tariff provision and explains why the requirements for that provision are not satisfied in this case. The court will determine any issues of tariff interpretation and application that can be determined as a matter of law when deciding the parties' summary judgment motions. Thus, Owens will not be given the opportunity to testify about the meaning of the terms in the tariff unless there are factual issues for the jury. If there are such issues of fact, then Owens' analysis in Section J(2) explaining why Sancom did not provide switched access service to Free Conference and Ocean Bay under the facts of this case will be helpful and admissible. This type of testimony is not an improper legal conclusion that merely tells the finder of fact what result to reach. See Ways, 206 F. Supp. 2d at 991. Section J(2) is admissible.

In Section J(3), Owens explained that switched access service is only provided to an end user's premises under Sancom's tariffs and argued that the conference bridges and voice broadcast equipment Free Conference and Ocean Bay placed in Sancom's central office did not satisfy the definition of "customer premise equipment" in Sancom's local exchange tariff. Owens Report at 77-78.

Again, the court will determine issues of tariff interpretation and application as a matter of law, if possible, at the summary judgment stage. If there are questions of material fact regarding the application of the definition of "customer premise equipment" to the facts of this case, then Owens' proposed testimony in Section J(3) will be admissible.

In Section J(4), Owens argued that some of the traffic generated by Free Conference, namely the traffic involving the playback of recorded conference calls, did not terminate in South Dakota. Owens Report at 79-80. Rather, Owens argued, these calls were re-routed to devices located in Iowa or California. Id. at 80. Owens quoted an FCC opinion to show that the FCC uses an "end to end analysis" in determining where a call terminates. Id. (quoting Qwest Communications Corp. v. Farmers and Merchants Mutual Telephone Company, 2007 WL 2872754, 22 F.C.C.R. 17973 at ¶ 31 (2007) (hereinafter Farmers and Merchants)). Based on the FCC's reasoning, Owens concluded that the traffic at issue did not originate or terminate in South Dakota. Unlike the other subsections of Section J, the court finds that Section J(4) contains impermissible legal reasoning and opinions. An expert may not testify about the FCC's explanation of the law. It is up to the court to instruct the jury on the law determining whether traffic terminates in a certain area. Cf. Bammerlin v. Navistar Intern. Transp. Corp., 30 F.3d 898, 900 (7th Cir. 1994) ("The meaning of federal regulations is not a question of fact, to be

resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court."). Thus, while the court will allow Owens to testify about factual issues relating to the question of whether the traffic at issue terminated in South Dakota, the court will not allow Owens to testify about the FCC's "end to end" analysis. The last two paragraphs of Section J(4) will be stricken, and Owens will not be allowed to testify about the FCC's analysis at trial.

In Section J(5), Owens explained the purpose of the carrier common line charge and argued that Sancom's application of the charge for free calling service company traffic was not permitted by the terms of Sancom's intrastate switched access tariff. Owens Report at 81-82. Like Sections J(2) and J(3), Section J(5) sets out the relevant tariff terms and explains how those terms apply under the facts of this case. Assuming the court finds that there are issues for the jury on the issue of the carrier common line charge, Owens' proposed testimony in Section J(5) is admissible.

In Section J(6), Owens identified several facts about Sancom's relationships with Free Conference and Ocean Bay and opined that Sancom treated these companies as partners, rather than as end user customers, and that the services provided by Sancom were a form of private carriage. Owens Report at 85. This is not the type of legal testimony prohibited by Southern Pine and Hogan. Owens' testimony is helpful to the finder of fact because it

identifies the relevant facts supporting his opinion and does not merely tell the finder of fact what result to reach. Section J(6) is admissible.

In Section J(7), Owens opined that Sancom treated Ocean Bay as a carrier, not as an end user, by assessing Ocean Bay 800 database query charges. Id. at 85-86. Owens stated that 800 database query charges are typically assessed to interexchange carriers and are never assessed to end users who originate calls to 800 numbers. Id. at 86. Owens' opinion in Section J(7) is based on a comparison of industry standards to case-specific details. This type of expert testimony is admissible. See Cedar Hill, 563 F.3d at 343 (finding expert testimony explaining industry-standard context relevant and admissible). Thus, Sancom's motion to strike Section J is granted with respect to portions of Section J(4) and denied with respect to the remainder of Section J.

### 7.     Section K: Sancom Discriminated in the Provision of FCSC Service

In Section K, Owens opined that if Sancom provided local exchange service to Free Conference and Ocean Bay, then Sancom violated the prohibition on unjust or unreasonable discrimination. Owens Report at 87-88. Owens set out the language of SDCL 49-31-11 and § 202(a) of the Communications Act. Id. Then Owens explained that if Sancom provided local exchange service to Free Conference and Ocean Bay, then Sancom provided a service that is not available to other end user customers who receive services

pursuant to Sancom's tariffs.  Id. at 88.  Owens concluded that such behavior

would result in unjust and unreasonable discrimination between Sancom's free

calling service company partners and legitimate local exchange customers.  Id.

at 88.

The court will provide the jury with the relevant law and will not allow

Owens to set out or explain the statutory prohibitions on unjust and

unreasonable discrimination.  See Police Retirement System, 940 F.2d at 357

(finding extended testimony on the meaning of statutory provision

inadmissible).  But Owens' opinion that if Sancom is found to have provided

local exchange service to Free Conference and Ocean Bay, then Sancom must

have engaged in unjust and unreasonable discrimination is admissible.  In

Nucor, 891 F.2d at 1350, a case involving a claim that a power company

charged unfair, unreasonable, and discriminatory rates, the Eighth Circuit

allowed expert testimony on the meaning of the terms, "fair," "reasonable," and

"non-discriminatory."  Just as in Nucor, the present case involves a complex

regulatory scheme and an allegation that a regulated company engaged in

discriminatory practices.  Thus, the court finds that Owens' testimony that

Sancom's behavior constituted unjust and unreasonable practices is

admissible.[3]  Sancom's motion to strike Section K is denied.

_____

[3] Sancom cites Hogan v. American Telephone and Telegraph Company,
812 F.2d 409, 411 (8th Cir. 1987), for the proposition that testimony labeling
certain conduct as discriminatory is inadmissible.  In Hogan, 812 F.3d at 411,

**8.     Section L: Qwest has No Remedy, Other Than Withhold
         Payment**

In Section L, Owens argued that Qwest's only alternative upon

determining that the access charges assessed by Sancom for free calling service

company traffic were not permitted by Sancom's tariffs was to dispute

Sancom's access charges and cease payment of Sancom's invoices.  Owens

Report at 88.  In Section L(1), Owens explained that Qwest could not complete

its customers calls to the free calling service companies without delivering the

calls to Sancom for termination.  Id. at 89.  This testimony explains industry

standards and practices and is admissible.  See Southern Pine, 320 F.3d at

841.

In Section L(2), Owens stated that Qwest could not deaverage its retail

long-distance rates to reflect the high cost of completing calls to Sancom's free

calling service company partners because such deaveraging was prohibited by

---

the Eighth Circuit found that the trial court erred—albeit harmlessly—in
allowing lay witnesses to testify about whether they observed discriminatory
acts or intended to discriminate.  The court reasoned that the exclusion of
opinion testimony is appropriate if the terms used, such as "discriminate,"
have a separate, distinct, and special legal meaning.  Id.  The court finds that
the reasoning in Hogan does not render Owens' testimony in Section K
inadmissible because Hogan predates Nucor, Hogan involved lay testimony
rather than expert testimony, and Hogan involved claims of race discrimination
in an employment context rather than claims of discriminatory conduct by a
regulated carrier in the telecommunications industry.  Based on the differences
between Hogan and the present case and the similarities between Nucor and
the present case, the court finds that the reasoning in Nucor applies in this
case.

the Telecommunications Act. Owens Report at 89-90. Section L(2) is a statement of the statute and a conclusion that the statute bars Qwest from deaveraging its retail long-distance rates. This is the type of expert testimony that usurps the role of the judge in instructing the jury on the law and impermissibly tells the factfinder what result to reach. See Hogan, 812 F.2d at 411. Section L(2) will be stricken and Owens will not be allowed to reference § 254(g) of the Telecommunications Act and conclude that this section would prohibit deaveraging.

In Section L(3), Owens asserted that Qwest could properly dispute and refuse to pay Sancom's invoices for switched access charges associated with the free calling service company traffic. Owens Report at 90. Owens also answered Sancom's claim that the filed rate doctrine prevents Qwest from failing to pay Sancom's invoices by setting out the filed rate doctrine, quoting several cases, citing § 203(c) of the Communications Act, and concluding that the filed rate doctrine bars Sancom from charging Qwest for access services that do not satisfy the requirements of Sancom's tariffs. Id. at 90-91 (quoting AT&T Co. v. Central Office Tel., 524 U.S. 214, 223-24 (1998); Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 195 (2d Cir. 2001)). Owens' analysis in Section L(3) constitutes legal reasoning that is more appropriate for a legal brief than for an expert report. Owens may not testify about the meaning of and requirements of the filed rate doctrine; these are matters for the judge to

consider at summary judgment and, if necessary, to instruct the jury on.  <u>See</u>

<u>Southern Pine</u>, 320 F.3d at 841.  Section L(3) will be stricken and Owens will

not be allowed to testify about the contours of the filed rate doctrine at trial.

Overall, Sancom's motion to strike Section L is granted in part and denied in

part.

### 9. Section M: Review of FCC Proceedings Regarding Traffic Pumping

In Section M, Owens discussed the proceedings and opinions of the FCC

in two cases, <u>Farmers and Merchants</u> and <u>In re Request for Review by</u>

<u>InterCall, Inc. of Decision of Universal Service Administrator</u>, 2008 WL

2597359, 23 F.C.C.R. 10731 (2008).  With respect to <u>Farmers and Merchants</u>,

Owens set out the procedural history, asserted that the local exchange

companies misrepresented facts to the FCC, and quoted a portion of the public

proceeding before the Iowa Utilities Board.  Owens Report at 91-95.  With

respect to <u>InterCall</u>, Owens summarized the FCC's decision and concluded that

<u>InterCall</u> shows that Sancom is not entitled to assess switched access charges

for calls to Free Conference because Free Conference is a carrier, not an end

user.  <u>Id.</u> at 95-96.  Owens' discussion in Section M is inadmissible expert

testimony on matters of law.  <u>See</u> <u>Southern Pine</u>, 320 F.3d at 841.  Counsel for

Qwest and Sancom may cite and discuss <u>Farmers and Merchants</u> and <u>InterCall</u>

in their briefs, but the reasoning and weight of an FCC decision is not a proper

matter for expert testimony.  Sancom's motion to strike Section M is granted.

### 10.    Summaries

Based on the foregoing, the summary of Section M found on page 9 of the Owens Report is stricken.  But Sancom's motion to strike Summary Conclusion Nos. 1, 3, 4, 5, 6, and 7 found on pages 2 through 4 of the Owens Report is denied.  Sancom's motion to strike the summaries of Sections D, E, F, H, I, J, K, and L found on pages 6 through 9 of the Owens Report is denied because portions of these sections are admissible.  Finally, Sancom's motion to strike "Summary of Findings" numbers 1, 3, 4, 6, 7, and 8 found on page 98 of the Owens Report is denied.

### B.    Owens Rebuttal and First Supplemental Report

Sancom moves to strike Sections D(4), D(5), E, and F of the Owens Rebuttal and First Supplemental Report on the grounds that these sections constitute improper legal opinions and conclusions and are improper rebuttal testimony.

### 1.    Section D(4): Sales Tax Audit

In Section D(4), Owens addressed a sales tax audit performed by the South Dakota Department of Revenue and Regulation.  Owens Rebuttal and First Supplemental Report at 36.  The auditor found that Sancom was not obligated to collect sales tax from Free Conference because Free Conference was acting as a reseller, not an end user.  Id.  Qwest first learned of the audit during the deposition of Sancom's comptroller.  Id. at 36-37.  Owens argued

26

that the audit was based on an inaccurate description of how the Free Conference traffic was routed and that the auditor may not have realized that Sancom considered the fees paid by long-distance carriers to be access charges.  Id. at 37-39.  Owens also argued that Free Conference and Ocean Bay did not resell local exchange service to their own customers.

Sancom argues that Section D(4) is inadmissible because it contains impermissible legal conclusions and Owens has no qualifications or experience relating to tax audits.  The court finds that Section D(4) does not contain impermissible legal conclusions.  Owens' proposed testimony compares the assumptions of the auditor with his understanding of the facts of the case.  His testimony appears to be based on industry practices and the nature of the Sancom-Free Conference relationship.  This is not opinion testimony couched as a legal conclusion that merely tells the jury what result to reach.  Thus, Section D(4) is not inadmissible as an impermissible legal conclusion.  With respect to Owens' qualification to testify regarding the tax audit, the court finds that Owens' experience in the telecommunications industry qualifies him to point out the alleged misinformation and misunderstandings regarding the nature of the Sancom-Free Conference relationship underlying the tax audit. Any gaps in Owens' qualifications or knowledge regarding tax audits go to the weight to be given his testimony, not its admissibility.  Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006).  Sancom can bring out the

weaknesses of Owens' testimony on the tax audit on cross-examination. See Kudabeck v. Kroger Co., 338 F.3d 856, 862 (8th Cir. 2003) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Sancom's motion to strike Section D(4) is denied.

### 2. Section D(5): Sancom General Exchange and Interstate Access Tariffs

In Section D(5), Owens indicated that he had received copies of Sancom's General Exchange Tariffs and intrastate access tariffs from the South Dakota Public Utilities Commission, documents he did not have when he prepared his initial report. Owens Report at 39. Owens updated his analysis from Section F of the Owens Report using the correct switched access rates. Owens Report at 40-43. Sancom argues that Section D(5) is inadmissible expert testimony on the meaning and application of state and federal regulations and tariffs. As the court explained in addressing Sancom's motion to strike Section F of the Owens Report, background information regarding Sancom's rates is admissible to provide an industry standard context for the specific facts of this case regarding Sancom's relationship with Free Conference and Ocean Bay. As a result, the court finds that Owens' updated analysis in Section D(5) of his rebuttal and first supplemental report is admissible. Sancom's motion to strike Section D(5) is denied.

### 3. Section E: The FCC's Qwest v. Farmers Merchants Decision Relied on Falsified Documents

In Section E, Owens explained the background of the Farmers and Merchants decision and asserted new facts to support his argument that the FCC relied on falsified documents. Owens Rebuttal and First Supplemental Report at 43-46. For the reasons set forth in the court's discussion of Section M of the Owens Report, Section E of the Owens Rebuttal and First Supplemental Report is inadmissible, and Sancom's motion to strike this section is granted.

### 4. Section F: AT&T v. Jefferson

In Section F, Owens set out the background and reasoning of the FCC's opinion in AT&T Corp. v. Jefferson Tel. Co., 2001 WL 994994, 16 F.C.C.R. 16130 (2001). Owens Rebuttal and First Supplemental Report at 46-47. Like Owens' discussion of Farmers and Merchants and InterCall in his initial report, Owens' discussion of Jefferson in his rebuttal and first supplemental report usurps the role of the judge in determining the law. Because the court finds that Section F constitutes impermissible testimony on legal matters, the court need not address Sancom's argument that Section F also constitutes improper rebuttal testimony. Sancom's motion to strike Section F is granted.

## III. Owens Surrebuttal and Second Supplemental Report

Sancom also moves to strike all but Section I.B of the Owens Surrebuttal and Second Supplemental Report on the grounds that this report is improper

supplemental testimony under Rule 26(e) of the Federal Rules of Civil Procedure, is composed entirely of legal analysis, and is cumulative. Qwest argues that the Owens Surrebuttal and Second Supplemental Report is proper supplemental testimony responding to new opinions stated in Calabro's rebuttal report and as a result is admissible under Rule 26(e). Qwest also argues that Owens' opinions are not improper legal conclusions.

## A.    Rule 26

Rule 26(a)(2) of the Federal Rules of Civil Procedure governs the mandatory disclosure of expert testimony. Under this rule, each party must disclose the identity of any expert witness it may use at trial, along with a written report prepared and signed by the witness, by the date ordered by the court or, in the absence of a court order, 90 days before trial. Fed. R. Civ. P. 26(a)(2). If the evidence is offered solely to contradict or rebut expert testimony offered by another party, however, disclosure may be made up to 30 days after the other party's disclosure. Fed. R. Civ. P. 26(a)(2)(C)(ii). Each party also has an obligation to supplement information included in an expert's report or given during an expert's deposition "if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e). Absent a court order directing otherwise, supplemental disclosures must be made at least 30 days before trial. Fed. R. Civ. P. 26(a)(3)(B), 26(e).

Here, the court ordered the parties to disclose the identity of and reports from retained experts by March 27, 2009, any rebuttal reports by April 27, 2009, and any supplementations under Rule 26(e) by twenty days before trial. Docket 102. Qwest disclosed the Owens Surrebuttal and Second Supplemental Report on July 28, 2009, two months after the deadline for rebuttal reports. Thus, unless the Owens Surrebuttal and Second Supplemental Report qualifies as a supplemental report under Rule 26(e), it is untimely.

The court finds that the Owens Surrebuttal and Second Supplemental Report does not qualify as a supplemental report. The purpose of a supplemental report is to "inform the opposing party of any changes or alterations," Tenbarge v. Ames Taping Tool Sys., Inc., 190 F.3d 862, 865 (8th Cir. 1999), not "to provide an extension of the deadline by which a party must deliver the lion's share of its expert information," Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., 73 F.3d 546, 571 (5th Cir. 1996). Rule 26(e) "permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was not available at the time of the initial report." Minebea Co. v. Papst, 231 F.R.D. 3, 6 (D.D.C. 2005).

The Owens Surrebuttal and Second Supplemental Report consists of Owens' response to arguments raised by Calabro in his rebuttal report and deposition. Calabro's arguments, in turn, respond to assertions made by Owens in his initial report. For example, in Section A(2) of the Owens

Surrebuttal and Second Supplemental Report, Owens argued that Calabro incorrectly interpreted Owens' discussion of the origin of access charges. Owens explained his position (originally stated in Section E of the Owens Report), responded to Calabro's discussion of Owens' position, and restated his original argument. Owens did not indicate that his initial report contained inaccuracies or that he had discovered new information—as opposed to new arguments by Calabro—that rendered his initial report incomplete or incorrect. The court has reviewed the remainder of the Owens Surrebuttal and Second Supplemental Report, including Owens' discussion of Calabro's arguments in Sections A(2) through A(15) and Owens' discussion of netting in Section C, and finds that the report does not qualify as a supplemental report under Rule 26(e) because it does not correct inaccuracies or add information that was unavailable to Owens at the time of the initial report. Rather, the Owens Surrebuttal and Second Supplemental Report reads more like a rebuttal report offered solely to contradict or rebut expert testimony offered by Sancom. See Fed. R. Civ. P. 26(a)(2)(C)(ii). But as the court previously noted, Qwest disclosed the Owens Surrebuttal and Second Supplemental Report two months after the deadline for rebuttal reports.

Because the Owens Surrebuttal and Second Supplemental Report does not qualify as a supplemental report under Rule 26(e), it is untimely. Untimely disclosure of an expert opinion triggers Rule 37(c)(1) sanctions, including the

exclusion at trial of testimony on undisclosed opinions, unless "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The court should consider four factors in determining whether exclusion is the proper sanction for untimely expert testimony: (1) the importance of the excluded expert testimony; (2) the party's explanation for failure to disclose; (3) the potential prejudice created by permitting use of the expert testimony at trial or on a pending motion; and (4) the ability to cure any prejudice by granting a continuance. See Transclean Corp. v. Bridgewood Servs., Inc., 101 F. Supp. 2d 788, 795 (D. Minn. 2000); see also Citizens Bank of Batesville, Ark. v. Ford Motor Co., 16 F.3d 965, 966 (8th Cir. 1994) (using four factors to determine whether the trial court can exclude witnesses not disclosed in compliance with the pretrial order). The trial court has great discretion in determining whether to strike expert testimony that is disclosed in contravention of the court's scheduling orders. See Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 285 (8th Cir. 1995).

Considering the first factor, the court finds that Owens' proposed testimony in his surrebuttal and second supplemental report is not particularly important because most of Owens' responses to Calabro's arguments can be brought out by counsel for Qwest on cross-examination of Calabro. For example, Owens' argument that Calabro's discussion of the term "traffic pumping" and whether it applies to Sancom's practices is unpersuasive

33

because Calabro was not aware that Sancom had a relationship with Ocean Bay, that Ocean Bay engaged in certain practices, or that Free Conference paid some companies to generate traffic can be brought out on cross-examination of Calabro without the testimony of Owens. In several other places in the Owens Surrebuttal and Second Supplemental Report, Owens points out issues and facts that Calabro admitted he had not considered. Because many of Owens' arguments in this report can be brought out at trial without Owens' testimony, the proposed testimony is not particularly important.

With respect to the second factor, the court finds Qwest's explanation for the failure to timely disclose the opinions contained in the Owens Surrebuttal and Second Supplemental Report to be persuasive. Sancom disclosed Calabro's initial report on March 27, 2009. This sixteen-page report provided an overview of the operations of Sancom and Free Conferencing, a description of the steps involved in call termination of conference calls, a discussion of Voice Over Internet Protocol services, and a four-page explanation of why the services Sancom provided to Qwest qualified as switched access service under Sancom's tariffs. Calabro discussed only one provision of Sancom's interstate tariff and did not discuss any of the other tariff provisions brought up by Owens. Sancom disclosed Calabro's rebuttal report on April 27, 2009. In this thirty-five page report, Calabro discussed in detail the arguments raised by Owens in his initial report. Thus, Calabro did not discuss many of the issues

deemed relevant by Qwest and Owens until the same time that Owens disclosed his rebuttal and first supplemental report, so Owens did not have an opportunity to respond to Calabro's arguments. Because Owens did not have an opportunity to respond to the bulk of Calabro's theory in his rebuttal report, the court finds that Qwest's disclosure of a surrebuttal report by Owens was justified.

The court also finds that the timing of the disclosure of the Owens Surrebuttal and Second Supplemental Report was substantially justified. While Sancom disclosed Calabro's rebuttal report on April 27, 2009, Qwest did not depose Calabro until June 11, 2009. See Declaration of Charles W. Steese, Docket 187 at ¶ 2. After the deposition, counsel for Qwest informed counsel for Sancom that Qwest intended to ask Owens to supplement his report to respond to the new arguments raised by Calabro in his rebuttal report and deposition. Id. Counsel for Qwest received the transcript of Calabro's deposition on June 24, 2009, and disclosed the Owens Surrebuttal and Second Supplemental Report thirty-four days later on July 28, 2009. Thus, Sancom was not surprised by Qwest's disclosure of the Owens Surrebuttal and Second Supplemental Report, and Qwest disclosed the report about one month after receiving the last piece of information necessary for Owens to respond to the new arguments of Calabro. Under these circumstances, the court finds that the late disclosure was harmless.

Considering the third factor, the court finds that the potential prejudice to Sancom created by permitting the use of the Owens Surrebuttal and Second Supplemental Report at trial or on a pending motion is minimal. As noted under the first factor, most of Owens' arguments in his most recent report can be addressed by counsel for Qwest on cross-examination of Calabro. While this fact renders Owens' report relatively unimportant, it also means that Sancom will not be prejudiced by denial of its motion to strike this report. Moreover, unlike some reports excluded by courts as improper supplementation under Rule 26(e), the Owens Surrebuttal and Second Supplemental Report does not contain new opinions by Owens. Indeed, Sancom argues that this report does not contain any new arguments and is largely duplicative of Owens' previous submissions. Thus, admission of Owens' arguments does not prejudice Sancom.

Finally, with respect to the fourth factor, the court finds that a continuance would be unnecessary in this case because there is no prejudice to Sancom and a trial date has not been set. Because Qwest's disclosure (and the timing of the disclosure) of the Owens Surrebuttal and Second Supplemental Report is substantially justified and does not prejudice Sancom, Sancom's motion to strike this report under Rules 26 and 37 is denied.

## B.     Legal Conclusions

Sancom also argues that the Owens Surrebuttal and Second Supplemental Report should be stricken because it consists of improper legal analysis.  The court has reviewed the Owens Surrebuttal and Second Supplemental Report and finds that it does not contain improper legal analysis by an expert witness for the same reasons articulated in Section I above. Sancom's motion to strike the Owens Surrebuttal and Second Supplemental Report on this ground is denied.

## C.     Rule 403: Cumulativeness

Finally, Sancom argues that the Owens Surrebuttal and Second Supplemental Report should be excluded under Rule 403 of the Federal Rules of Evidence because it is cumulative.  Under Rule 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.  Sancom's argument is unavailing. The court generally does not receive expert reports as exhibits at trial.  Thus, the jury will not have before it copies of Owens' three reports, which concededly contain many of the same arguments.  Rather, counsel for Qwest will have to bring out Owens' opinions on direct examination.  The court cannot determine if Qwest will attempt to put on needlessly cumulative evidence at this stage, so

Sancom's motion to strike the Owens Surrebuttal and Second Supplemental

Report under Rule 403 is denied.

## III.  Canfield Report

Sancom also moves to strike portions of the Canfield Report, namely the

statement, "I believe that Sancom and Free Conference are jointly and severally

liable for these damages suffered by Qwest," and all references to "damages."

In order to determine the admissibility of these phrases, the court must

consider their context within the report taken as a whole.  Canfield's expert

report explains his analysis of the damages Qwest suffered arising out of the

traffic it carried to and from Free Conference and Ocean Bay.  Id. at ¶ 3.

Canfield indicated that he examined the following data in his analysis of

Qwest's losses: Qwest's switch call detail records from January 1, 2005, to

March 9, 2009, switched access invoices submitted by Sancom to Qwest from

April 2005 to March 2009, Qwest's off-network rates for traffic Qwest delivered

to Sancom via alternate long-distance providers, Qwest's wholesale rates for

traffic Qwest delivered to Sancom on behalf of Global Crossing, the Local

Exchange Routing Guide published by Telcordia, the Feature Group D CIC

Report published on the NANPA website, telephone number ranges provided by

Sancom to Free Conference and Ocean Bay, and Sancom's summary of

minutes and payments to Free Conference.  Id. at ¶ 8.  Canfield determined the

total number of minutes Qwest transported to or from Sancom from

February 1, 2005, through March 6, 2009, and the number of these minutes that were transported to or from a number associated with a free calling service company. Id. at ¶¶ 9-11. Next Canfield determined the appropriate rate for the Sancom traffic, which he divided into three categories, and calculated the total costs Qwest incurred. Id. at ¶¶ 13-15. Canfield examined Sancom's invoices to Qwest and Qwest's associated payments and determined that the total cost to Qwest for the free calling service company traffic delivered to Sancom was $1,311,042.02, that Qwest withheld payment in the amount of $528,146.84, and that Qwest was due a refund in the amount of $782,895.18. Id. at ¶¶ 16-17. At this point, Canfield stated, "I believe that Sancom and Free Conference are jointly and severally liable for these damages suffered by Qwest." Id. at ¶ 17.

Canfield also examined documents submitted by Sancom to determine the amount Sancom paid Free Conference between May 20, 2005, and June 17, 2008. Id. at ¶ 18. Canfield found that Sancom provided nearly $8.8 million in payment for 459.4 million minutes of use. Id. Considering that Qwest delivered 51.3 million minutes of use associated with Free Conference telephone numbers to Sancom, Canfield determined that Free Conference was compensated $981,106 for traffic delivered by Qwest. Id.

Finally, Canfield summarized the reliability and accuracy of the software he used to pull the applicable data and explained that his calculation of the

damages was undervalued because call records were unavailable for certain periods of time.  Id. at ¶¶ 19-21.

## A.    Statement about Joint and Several Liability

Sancom argues that Canfield's opinion that "Sancom and Free Conference are jointly and severally liable for these damages suffered by Qwest," should be excluded as an impermissible legal conclusion by an expert witness and because Canfield does not have the experience or background to testify about joint and several liability.  The court agrees.

As noted, Canfield's report focuses on the factors and data he used to calculate the amount Qwest paid for free calling service company traffic to Sancom.  Aside from determining the amount Sancom compensated Free Conference for traffic delivered by Qwest, Canfield did not discuss the relationship between Sancom and Free Conference or the theories of liability under which Qwest could recover from Sancom.  Moreover, the question of whether liability is joint and several is a legal question for the court.  See Mary J. Cavins, Annotation, Propriety and Effect of Jury's Apportionment of Damages as Between Tortfeasores Jointly and Severally Liable, 46 A.L.R. 801 at § 3(a) (explaining traditional rule that damages against joint tortfeasors may not be apportioned unless otherwise allowed by statute).  Thus, Canfield's opinion about joint and several liability is an unsupported legal conclusion that merely tells the finder of fact what result to reach.  As noted, "opinion

testimony that is couched as a legal conclusion or that merely tells the factfinder what result to reach is not helpful" and must be excluded. <u>Hogan</u>, 812 F.2d at 411. The statement, "I believe that Sancom and Free Conference are jointly and severally liable for these damages suffered by Qwest," in paragraph 17 of the Canfield Report will be stricken, and Canfield will not be allowed to testify about joint and several liability at trial.

### B.    References to "Damages"

Sancom also argues that all references to "damages" in Canfield's report should be stricken because Canfield does not know the legal definition of damages, Canfield merely acted as a human calculator, Canfield would not provide any assistance to the jury because the jury is capable of performing basic mathematical functions, and Canfield's calculations did not require any specialized knowledge. The court disagrees.

As noted, evidence based on scientific, technical, or other specialized knowledge is admissible under Rule 702 if (1) the evidence is relevant, that is, useful to the finder of fact, (2) the witness is qualified, and (3) the evidence is reliable or trustworthy. <u>Lauzon</u>, 270 F.3d at 686. Sancom does not argue that Canfield's methodology in analyzing the call and billing data and calculating Qwest's damages is unreliable, so the third prong is satisfied. <u>See</u> <u>Bonner v. ISP Tech., Inc.</u>, 259 F.3d 924, 929 (8th Cir. 2001) (explaining that the reliability prong is concerned with expert witnesses' methodology). Sancom

does argue that Canfield's opinion is not helpful to the finder of fact and that Canfield is not qualified to opine on Qwest's "damages."

With respect to the relevancy prong, expert testimony will be relevant and helpful to the jury if it concerns matters beyond the general knowledge of average individuals. See United States v. Shedlock, 62 F.3d 214, 219 (8th Cir. 1995). Here, Canfield's analysis of Qwest's call records and Sancom's invoices concerns matters beyond the general knowledge of average individuals. While average individuals may be able to multiply the number of minutes of use by the rate per minute to determine the total costs for the traffic, Canfield's calculation of Qwest's losses required isolating the relevant calls, determining which traffic was carried to Free Conference or Ocean Bay, segregating the calls into categories for the purpose of determining the applicable rate, performing calculations to determine the cost per category, and ascertaining which invoices Qwest paid and which payments Qwest withheld. For one category of traffic, the rate was applied on a month-by-month basis. For the second category, the rate varied based on the wholesale partner carrying the traffic. For the final category, the rate was determined on a month-by-month basis and the total cost was offset by the revenue Qwest received from its wholesale partners. Canfield analyzed more than 55 million minutes transported by Qwest. The numerous factors and sheer volume of calls going into Canfield's calculations mean that his analysis and conclusions concern

matters beyond the general knowledge of average individuals. Canfield's analysis does not involve the rudimentary multiplication that Sancom asserts it does. Thus, Canfield's opinion regarding the amount to which Sancom is entitled in an invoice credit and refund is relevant and helpful to the jury.

With respect to the qualification prong, Rule 702 recognizes five bases for qualifying an expert, which include "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. And "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." Robinson, 447 F.3d at 1100. Here, Canfield is qualified to offer an opinion on the damages Qwest incurred based on his education and his knowledge and experience in the billing practices of the telecommunications industry. Canfield holds a Bachelor of Science degree in Finance and Economics and a Master of Business Administration degree. Canfield Report at ¶ 2. He has worked in the telecommunications industry since 1996 and is the Executive Director of Usage Audit and Analysis at TEOCO Corporation. Id. He has also managed the implementation of mediation, billing, and bill payment systems and represented his company at industry forums responsible for the development of guidelines supporting intercarrier access billing procedures. Id. These experiences qualify Canfield to opine on Qwest's losses.

Sancom argues that Canfield is not qualified to refer to Qwest's "damages" because he cannot provide a legal definition of that term and does

43

not know the bases for liability in this case.  It is not necessary for Canfield to explain the legal definition of "damages."  Indeed, as Sancom states many times over, it is the role of the trial judge to instruct the jury on the law.  See Southern Pine, 320 F.3d at 841.  Canfield explained in his deposition that he used the word "damages" to "refer to the overall costs incurred to Qwest for the traffic received from or delivered to telephone numbers of Free Conference Corp. or Ocean Bay Marketing."  Videotape Deposition of Derek Canfield, Docket 131-4 at 51.  Canfield later clarified, "[a]gain, the purpose of my testimony is to calculate the associated costs of this traffic, as requested by Qwest."  Id. at 52.  It will be up to the court to determine if Canfield's testimony is relevant on the issue of damages, and if Sancom has any concerns that Canfield's use of the term would confuse the jury, Sancom can ask Canfield to clarify his meaning on cross-examination.

And, it is well-settled that a damages expert like Canfield can testify as to damages while assuming the underlying liability.  See, e.g., In re Sulfuric Acid Antitrust Litigation, 235 F.R.D. 646, 660 (N.D. Ill. 2006) ("A damages model would, of course, be necessarily consistent with liability, or necessarily assume liability.").  Canfield's opinion on the costs Qwest incurred from the traffic delivered to the free calling service companies is not rendered inadmissible because Canfield is not qualified to opine on the underlying liability issues.

Sancom's motion to strike the word, "damages," from the Canfield Report is denied.

Based on the foregoing, it is hereby

ORDERED that Sancom's motion to strike portions of Qwest's Rule 26(a)(2)(B) Disclosure and the Expert Report of Jeffrey D. Owens (Docket 111) is granted in part and denied in part as set forth herein.

IT IS FURTHER ORDERED that Sancom's motion to strike portions of the Rebuttal and First Supplemental Report of Jeffrey D. Owens and the Expert Disclosure of Derek Canfield (Docket 112) is granted in part and denied in part as set forth herein.

IT IS FURTHER ORDERED that Sancom's motion to strike portions of the Surrebuttal and Second Supplemental Report of Jeffrey D. Owens (Docket 173) is denied.

IT IS FURTHER ORDERED that Qwest's request for a <u>Daubert</u> hearing and for oral argument on Sancom's motions to strike (Dockets 132 and 186) is denied as moot.

Dated January 4, 2010.

BY THE COURT:


/s/ *Karen E. Schreier*
_____
KAREN E. SCHREIER
CHIEF JUDGE