UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SANCOM, INC., a South Dakota corporation, | ) ) ) | CIV. 07-4147-KES |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| QWEST COMMUNICATIONS CORPORATION, a Delaware corporation, | ) ) ) ) | ORDER STAYING CASE AND REFERRING SEVERAL ISSUES TO FEDERAL COMMUNICATIONS |
| Defendant and Counterclaimant, | ) ) ) | COMMISSION AND DENYING MOTION FOR RECONSIDERATION |
| vs. | ) ) | |
| SANCOM, INC., a South Dakota corporation; and FREE CONFERENCING CORPORATION, a Nevada corporation, | ) ) ) ) ) ) | |
| Counterclaim Defendants. | ) | |

Plaintiff, Sancom, Inc. (Sancom), moves the court to stay the case and refer several issues to the Federal Communications Commission (FCC) for resolution. Defendant, Qwest Communications Corporation (Qwest), opposes the motion.

**BACKGROUND**

**I.    History of the Present Case**

Sancom brought this action to recover amounts allegedly due under its federal and state tariffs. Sancom, a competitive local exchange carrier (CLEC)

based in South Dakota, alleges that it provided originating and terminating

access services to Qwest, an interexchange carrier (IXC), and billed Qwest the

applicable rates set forth in Sancom's interstate access tariff filed with the FCC

and intrastate access tariff filed with the South Dakota Public Utilities

Commission (SDPUC).[1] Sancom alleges that Qwest has failed to pay the

invoices and as a result owes Sancom at least $526,671.60 plus interest and

applicable fees.

---

[1] By way of background, there are two types of telecommunications providers, local exchange carriers (LECs) and IXCs. LECs provide the service and own the hardware that connects to individual customers in their local areas. By contrast, IXCs, commonly known as long-distance carriers, own the hardware that connects different local carriers. When an individual makes a long-distance telephone call, the call is originated on wires and facilities owned by the LEC serving the individual making the call and the call is terminated over wires and facilities owned by the LEC serving the individual receiving the call. IXCs pay "originating" and "terminating" access charges to the LECs that serve individuals who initiate and receive long-distance calls, respectively.

LECs are further divided into incumbent local exchange carriers (ILECs) and CLECs. "ILECs . . . operated as monopolies in a given area until the local phone service market was opened by the Telecommunications Act of 1996, which provided for the emergence of new LECs, the CLECs, to compete with the so-called 'Baby Bells.' " Advamtel, LLC v. AT&T Corp., 118 F. Supp. 2d 680, 681(E.D. Va. 2000). ILECs are required to file and maintain tariffs setting the rate for access service with the FCC (for purely interstate communications) or the applicable state utility commission (for intrastate communications). In re Establishing Just & Reasonable Rates for Local Exchange Carriers, 2007 WL 2872755, 22 F.C.C.R. 17989, ¶ 2 (2007) (notice of proposed rulemaking). In general, CLECs may file interstate access tariffs if the rate for access service is no higher than the rate charged for such services by the competing ILEC. Id. at ¶ 10. CLECs may negotiate higher rates with IXCs. Id. Special rules apply to rural CLECs. Id.

Sancom also alleges that Qwest refused to pay Sancom's invoices in order to destroy the business relationship between Sancom and Free Conferencing Corporation (Free Conferencing), a conference calling company.[2] Sancom alleges that it entered into a contract with Free Conferencing under which Sancom provided tariffed services to Free Conferencing and allowed Free Conferencing to collocate its conference call bridges at Sancom's central office. Sancom terminated calls made to telephone numbers assigned to Free Conferencing, charged the IXC that carried the call the terminating switched access charge, and paid Free Conferencing a "marketing fee" in the form of a portion of the charge collected from the IXC. Sancom also alleges that in 2007, Qwest conspired with one or more IXCs to identify small LECs that deliver traffic to conference calling companies. Sancom alleges that Qwest then charged its own customers more for calls that would be terminated by these small LECs and at the same time refused to pay all terminating access charges to the small LECs, including charges associated with calls to both conference calling companies and non-conference calling company customers.

---

[2] Free Conferencing provides free conference calling services to its customers. Free Conferencing's customers use their own IXCs to call a telephone number assigned to Free Conferencing, which connects the customers to a conference call bridge located on the Sancom network. Conference call participants are connected to each other at and by the bridge. Sancom charges the IXC that transmitted the call to Sancom for delivery to the Free Conferencing bridge the normal terminating access charge. The court will refer to Free Conferencing and other companies that provide free telephone services (such as conferencing calling, pornographic chatting, and international calling) collectively as "free calling providers" or "conference calling companies."

Sancom filed suit against Qwest alleging breach of contract based on Qwest's failure to pay the access charges set out in Sancom's federal and state tariffs, breach of implied contract, unjust enrichment, tortious interference with business relations, violation of § 37-24 of the South Dakota Deceptive Trade Practices and Consumer Protection Act, and unjust and unreasonable practices in violation of 47 U.S.C. § 201(b) (§ 201(b)).

Qwest denies that it failed to pay switched access charges for services provided pursuant to Sancom's tariffs on the ground that the services provided by Sancom do not qualify as "switched access service," as that term is defined in Sancom's tariffs. Qwest alleges that Sancom and Free Conferencing's agreement constituted a "traffic pumping scheme" under which Free Conferencing stimulated long-distance calls by offering various calling services to the public free of charge. Qwest alleges that the sole purpose of Sancom's arrangements with Free Conferencing and other conference calling companies was to artificially and dramatically increase long-distance traffic through Sancom's switches and thereby generate excessive and unreasonable terminating switched access revenue.

Qwest counterclaimed against Sancom, alleging unjust and unreasonable practices in violation of § 201(b) based on Sancom's participation in the traffic pumping scheme and conduct in charging for services under its tariffs that it did not provide, violation of 47 U.S.C. § 203(c) (§ 203(c)) based on Sancom's assessment of charges for terminating switched access services in a

4

manner contrary to its published tariff, unfair competition, breach of contract arising out of Sancom's state and federal tariffs, tortious interference with business contract based on Sancom's interference with Qwest's contracts with other long-distance carriers, civil conspiracy, and unjust enrichment. Qwest also requested declaratory relief. Qwest named Free Conferencing as a counterclaim defendant on its unfair competition, tortious interference with contract, civil conspiracy, and unjust enrichment counterclaims.

The court has ruled on various motions to dismiss in this case. In June 2008, the court denied Sancom's motion to dismiss Qwest's counterclaims.[3] In June 2009, the court dismissed Sancom's unjust enrichment, tortious interference with business relations, South Dakota Deceptive Trade Practices and Consumer Protection Act, and civil conspiracy claims pursuant to the filed rate doctrine. Sancom and Free Conferencing have moved for summary judgment on Sancom's remaining claims against Qwest and on Qwest's counterclaims against Sancom and Free Conferencing. Qwest has moved for summary judgment on Sancom's breach of implied contract and § 201(b) claims. Now Sancom moves the court to reconsider its order dismissing Sancom's unjust enrichment claim and to stay the case and refer certain

---

[3] The June 2008 order addressed the original version of Qwest's counterclaims. Subsequently, Qwest was granted leave to file amended counterclaims adding Free Conferencing as a defendant.

issues to the FCC. The parties' motions for summary judgment (as well as a related motion to strike) are still pending.

## II.    Related Cases

This case is one of a number of cases pending in this court and in other courts involving a dispute between an LEC and an IXC regarding access charges associated with traffic delivered to free calling providers. In each of these cases, an LEC claims that an IXC has wrongfully refused to pay terminating access charges for services performed pursuant to the LEC's tariffs and requests compensation under breach of contract, breach of implied contract, and/or unjust enrichment theories. In each case, the IXC claims that the services provided were not covered by the applicable tariffs because the LEC did not "terminate" the calls and the free calling providers were not "end users" within the meaning of the tariffs. Many of the IXCs also claim that the applicable LEC engaged in unlawful "traffic pumping."

The following cases are pending in the District of South Dakota: Northern Valley Communications, LLC v. MCI Communications Services, Inc. d/b/a Verizon Business Services, Civ. 07-1016-KES;[4] Sancom, Inc. v. Sprint Communications Co., Civ. 07-4107-KES; Northern Valley Communications, LLC v. Sprint Communications Co., Civ. 08-1003-KES; Splitrock Properties,

---

[4] Northern Valley Communications, LLC v. MCI Communications Services, Inc., d/b/a Verizon Business Services, Civ. 07-1016 is consolidated with Sancom, Inc. v. MCI Communications Services, Inc., d/b/a Verizon Business Services, Civ. 07-4106.

Inc. v. Qwest Communications Co., Civ. 08-4172-KES; Sancom, Inc. v. AT&T Corp., Civ. 08-4211-KES; Northern Valley Communications L.L.C. v. AT&T Corp., Civ. 09-1003-CBK; Northern Valley Communications L.L.C. v. Qwest Communications Co., Civ. 09-1004-CBK; and Splitrock Properties, Inc. v. Sprint Communications Co., Civ. 09-4075-KES.[5]  According to Sancom, there are 9 similar cases pending in the United States District Court for the Southern District of Iowa, 3 cases pending in the United States District Court for the Northern District of Iowa, 2 cases pending in the United States District Court for the Southern District of New York, and 1 case each pending in the United States District Court for the District of Minnesota and the United States District Court for the Western District of Kentucky.  Two of these courts have already stayed the action pending referral of several issues to the FCC.  See Tekstar Commc'ns, Inc. v. Sprint Commc'ns Co., Civil No. 08-1130 (JNE/RLE), 2009 WL 2155930 (D. Minn. July 14, 2009); All Am. Tel. Co., Inc. v. AT&T, Inc., 07 Civ. 861 (WHP), Docket 88 (Jan. 19, 2010).  Motions to stay and refer certain issues to the FCC are pending in several of the Southern District of Iowa cases.

---

[5] Motions to stay and refer issues to the FCC have been filed by the plaintiff-CLEC in Sancom v. Sprint, Civ. 07-4107-KES; Northern Valley v. Sprint, Civ. 08-1003-KES; Sancom v. AT&T, Civ. 08-4211-KES; Northern Valley v. AT&T, Civ. 09-1003-CBK; and Northern Valley v. Qwest, Civ. 09-1004-CBK.

**III.** **<u>Farmers</u>**

Similar cases are also pending before various regulatory agencies, the most significant of which is <u>Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Co.</u> (<u>Farmers</u>), pending before the FCC. Sancom's motion to stay and refer several issues to the FCC arises out of the FCC's latest decision in <u>Farmers</u>. In <u>Farmers</u>, Qwest filed a complaint against Farmers and Merchants Mutual Telephone Company (Farmers), an ILEC in Iowa, alleging that Farmers violated <u>§ 201(b)</u> by earning an excessive rate of return as a result of its plan to increase dramatically the amount of terminating access traffic delivered to its exchange via agreements with conference calling companies. <u>Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., 2007 WL 2872754, 22 F.C.C.R. 17973, ¶ 1 (2007)</u> (memorandum opinion and order) ("<u>Farmers I</u>"). Qwest also alleged that Farmers violated <u>§ 203(c) and § 201(b)</u> by assessing switched access charges for services that were not switched access. <u>Id.</u> In October 2007, the FCC issued its memorandum opinion and order in <u>Farmers I</u>, ruling that Farmers violated <u>§ 201(b)</u> by receiving an unlawfully high rate of return, but declining to award Qwest damages because Farmers' tariff was deemed lawful. <u>Id.</u> at ¶¶ 25-26. The FCC also rejected Qwest's argument that Farmers violated <u>§ 203(c) and § 201(b)</u> by imposing terminating access charges on traffic that Farmers did not, in fact, terminate because, the FCC found, Farmers did "terminate" the traffic and the conference calling companies were "end users"

as defined in Farmers' tariff.  Id. at ¶¶ 30, 35.  Qwest filed a petition to reconsider challenging various aspects of Farmers I.

In January 2008, the FCC granted in part Qwest's petition for partial reconsideration based on Qwest's assertions that Farmers falsely represented that the conference calling companies purchased interstate End User Access Service and paid the federal subscriber line charge and that Farmers backdated contract amendments and invoices to make it appear that the conference calling companies had been purchasing tariffed services.  Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., 2008 WL 246393, 22. F.C.C.R. 1615, ¶¶ 3, 6 (2008) (order on reconsideration).  The FCC stated that it granted this motion for partial reconsideration because its finding in Farmers I that the conference calling companies were end users under Farmers' tariff was based on the above-mentioned representations made by Farmers.  Id. at ¶ 6.  The FCC ordered Farmers to produce all of the documents it produced in a related state utilities board proceeding, including documents relating to the decision to backdate contract amendments and invoices.  Id. at ¶ 8.

In November 2009, the FCC issued its second order on reconsideration and ruled that the evidence brought to light pursuant to Qwest's petition for reconsideration warranted a change in its original ruling and compelled the conclusion that Farmers violated § 203(c) and § 201(b).  Qwest Commc'ns Corp. v. Farmers & Merchants Mutual Tel. Co., No. EB-07-MD-001, 2009 WL

4073944, ¶ 1 (FCC Nov. 25, 2009) (second order on reconsideration) ("Farmers II").[6]  The FCC found that the conference calling companies did not subscribe to the services offered under Farmers' tariff, so they were neither "customers" nor "end users" within the meaning of the tariff and Farmers was not entitled to charge Qwest switched access charges.  Id. at ¶ 10.  As a result, the FCC found that Farmers' practice of charging Qwest access charges for the traffic relating to the conference calling companies was unjust and unreasonable in violation of § 201(b).  Id. at ¶ 26.  The FCC stated that the amount of any damages would be calculated in a separate proceeding and suggested that its ruling that the services Farmers provided did not qualify as "switched access services" under Farmers' tariff did not mean that Farmers was entitled to no compensation for these services.  Id. at ¶ 24 n.96.[7]

---

[6] Qwest did not challenge the FCC's finding in Farmers I that Farmers terminated the traffic at issue, so Farmers II did not address this issue. Farmers II, 2009 WL 4073944 at ¶ 6 n.29.

[7] Sancom challenges the validity and precedential value of Farmers II on the grounds that the opinion is subject to further petitions for reconsideration, was untimely, and cannot be considered a proper "reconsideration" because three of the Commissioners who decided Farmers II were new since the FCC decided Farmers I.  Because it is not necessary for the court to apply Farmers II in this order, it does not address Sancom's attacks on the opinion.

**DISCUSSION**

**I.     Referral to the FCC**

Sancom moves to stay the case and refer specific issues to the FCC pursuant to the primary jurisdiction doctrine.  "Primary jurisdiction is a common-law doctrine that is utilized to coordinate judicial and administrative decision making."  Access Telecomms. v. Southwestern Bell Tel. Co., 137 F.3d 605, 608 (8th Cir 1998).  The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."  Alpharma, Inc. v. Pennfield Oil Co., 411 F.3d 934, 938 (8th Cir. 2005) (internal quotation and citation omitted).

There is no fixed formula for deciding whether to apply the doctrine of primary jurisdiction.  Access Telecomms., 137 F.3d at 608 (citing United States v. Western Pac. R.R. Co., 352 U.S. 59, 64 (1956)).  Rather, the applicability of the doctrine in any given case depends on "whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created."  Id.  The Eighth Circuit has identified two main reasons and purposes for the doctrine: first, and most common, "the use of agency expertise in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion," and second, the "promot[ion] of uniformity and consistency within

the particular field of regulation." Alpharma, 411 F.3d at 938 (internal quotation omitted); Access Telecomms., 137 F.3d at 608; see also United States v. McDonnell Douglas Corp., 751 F.2d 220, 224 (8th Cir. 1984) ("The doctrine of primary jurisdiction . . . should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution." (internal quotation and citation omitted)). The Eighth Circuit warns that the doctrine "is to be 'invoked sparingly, as it often results in added expense and delay.' " Alpharma, 411 F.3d at 938 (quoting Red Lake Band of Chippewa Indians v. Barlow, 846 F.2d 474, 477 (8th Cir. 1988)). When the primary jurisdiction doctrine applies, the "district court has discretion either to [stay the case and] retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." Access Telecomms., 137 F.3d at 609 (internal quotation and citation omitted, alteration in original).

Sancom proposes that the court refer three issues to the FCC: (1) determination of whether Sancom is entitled to collect switched access charges for calls to numbers assigned to free calling providers pursuant to its interstate access tariff; (2) if Sancom's interstate access tariff does not apply to the services at issue, determination of the proper legal classification of these services and determination of whether Sancom is entitled to compensation for them; and (3) determination of a reasonable rate for these services. The court finds that the reasons for applying the primary jurisdiction doctrine are present

and that applying the doctrine will aid the purposes for which the doctrine was created with respect to each issue.[8]

## A. Application of Tariff

The first issue Sancom asks the court to refer to the FCC is the question of whether the service that Sancom provided with respect to the free calling provider traffic at issue in this case qualifies as "switched access service" within the meaning of Sancom's interstate access tariff. This is essentially a tariff interpretation and enforcement question. An action to enforce a tariff is properly brought before a court. Access Telecomms., 137 F.3d at 609. "Ordinarily, the construction of a tariff is a matter of law for the Court, being no different than the construction of any other written document." United States v. Great N. Ry. Co., 337 F.2d 243, 246 (8th Cir. 1964). But where

---

[8] Qwest argues Sancom's request for a primary jurisdiction referral is barred by the election of venue required by 47 U.S.C. § 207. Section 207 provides that a person claiming to be damaged by a common carrier's violation of Chapter 2 of the Communications Act may make a complaint to the FCC or may bring suit in federal court, but may not pursue both remedies. 47 U.S.C. § 207. Section 207 does not bar a primary jurisdiction referral in this case. This provision merely prevents a party from filing claims in both the FCC and federal court. It is silent about the ability of a plaintiff to seek referral of specific issues to the FCC after the plaintiff has elected to proceed in federal court. Qwest's interpretation of § 207 would bar every plaintiff bringing claims under the Communications Act from requesting a primary jurisdiction referral of any issue. Such a result is inconsistent with the rule that the primary jurisdiction doctrine should be invoked when the reasons for the doctrine are present and applying the doctrine will promote the purposes for which it was created. Access Telecomms., 137 F.3d at 608 (explaining that purposes of doctrine are to take advantage of the special competence of the administrative body and to promote uniformity and consistency within the field of regulation).

" 'words in a tariff are used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application,' . . . the issue should first go to the appropriate administrative agency." Access Telecomms., 137 F.3d at 609 (quoting Western Pac., 352 U.S. at 66).  "The reason is plainly set forth: such a 'determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of [the regulated area] is indispensable, and such acquaintance is commonly to be found only in a body of experts.' " Western Pac., 352 U.S. at 66 (quoting Great N. Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291 (1922)).

Where interpretation of the relevant tariff is straightforward, the primary jurisdiction doctrine does not apply.  For example, in National Communications Ass'n, Inc. v. American Telephone & Telegraph Co., 46 F.3d 220, 223 (2d Cir. 1995), the threshold question of whether the plaintiff qualified for services under the tariff in turn depended on the factual question of whether the plaintiff had timely paid its bills.  The Second Circuit reasoned that this issue could be resolved by the district court in a reasonable amount of time and did not require the FCC's policy experience or specialized knowledge.  Id.  Thus, the primary jurisdiction doctrine did not apply.  Id. at 225.

In contrast, where the interpretation of the tariff requires interpretation of technical terms or specialized knowledge, referral under the primary jurisdiction doctrine is appropriate.  For example, in Access

Telecommunications, 137 F.3d at 609, the Eighth Circuit reasoned that the plaintiff's claim that the defendant carrier violated the plaintiff's tariff was properly referred to the FCC because application of the tariff would cause the court "to become embroiled in the technical aspects" of voice grade 7, the service at question, and the FCC had more expertise than the courts on the relevant issues of circuit designs, signal transmission, noise attenuation, and echo return loss.[9]  Similarly, in United States v. Great Northern Railway Co., 337 F.2d at 246-47, the Eighth Circuit found that the phrase "transit privileges" in the relevant tariff "had a particular connotation in the rail transportation field, being a generic term requiring specific definition" and as such was a matter for primary determination by the applicable regulatory agency.[10]

Here, application of Sancom's switched access tariff requires interpretation of words used in a technical sense and consideration of extrinsic

---

[9] In Access Telecommunications, 137 F.3d at 609, the plaintiff's tariff claim required determination of the reasonableness of the defendant carrier's classification, a determination clearly within the FCC's authority under § 201(b).  But the Eighth Circuit did not indicate that the propriety of the application of the primary jurisdiction doctrine depended on the presence of a reasonableness determination.

[10] In United States v. Great Northern Railway Co., 337 F.2d at 247-48, the Eighth Circuit found that there was no need to refer the case to the Interstate Commerce Commission because the Commission had sufficiently defined the term in previous opinions to which the district court was required to give the greatest deference and weight.

evidence relating to topics within the expertise of the FCC.  Under Sancom's

interstate access tariff,

> Switched Access Service, which is available to customers for their
> use in furnishing their services to end users, provides a two-point
> communications path between a customer designated premises
> and an end user's premises. . . . Switched Access Service provides
> for the ability to originate calls from an end user's premises to a
> customer designated premises, and to terminate calls from a
> customer designated premises to an end user's premises in the
> LATA where it is provided.

Tariff F.C.C. No. 1, Docket 147-5, § 6.1.  Thus, in order for the services

provided by Sancom to qualify as "switched access services," Sancom must

terminate the calls to an "end user's premises."  That is, the free calling

providers must qualify as "end users."  Sancom's interstate access tariff defines

"end user" as "any customer of an interstate or foreign telecommunications

service that is not a carrier."  Id. at § 2.6.  "Customer," in turn, is defined as

"any individual, partnership, association, joint-stock company, trust,

corporation, or governmental entity or any other entity which subscribes to the

services offered under this tariff, including both Interexchange Carriers (ICs)

and End Users."  Id.  Sancom's interstate access tariff does not define

"subscribe."

Determination of whether Free Conferencing and other free calling

providers qualify as "end users" under Sancom's interstate access tariff would

embroil the court in the technical aspects of switched access service.  In

Farmers II, the FCC interpreted the same tariff language at issue here.  See

Farmers II, 2009 WL 4073944 at ¶ 10 (setting out definitions of switched access service, end user, and customer). Thus, the FCC's analysis in Farmers II sheds light on the issues the court would be called on to resolve if it interpreted Sancom's interstate access tariff in this case. In Farmers II, the FCC considered the different connections Farmers provided to the conference calling companies versus the customers of its tariffed service. The FCC explained that "Farmers provided the conference calling companies with high-capacity DS3 trunks that fed into trunk-side connections, to a brand new 'soft switch' that Farmers purchased specifically to handle traffic bound for the conference calling companies." Id. at ¶ 13. Farmers used a Nortel DMS-10 circuit switch to serve all of its other customers. Id. The import and meaning of the different types of connections provided to different customers is an issue the FCC is more qualified than the court to consider. See Access Telecomms., 137 F.3d at 609 (explaining that the FCC has more expertise than the courts on matters such as circuit designs, signal transmissions, noise attenuation, and echo return loss).

The FCC also found that Farmers' agreements with the conference calling companies did not resemble traditional agreements for the provision of switched access services in that the agreements included exclusivity clauses and other unique terms not available under Farmers' tariff, required Farmers to pay the conference calling companies a given and unique sum per minute of traffic that Farmers delivered, and obligated each conference calling company

17

to generate different amounts of traffic.  Farmers II, 2009 WL 4073944 at ¶ 14.
The FCC is uniquely qualified to compare the terms of an agreement between
an LEC and a conference calling company with the terms of a traditional
agreement for the provision of tariffed access services because of the FCC's
experience in the field.

Similarly, the FCC considered Farmers' failure to enter the conference
calling companies' account information into its customer billing systems in
accordance with its standard business practices for tariffed services, Farmers'
failure to bill the conference calling companies for monthly services, Farmers'
conduct throughout its business relationships with the conference calling
companies, and the flow of money between Farmers and the conference calling
companies.  Id. at ¶¶ 12 n.49, 16, 17.  An adequate appreciation of the
relevance of these and other facts relating to an LEC's relationship with a
conference calling company requires acquaintance with the many intricate
facts of the normal practices and regulatory regime for switched access service.

Based on the FCC's analysis in Farmers II and the specific and technical
meaning of the terms "switched access service," "end user," "customer," and
"subscribe," the court finds that the issue of whether the services Sancom
provided to Qwest in this case qualify as "switched access services" under
Sancom's interstate tariff is a matter that requires the expertise of the FCC.
"The courts, while retaining the final authority . . . should avail themselves of
the aid implicit in the agency's superiority in gathering the relevant facts and in

marshaling them into a meaningful pattern." United States v. Great N. Ry. Co., 337 F.2d at 246 (internal quotation and citation omitted).

Qwest argues that the guidance provided by the FCC in Farmers II is sufficient to avail the court of the FCC's expertise so that referral of the issue of the application of Sancom's tariff to the services at question in this case is unnecessary. Indeed, the Supreme Court has explained, "[c]ertainly there would be no need to refer the matter of [tariff] construction to the Commission if that body, in prior releases or opinions, has already construed the particular tariff at issue or has clarified the factors underlying it." Western Pac., 352 U.S. at 69; see also Great N. Ry. Co., 337 F.2d at 247-48 (explaining that where Interstate Commerce Commission had sufficiently defined "transit privileges" in previous opinions, the primary jurisdiction doctrine had been satisfied and there was no need to refer the case to the Commission).

Here, the court finds that Farmers II does not provide sufficient guidance to render referral unnecessary. Farmers II made clear that the application of the tariff is a fact-specific question. The type of connection and nature of the relationship between Sancom and Free Conferencing and other free calling providers may differ from the facts of Farmers II so that the FCC's expertise is still necessary in this case. Further, many of the details of Farmers' billing practices and conduct were redacted from the FCC's opinion in Farmers II, and as a result, the opinion provides the court with the FCC's conclusion rather than the key facts supporting that conclusion. See Farmers II, 2009 WL

19

4073944 at ¶¶ 16, 18-20 (redacting confidential information regarding Farmers' billing practices, Farmers' efforts to backdate and amend its agreements, and Farmers' relationship with the conference calling companies). Thus, there remain technical issues on which the FCC has not provided sufficient guidance. Finally, <u>Farmers II</u> resolved the tariff question with respect to an ILEC rather than a CLEC, and the FCC has not provided guidance on the impact of the detariffing regime for CLECs on this issue. <u>See</u> <u>In re Access Charge Reform, 2001 WL 435698, 16 F.C.C.R. 9923 (2001)</u> (seventh report and order and further notice of proposed rulemaking) (adopting detariffing regime for CLECs). As the District of Minnesota explained, "the Court anticipates that review of the myriad factors involved in the process of establishing tariffs will be significant to gauging the scope of [plaintiff-LEC's] tariff." <u>Tekstar, 2009 WL 2155930, at *2</u> (citing <u>In re Establishing Just & Reasonable Rates for Local Exchange Carriers, 2007 WL 2872755, 22 F.C.C.R. 17989, 17992-94 (2007)</u> (notice of proposed rulemaking); <u>47 C.F.R. § 61.26</u>). Thus, <u>Farmers II</u> does not obviate the need for a primary jurisdiction referral of the tariff application issue in this case.

Referral of the tariff application issue would also promote uniformity and consistency within the particular field of regulation. Because there are currently about two dozen cases pending in federal courts across the country involving the issue of whether the connection of long-distance calls through an LEC's facilities to conference calling companies constitutes "switched access

service" under the applicable access tariffs, the court finds that the potential

for inconsistent or contradictory rulings on this issue is great. Indeed, the FCC

and the Iowa Utilities Board (IUB) have reached partially inconsistent

conclusions on the tariff application issue. As noted, the FCC reversed its

course between <u>Farmers I</u> and <u>Farmers II</u> and found that the conference calling

companies were not "end users" under Farmers' tariff. The IUB considered

intrastate traffic involving many of the same parties as <u>Farmers I</u> and

<u>Farmers II</u> and found that the conference calling companies did not subscribe

to the services offered in the LECs' intrastate access tariffs and therefore were

not end users under the tariffs. <u>In re Qwest Comm'cns Corp. v. Superior Tel.</u>

<u>Coop.</u>, Docket No. FCU-07-2 at 24, 2009 WL 3052208, at *10 (Iowa Utils. Bd.

Sept. 21, 2009) (final order). This finding is consistent with <u>Farmers II</u>. But

the IUB also found that the calls to the conference calling companies did not

terminate in the LECs' exchanges, which is inconsistent with <u>Farmers I</u> and

<u>Farmers II</u>. Docket No. FCU-07-2 at 42, 2009 WL 3052208, at *19.[11] The

inconsistencies between <u>Farmers I</u> and <u>Farmers II</u> and the IUB's final order

shows that the risk of inconsistent and contradictory rulings on the tariff

application issue is great, even in light of the guidance provided by existing

---

[11] Sancom challenges the validity of the IUB's final order on several
grounds. Because the court relies on the final order only to show the need for
uniformity and consistency in this area, the court does not address Sancom's
challenge to the merits of the opinion.

agency decisions.  The purposes of the primary jurisdiction doctrine support referral of the tariff application issue.

**B.  Classification of Services**

The second issue Sancom asks the court to refer to the FCC is, if Sancom's interstate access tariff does not apply to delivery of calls to Free Conferencing and other free calling providers, what is the proper legal classification of these services and is Sancom entitled to compensation for them.  The FCC's expertise is necessary to determine whether Sancom is entitled to compensation for services not covered by its tariffs.  The FCC has partially deregulated the environment in which CLECs provide access service, and the determination of the impact of such deregulation on the compensation issues in this case is better entrusted to the FCC than to the courts.  In 2001, the FCC adopted a detariffing regime for CLECs.  In re Access Charge Reform, 16 F.C.C.R. 9923.  The FCC established "a benchmark level at which CLEC access rates will be conclusively presumed to be just and reasonable and at (or below) which they may therefore be tariffed.  Above the benchmark, CLECs will be mandatorily detariffed."  Id. at ¶ 40.  CLECs can negotiate with IXCs to set rates above the benchmark.  Id. at ¶¶ 3, 43.  The FCC also created an exemption for rural CLECs competing with non-rural ILECs that allowed such CLECs to charge access rates above the benchmark applicable to all other CLECs.  Id. at ¶ 73.  The FCC further clarified the rules governing the provision of access services by CLECs in In re Access Charge Reform, 2004 WL 1103977,

19 F.C.C.R. 9108 (2004) (eighth report and order and fifth order on reconsideration).  Given the FCC's role in establishing and regulating the partially deregulated regime for CLECs, the ways in which CLECs can obtain non-tariffed rates through agreements with IXCs are matters for the FCC to determine.

Further, the FCC suggested in Farmers II that an ILEC may obtain compensation from an IXC to which it provided services even though the services did not qualify as "switched access services" under the ILEC's access tariff.  In Footnote 96, the FCC stated,

> This is not to say that Farmers is precluded from receiving any compensation at all for the services it has provided to Qwest.  See, e.g., New Valley Corp. v. Pacific Bell, Memorandum Opinion and Order, 15 FCC Rcd 5128, 5133, ¶ 12 (2000) (fact that a carrier's tariff did not include rates or terms governing the service provided did not mean that the customer was entitled to damages equal to the full amount billed; rather "where, as here, the carrier had no other reasonable opportunity to obtain compensation for services rendered . . . a proper measure of the damages suffered by a customer as a consequence of a carrier's unjust and unreasonable rate is the difference between the unlawful rate the customer paid and a just and reasonable rate"), aff'g New Valley Corp. v. Pacific Bell, Memorandum Opinion and Order, 8 FCC Rcd 8126, 8127, ¶ 8 (Com. Car. Bur. 1993) (finding no basis in the Supreme Court's "Maislin [decision] or any other court or Commission decision for the conclusion that a customer may be exempt from paying for services provided by a carrier if those services were not properly encompassed by the carrier's tariff").  See also America's Choice, Inc. v. LCI Internat'l Telecom Corp., Memorandum Opinion and Order, 11 FCC Rcd 22494, 22504, ¶ 24 (Com. Car. Bur. 1996) (holding that "a purchaser of telecommunications services is not absolved from paying for services rendered solely because the services furnished were not properly tariffed").

Farmers II, 2009 WL 4073944 at ¶ 24 n.96.  The FCC has not indicated the basis for compensation of the ILEC, whether the ILEC's termination of calls to the conference calling companies was subject to federal tariffing requirements, or how such calls should be classified within the regulatory scheme.  Moreover, the FCC has not had an occasion to address the implication of the detariffed regime for CLECs on compensation for services that do not fall within the definition of tariffed services.  These issues are properly determined by the FCC.

Qwest argues that the FCC has already ruled that a CLEC can only obtain compensation from IXCs for switched access services pursuant to a filed tariff or a negotiated agreement, and that once a CLEC has filed a tariff, it is bound by that tariff.  Thus, Qwest argues, if Sancom's access tariff does not apply to the services it provided in this case, Sancom is entitled to no compensation and there is nothing for the FCC to decide on the issue of the classification of Sancom's services.  Qwest's argument finds some support in the FCC's order explaining the detariffed regime for CLECs.  See In re Access Charge Reform, 16 F.C.C.R. 9923 at ¶ 28 n.71 (citing Advamtel, LLC v. AT&T Corp., 118 F. Supp. 2d 680, 687 (E.D. Va. 2000) for the proposition that parties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed with the FCC).  But the FCC also stated in Footnote 96 of Farmers II that Farmers is not necessarily precluded from recovering any compensation for services that do not fall within its access

24

tariff.  Farmers II, 2009 WL 4073944 at ¶ 24 n.96.  The FCC has not issued an opinion on the damages portion of the Farmers proceeding, so the legal basis for the FCC's statement that Farmers may be entitled to some compensation is not yet clear.  Given the posture of Farmers II, the court finds that the purposes of the primary jurisdiction doctrine are best served by allowing the FCC to determine whether and under what basis an LEC is entitled to be compensated for delivering long-distance traffic to free calling providers on behalf of IXCs like Qwest where the service does not fall under the applicable switched access tariff.

Referral of the issue of the classification of the services provided by Sancom also promotes uniformity and consistency.  There is disagreement among courts in this district over whether an LEC may recover under an unjust enrichment theory.  Compare Sancom, Inc. v. Qwest Comm'cns Corp., 643 F. Supp. 2d 1117, 1125-27 (D.S.D. 2009) (finding unjust enrichment claim to be barred by the filed rate doctrine) and Splitrock Props., Inc. v. Qwest Comm'cns Corp., Civ. 08-4172-KES, Docket 28 at 3 (D.S.D. Aug. 28, 2009) (same) with Northern Valley Commc'ns, LLC v. Qwest Commc'ns Corp., 659 F. Supp. 2d 1062, 1070 (D.S.D. 2009) (finding that filed rate doctrine does not defeat unjust enrichment claim where it is alleged that tariff does not apply). While the court does not refer this legal question to the FCC, the inconsistent rulings show the need for clarification by the FCC on how a CLEC may be

compensated for services provided outside of its tariffs. The purposes of the primary jurisdiction doctrine support referral of the service classification issue.

### C. Reasonable Rate

The third question Sancom asks the court to refer to the FCC is, if Sancom's interstate access tariff does not apply to the services at issue, but Sancom is entitled to compensation for these services, what is the reasonable rate. It is well established that the FCC is specially positioned to determine the reasonableness of rates. See, e.g., Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004) (stating that regulating agency has authority to determine reasonableness of rates). Thus, if Sancom is entitled to compensation for the services it provided to Qwest outside of its tariffed rate, the FCC has the expertise and experience to determine the appropriate rate. See Access Telecomms., 137 F.3d at 609 (stating that FCC has statutory authority to make reasonableness determinations).

Qwest argues that the issue of a reasonable rate for Sancom's services should not be referred because the FCC is prohibited from setting rates retroactively. Qwest also argues that the FCC does not have jurisdiction to set a rate because it does not have jurisdiction over collection actions brought by carriers like Sancom. Qwest's argument seems to be supported by existing FCC opinions. See ACC Long Distance Corp. v. Yankee Microwave, Inc. 1993 WL 755637, 8 F.C.C.R. 85, ¶ 10 (1993) (memorandum opinion and order) ("The Commission's authority to determine and prescribe just and reasonable rates

derives from Section 205 of the Act which authorizes rates to be prescribed only on a prospective basis."). But as noted, the FCC suggested in Footnote 96 of Farmers II that an LEC may be entitled to some compensation for services it provides to an IXC even if the services do not fall under the LEC's tariff. Farmers II, 2009 WL 4073944 at ¶ 24 n.96. In the absence of further analysis from the FCC regarding the basis for such compensation, the court cannot say that the FCC is without jurisdiction to determine an appropriate rate or amount of compensation.[12] Qwest argues that the opinions cited in Footnote 96 are distinguishable from the circumstances in Farmers II and in this case because they did not involve a collection action by a carrier, so that the FCC cannot rely on these cases to award compensation to Farmers. As noted, the FCC has not yet set out the legal basis for an award of compensation to Farmers. As with the classification of services issue, the court finds that interests of the primary jurisdiction doctrine are best served by allowing the FCC to determine whether, under what basis, and at what rate, an LEC is entitled to be compensated for the services provided in this case.

---

[12] Thus, the court is not, as Qwest argues, attempting to ask the FCC to decide an issue under primary jurisdiction that the FCC does not have authority to decide in the first instance. Because the FCC has not ruled on the damages portion of the Farmers proceeding, the FCC has not clarified the jurisdictional and legal basis for awarding compensation to Farmers. Given the complex and dynamic state of the regulatory regime for switched access services, the court finds that the FCC should address these questions in the first instance.

Qwest also argues that the FCC may refuse to analyze the reasonable rate issue until the court has made certain factual findings. Qwest is correct that in some cases, the FCC declines to answer all of the issues referred to it by a district court. See, e.g., In re Petitions of Sprint PCS & AT&T Corp., 2002 WL 1438578, 17 F.C.C.R. 13192 (2002) (declaratory ruling) (setting out circumstances in which carrier can charge access fees for access to carrier's wireless network but deferring to court to answer question of whether contract existed under state law). Thus it is possible that the FCC will not reach the issue of the reasonable rate for the services in question. But the court has found that if resolution of this action requires determination of a reasonable rate for Sancom's services, then this question should be referred to the FCC pursuant to the primary jurisdiction doctrine. Referring all of the issues at one time promotes efficiency and reduces delay. The court will draft the language of the issues to be referred to make it clear that the FCC should only consider the reasonable rate issue if it has jurisdiction to do so and if its analysis on the tariff interpretation and classification of services issues requires determination of the reasonable rate.

Overall, the reasons for the primary jurisdiction doctrine are present in this case so that applying the doctrine will aid the purposes for which it was created. The court has considered the added expense and delay that may result from the primary jurisdiction referral, but finds that the need for expert consideration, uniformity, and consistency within this complicated, technical,

and dynamic field compels referral of specific issues to the FCC.[13]  The court agrees with the Southern District of New York that "[t]his area of telecommunication regulation is in dynamic flux . . . [so] these issues . . . are ripe for determination and clarification by the regulatory agency."  All Am. Tel. Co., 07 Civ. 861 (WHP), Docket 88 at 3 (citing Allnet Commc'n Servs., Inc. v. Nat'l Exchange Carrier Assoc., 965 F.2d 1118, 1121 (D.C. Cir. 1992)).  Thus, the court will stay the case and order the parties to initiate the proper proceedings with the FCC.

## II.    Motion to Reconsider

Sancom moves the court to reconsider its order dismissing Sancom's unjust enrichment claim on the basis of Footnote 96 of Farmers II.

### A.    Standard

The Federal Rules of Civil Procedure do not mention motions to reconsider.  The Eighth Circuit traditionally has instructed courts to consider such motions either under Rule 59(e) or Rule 60(b).  Sanders v. Clemco Indus., 862 F.2d 161, 168 (8th Cir. 1988); see also Schoffstall v. Henderson, 223 F.3d 818, 827 (8th Cir. 2000) (holding that Rule 59(e) applies to a motion to reconsider); Broadway v. Norris, 193 F.3d 987, 989 (8th Cir. 1999) (analyzing

_____

[13] The ever-increasing number of cases and inconsistent judgments in this field has convinced the court that referral of specific issues to the FCC pursuant to the primary jurisdiction doctrine is necessary despite the court's refusal to refer the defendant-IXC's counterclaims in Northern Valley v. MCI , Civ. 07-1016-KES, Docket 76 at 21-22 (D.S.D. June 26, 2008).

whether Rule 59(e) or Rule 60(b) applies to a motion to reconsider). Here, Sancom moves the court to exercise its general discretionary authority to review and revise its interlocutory rulings prior to the entry of final judgment pursuant to Rule 54(b). See Auto Servs. Co., Inc. v. KPMG, LLP, 537 F.3d 853, 856-57 (8th Cir. 2008); see also Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). The parties dispute the proper rule and standard for Sancom's motion for reconsideration, but it is clear that the court has broad discretion in determining whether to grant the motion for reconsideration. Auto Servs., 537 F.3d at 857 (noting that district court has "general discretionary authority" to review and revise interlocutory rulings); Hagerman v. Yukon Energy Corp., 839 F.2d 407, 413-14 (8th Cir. 1988) (noting that district court has broad discretion in deciding motion for reconsideration).

**B.    Discussion**

The court previously found that this claim was barred by the filed rate doctrine, which provides that once a carrier's tariff is approved by the FCC, the terms of the tariff conclusively and exclusively enumerate the rights and liabilities as between the carrier and its customers. Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1097 (8th Cir. 2006). The filed rate doctrine

prohibits courts from granting relief that would have the effect of changing the rate charged for services rendered pursuant to a valid tariff.  See Firstcom, Inc. v. Qwest Corp., 555 F.3d 669, 681 (8th Cir. 2009).  "[T]he purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness of the rates; and (2) insure that regulated entities charge only those rates that the agency has approved or has been made aware of as the law may require."  Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004). The court found that Sancom's unjust enrichment claim would require the court to engage in judicial rate-setting and risk violating the nondiscrimination principle underlying the filed rate doctrine.

Now Sancom argues that the court should reinstate its unjust enrichment claim because referral of the above-described issues to the FCC would "moot" the decisive reason for dismissal of the claim and because Footnote 96 of Farmers II is a controlling statement of federal policy that an LEC is entitled to compensation for services rendered regardless of whether its tariff covers those services.  Because the court will receive further guidance from the FCC on the proper classification of the services, whether Sancom is entitled to compensation for the services, and if so, at what rate, the court will reserve ruling on the motion to reconsider until it has received such guidance. As a result, this motion is stayed.

Based on the foregoing, it is hereby

ORDERED that Sancom's motion for reconsideration and to stay the case for referral of issues to the FCC (Docket 205) is granted in part and stayed in part. This action is STAYED pending (1) resolution of the dispute by agreement of the parties; (2) a decision on the disputed issues by the FCC pursuant to the referral described below; or (3) further order of the court.

IT IS FURTHER ORDERED that this matter is referred to the FCC for resolution, to the extent the FCC's jurisdiction permits, of the following issues:

(1)     Whether, under the facts of the present dispute between Sancom and Qwest, Sancom is entitled to collect interstate switched access charges it has billed to Qwest pursuant to Sancom's interstate access tariff for calls to numbers assigned to free calling providers.

(2)     In the event that the services provided by Sancom to Qwest, by which calls placed by Qwest's customers are delivered to free calling providers served by Sancom, do not qualify as switched access service under Sancom's applicable interstate access tariff, determination of the proper classification of these services, whether such services are subject to federal tariffing requirements, and whether Sancom is entitled to obtain compensation for these services.

(3)     In the event that the services provided by Sancom to Qwest do not qualify as switched access service under Sancom's applicable interstate access tariff, but Sancom is otherwise entitled to compensation for these services, determination of a reasonable rate for these services.

IT IS FURTHER ORDERED that Sancom shall contact the Market Disputes Resolution Division of the FCC to obtain guidance regarding the appropriate method for bringing this matter before the FCC. Sancom shall initiate proceedings as recommended by the Market Disputes Resolution

Division within 30 days of the date of this order. Sancom is directed to furnish the FCC with a copy of this order as part of its submission.

IT IS FURTHER ORDERED that the parties shall submit a joint report to the court every 3 months describing the status of the proceeding before the FCC, the first of which shall be filed no later than 3 months from the date of this order.

IT IS FURTHER ORDERED that Sancom's request for oral argument on its motion for reconsideration and to stay (Docket 209) is denied as moot.

Dated March 12, 2010.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE