UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| QWEST COMMUNICATIONS CORPORATION, a Delaware corporation, | CIV. 07-4147-KES |
| Third-Party Plaintiff, | |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| FREE CONFERENCING CORPORATION, a Nevada corporation, | |
| Third-Party Defendant. | |

Third-party plaintiff, Qwest Communications Corporation (Qwest),
brought claims against third-party defendant, Free Conferencing
Corporation (FC), alleging that FC engaged in conduct amounting to
unfair competition, civil conspiracy, and alternatively that FC was
unjustly enriched. A court trial was held May 13-20, 2014. The court has
considered the testimony, exhibits, briefs, and oral arguments in
determining the outcome of this case.

**FINDINGS OF FACT**

The following constitutes the court's findings of fact pursuant to
Federal Rule of Civil Procedure 52(a)(1), which were found by a
preponderance of the evidence:

Qwest[1] is a telecommunications provider throughout the United States and provides long-distance, or interexchange, service. As an interexchange carrier (IXC),[2] Qwest delivers long-distance calls from one local area to another.

FC provides conference calling services to its customers. FC operates a website and provides 24-hour customer support. Tr. 1138:13-1145:5. FC does not charge its customers for its services. FC is not a common carrier under the Communications Act of 1934, as amended. Ex. 1 at 2.

Sancom is a competitive local exchange carrier (CLEC),[3] which serves local customers in the Mitchell, South Dakota, area. Sancom

---

[1] On April 1, 2011, CenturyLink, Inc. acquired 100 percent of the stock of Qwest's parent company, Qwest Communications International, Inc., and Qwest is doing business as CenturyLink. *See* Ex. 1 at 2 n.6.

[2] There are two types of telecommunications providers, local exchange carriers (LECs) and IXCs. LECs provide the service and own the hardware that connects to individual customers in their local areas. By contrast, IXCs own the hardware that connects different local carriers to each other. When an individual makes a long-distance telephone call, the call originates on wires and facilities owned by the LEC serving the individual making the call and the call terminates over wires and facilities owned by the LEC serving the individual receiving the call. IXCs pay "originating" and "terminating" access charges to the LECs that serve individuals who initiate and receive long-distance calls, respectively.

[3] LECs are divided into incumbent local exchange carriers (ILECs) and competitive local exchange carriers (CLECs). "ILECs . . . operated as monopolies in a given area until the local phone service market was opened by the Telecommunications Act of 1996, which provided for the

began operating in 2004 and does business as Mitchell Telecom. Tr. 281:13-282:2. As a CLEC, Sancom owns the facilities that allow calls carried by IXCs, such as Qwest, to be originated and terminated with Sancom's customers. Sancom, a common carrier, is regulated by and filed tariffs with both the Federal Communications Commission (FCC) and the South Dakota Public Utilities Commission (SDPUC). *See* Ex. 4 & 6 (Sancom's intrastate tariff) and Ex. 85 (Sancom's interstate tariff). At times, Sancom worked with Vantage Point, a Mitchell-based telecommunications consulting company.

FC hired Darin Rohead, who operated as PowerHouse Communications, to identify rural LECs that were interested in contracting with FC to provide free conferencing services to FC's customers. *See* Ex. 16 (agreement dated February 23, 2004, between PowerHouse and FC, signed by Rohead and David Erickson, the

---

emergence of new LECs, the CLECs, to compete with the so-called 'Baby Bells.' " *Advamtel, LLC v. AT&T Corp.*, 118 F. Supp. 2d 680, 681(E.D. Va. 2000). ILECs are required to file and maintain tariffs setting the rate for access service with the FCC (for purely interstate communications) or the applicable state utility commission (for intrastate communications). *In re Establishing Just & Reasonable Rates for Local Exchange Carriers*, 2007 WL 2872755, 22 F.C.C.R. 17989, ¶ 2 (2007) (notice of proposed rulemaking). In general, CLECs may file interstate access tariffs if the rate for access service is no higher than the rate charged for such services by the competing ILEC. *Id.* at ¶ 10. CLECs may negotiate higher rates with IXCs. *Id.* Special rules apply to rural CLECs. *Id.*

president of FC). Rohead identified Sancom, drafted the contract used between Sancom and FC, and handled all the negotiations with Sancom. Tr. 1150:3-1151:18 (Erickson stating that Rohead connected him with various LECs, provided the contract, and negotiated FC's rate and terms of the agreement); Tr. 1154:1-9 ("Darin would present these things all packaged up, and from time to time, I would say just, you know, can I get a little more or, you know, and Darin was like, 'No, this is the deal. This is it.' In those cases, I didn't have any discussions with him, nor was anything I basically discussed with Darin really taken back to them and discussed. It was like, 'Here is the arrangement. Do you want it?' "); Tr. 1226:5-1227:3 (Erickson stating that the only time he entered into an agreement with an LEC without Rohead, he used the contract Rohead had provided for other LECs, and that Rohead first contacted Sancom).

Rohead also had a separate contract with Sancom under which Rohead received 0.22 cents per minute for all minutes to Rohead's clients' bridges. Ex. 13 (agreement dated February 21, 2005, between PowerHouse and Sancom). That agreement further provided that if Sancom collected less than 100 percent of the fees it was entitled to collect on those minutes, Rohead's fee would be proportionally reduced. *Id.* Rohead and Sancom kept this arrangement secret from Erickson and FC. Ex. 218 (confidentiality agreement); Ex. 46 (email stating that

Erickson was unaware of Rohead's compensation). Nonetheless, numerous witnesses credibly testified that they understood that Rohead acted on behalf of FC. *See* Tr. 671:17-20 (Chad Glanzer of Vantage Point stating that Rohead was the main contact); Tr. 676:5-18 (Glanzer stating that he knew Rohead acted on behalf of FC); L. Thompson depo. at 30:14-16 ("My understanding at the time was that Mr. Rohead was kind of the sales arm. He was the one that would interface with the ILEC, and we were supposed to work through him."); Tr. 403:2-6 (Don Robertson stating that Rohead spoke to Sancom on behalf of FC); Tr. 427:16-24 (Robertson stating that Erickson knew Rohead was acting for FC, the only aspect Erickson did not know of was the separate payments from Sancom to Rohead); Tr. 463:3-11 (Ryan Thompson stating that Rohead represented FC); Tr. 545: 14-21 (Ryan Thompson recalling that Rohead presented the contract to Sancom "on behalf of [FC]"); Tr. 625:5-24 (Ryan Thompson assumed Rohead was acting for FC when he dealt with Sancom); Tr. 1221 (Erickson stating that he knew Rohead was working for other parties during at least part of Rohead's relationship with FC); Ex. 197 (email from Rohead to a Vantage Point employee conveying a message to Sancom from Erickson).

Shortly after Sancom began operating, it entered into an agreement with FC. Ex. 11. The agreement stated that Sancom would provide FC a

location for a conference call bridge on Sancom's premises in Mitchell. *Id.* at ¶ 2. FC promised to provide a minimum number of minutes to the bridge located at Sancom's headquarters in exchange for a marketing fee of 2 cents per minute generated by FC's traffic. *Id.* at ¶¶ 3, 10. The agreement was signed by Gene Kroell, Sancom's general manager at the time, and Erickson. *Id.* Sancom did not have any contracts in place with the IXCs. As a result, FC's marketing fee was paid from the revenue generated by Sancom's terminating switched access charges under its tariffs, in effect resulting in an arrangement whereby Sancom and FC split the access charges paid by the IXCs on calls destined for FC's conference bridges. See Ex. 1 at ¶¶ 3-4 (finding by the FCC that the arrangement was a split of tariffed terminating access revenue); Thompson depo. at 43: (stating that the arrangement between the LECs and conference call companies involved sharing terminating access revenue); Lorenzetti depo. at 24:4-16 (same); Tr. 403:17-404:3 (Robertson stating that the agreement shared terminating access revenue); Rohead depo. at 54:9-12 (stating that the arrangement was a split of the access charges); Ex. 29 (FC's revenue model given to potential investors and business partners).

Erickson claimed he was unaware that the arrangement between Sancom and FC would result in a split of Sancom's tariffed access

charges to IXCs. *See, e.g.*, Tr. 1174:11-16 (Erickson stating that he did not and still does not understand what rate FC was splitting with Sancom). Erickson also claimed to be unaware of how Sancom would bill its clients. Tr. 1152:18-21. This lack of knowledge is contradicted by evidence that Erickson and FC knew that FC's income would arise from the revenue LECs collected from IXCs. Ex. 326 (email from Erickson that some LECs may have to jump out of the NECA traffic-sensitive pool); Tr. 1248:1-1249:5 (Erickson discussing the email in Ex. 326); Ex. 29 (FC revenue model); Tr. 1293:13-1294:10 (Erickson agreeing that FC partially funded Sancom's legal fees to assist Sancom in collecting tariff charges from IXCs so Sancom could share that revenue with FC); Ex. 11 at ¶ 10 (agreeing that FC and Sancom could adjust FC's rate if there was a change in the amount Sancom could collect); Ex. 46 (email from Erickson agreeing to split a drop in the "rate [Sancom] receive[s] for terminating calls"). Erickson also stated he was unaware that the arrangement did not comply with Sancom's tariffs, that he did not intend to premise his business model on an unlawful source of revenue, and that he would have taken any steps he thought necessary to comply with the law as it existed at the time. Tr. 1190:10-1191:24; Tr. 1216:6-14.

FC's relationship with Sancom involved a high volume of traffic. During the billing cycle of March 23, 2005, through April 22, 2005,

Sancom terminated roughly 3.7 million minutes of FC traffic. Ex. 133. By the end of 2005, Sancom was terminating between 7 and 9 million minutes of FC traffic per month. *Id.* In September 2006, that number roughly doubled to 16 million minutes of terminating FC traffic, and nearly doubled again by the January 23, 2007-February 22, 2007, billing cycle that reported 30,101,366 minutes of traffic. *Id.* From May 2007 through January of 2008, Sancom's terminating minutes of FC traffic ranged from 41,788,919 to 54,535,148 minutes per monthly billing cycle. *Id.* For the 17 months beginning January 23, 2007, and ending June 22, 2008, FC traffic represented 98.02 percent of Sancom's traffic. Ex. 155 (showing that of Sancom's 700 million minutes of use during that time, 686 million were FC traffic, and roughly 14 million were attributable to all other end users).

Eventually, Qwest and other IXCs began disputing bills they received from certain LECs. Numerous lawsuits resulted, including this case, which was initially brought by Sancom to recover amounts Qwest allegedly owed under Sancom's tariffs. Qwest filed counterclaims against Sancom and a third-party complaint against FC.

In *Qwest Communications Corp. v. Farmers & Merchants Mutual Telephone Co.*, 2007 WL 2872754, 22 F.C.C.R. 17973 (2007) (hereinafter *Farmers I*), which was a lawsuit filed in a companion case, the FCC held

that the LEC did terminate the traffic at issue and that the conference calling companies were end users under the tariff. After reconsideration based in part on discovery of fabricated evidence, the FCC issued a second order finding that conference call customers were neither end users nor customers within the meaning of the LEC's tariff and that the LEC was not entitled to switched access charges for those calls. *Qwest Commc'ns Corp. v. Farmers & Merchants Mut. Tel. Co.*, 2009 WL 4073944, ¶¶ 1, 10 (FCC Nov. 25, 2009) (hereinafter *Farmers II*). Although the FCC found that the LEC was not entitled to switched access fees under its tariff, the FCC suggested in a footnote that the LEC may be entitled to some compensation for its services. *Id.* at ¶ 24 n.96.

After *Farmers II* was issued, this court referred three issues to the FCC: whether Sancom was entitled to collect tariff charges for calls destined for FC; whether Sancom was entitled to some compensation for its services if it could not bill Qwest under its tariff; and a determination of the reasonable rate for those services. Docket 246 at 32. The FCC found that FC was not an "end user" under Sancom's interstate tariff, so Sancom could not collect terminating switched access revenue from Qwest for calls destined for FC. *See* Ex. 1 at ¶¶ 1, 8, 17-25 (applying *Farmers II*). The FCC found that Sancom engaged in access stimulation. *Id.* at ¶ 3. The FCC reserved ruling on the second and third referred

questions. After the FCC's decision, Sancom and Qwest reached a settlement and the court dismissed Sancom's complaint against Qwest and Qwest's counterclaims against Sancom. Docket 284. The third-party complaint between Qwest and FC is still pending.

## LEGAL CONCLUSIONS

### I.  Unfair Competition

In Count IV of Qwest's third-party complaint against FC, Qwest alleges that FC is liable for unfair competition. Under South Dakota law,[4] "[t]he tort of unfair competition does not have specific elements." *Setliff v. Akins*, 616 N.W.2d 878, 887 (S.D. 2000). Rather, "it describes a general category of torts which courts recognize for the protection of commercial interest." *Id.* To succeed on an unfair competition claim, a plaintiff must establish the elements of an underlying tort. *Id.* at 887-88. Qwest asserts two torts as the basis for its unfair competition claim: tortious interference with a business relationship and inducement of regulatory violations. Docket 388 at 24.

---

[4] The court applies South Dakota substantive law to these claims. *See, e.g., Hiatt v. Mazda Motor Corp.*, 75 F.3d 1252, 1255 (8th Cir. 1996) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). The parties agree that South Dakota law applies.

### A.    Tortious Interference with a Business Relationship

To prove a claim for tortious interference, a plaintiff must show:

(1) [T]he existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectance was disrupted.

*Selle v. Tozser*, 786 N.W.2d 748, 753 (S.D. 2010) (citing *Dykstra v. Page Holding Co.*, 766 N.W.2d 491, 499 (S.D. 2009)). Qwest's contention in this case is that Qwest had a valid contractual relationship[5] with Sancom through Sancom's tariffs, and that FC interfered with that relationship by intentionally causing Sancom to bill Qwest improperly under its tariffs by engaging in access stimulation, thereby causing damage to Qwest. *See* Docket 388 at 25-27.

The tariff controlled the relationship between Qwest and Sancom.[6] Although Erickson claims he did not know how Sancom or other LECs

_____

[5] The parties at times refer to this claim as tortious interference with contract, or tortious interference with business relations. *See, e.g.*, Docket 406 at 1. A contract is merely one type of business relationship protected by the law. *See* Restatement (Second) of Torts § 766 cmt. c ("The liability for inducing breach of contract is now regarded as but one instance, rather than the exclusive limit, of protection against improper interference in business relations."). Both parties agree that the five-element test from *Selle* is the proper formulation of South Dakota law on this issue. Docket 392 at 29; Docket 388 at 25.

[6] FC argues that the tariff did not apply to the calls to FC's conference bridges so those calls could not have interfered with the tariff

would bill the IXCs, his assertion is not credible when weighed against the evidence showing that the arrangement between FC and its LEC partners was specifically designed to take advantage of the tariff relationship between rural LECs and IXCs. Erickson and FC knew about the tariff, its rates, and the obligations of the parties bound by the tariffs. The central question in this case is whether Qwest has shown that FC committed an improper act of interference with Sancom's tariff when FC and Sancom engaged in access stimulation.

### 1.   Interference

Access stimulation, also known as traffic pumping, involves a relationship between an LEC with a high terminating switched access charge and a provider of high volume calling operations such as free conference calling, chat lines, or adult entertainment calls. The LEC installs the necessary equipment at or near its facility and terminates the calls there. The LEC bills the IXC for the terminating switched access service associated with the calls. The LEC and the high volume calling business then share the access revenue. *See In the Matter of Connect*

---

relationship between Qwest and Sancom. Docket 392 at 30. This argument is unpersuasive. FC knew that the tariff was the only means by which Sancom could bill IXCs. Furthermore, FC has asserted throughout this litigation that it believed the tariff did apply until the FCC ruled much later that free calling services were not end users. FC has asserted that it intended to comply, and thought it was complying, with the tariffs.

*America Fund; A National Broadband Plan for Our Future*, 26 FCC Rcd.

17663, at ¶¶ 656-57 (2011) (hereinafter *CAF Order*). The FCC has

described access stimulation as follows:

> Access stimulation schemes work because when LECs enter
> traffic-inflating revenue-sharing agreements, they are
> currently not required to reduce their access rates to reflect
> their increased volume of minutes. The combination of
> significant increases in switched access traffic with
> unchanged access rates results in a jump in revenues and
> thus inflated profits that almost uniformly make the LEC's
> interstate switched access rates unjust and unreasonable
> under section 201(b) of the Act.

*Id.* at ¶ 657 (footnote omitted). The FCC has also described the impact of

access stimulation on the market:

> Access stimulation imposes undue costs on consumers,
> inefficiently diverting capital away from more productive uses
> such as broadband deployment. When access stimulation
> occurs in locations that have higher than average access
> charges, which is the predominant case today, the average
> per-minute cost of access and thus the average cost of long-
> distance calling is increased. Because of the rate integration
> requirements of section 254(g) of the Act, long-distance
> carriers are prohibited from passing on the higher access
> costs directly to the customers making the calls to access
> stimulating entities. Therefore, all customers of these long-
> distance providers bear these costs, even though many of
> them do not use the access stimulator's services, and, in
> essence, ultimately support businesses designed to take
> advantage of todays' above-cost intercarrier compensation
> rates.

*Id.* at ¶ 663.

"[A defendant] interferes with business relations of another . . . by

inducing a third person not to enter into or continue a business relation

with another or by preventing a third person from continuing a business relation with another." *Setliff v. Akins*, 616 N.W.2d at 889 (internal quotations omitted). FC contends that it did not induce or otherwise prevent Sancom from entering into or continuing a relationship with Qwest. As FC points out, Sancom still has a business relationship with Qwest, and continued providing service to Qwest throughout this dispute about payment for calls to FC's bridges.

The South Dakota Supreme Court has not directly addressed whether tampering with a business relationship in a manner that does not either prevent or terminate the business relationship can be sufficient to establish the interference element of this tort. Qwest argues that the plain language of the test should encompass such tampering. Qwest also directed the court to the decisions in *Brown v. Hanson*, 798 N.W.2d 422 (S.D. 2011); *Raven Indus., Inc. v. Lee*, 783 N.W.2d 844 (S.D. 2010); and *St. Onge Livestock Co. v. Curtis*, 650 N.W.2d 537 (S.D. 2002).[7]

The Restatement (Second) of Torts, on which South Dakota's law is patterned, states:

> One who intentionally and improperly interferes with the performance of a contract . . . between another and a third

_____

[7] Qwest moves for leave to provide supplemental authority on this issue. Docket 404. FC opposes that motion. Docket 405. The motion is denied because the court is already aware of those authorities and the positions of both parties.

> person by inducing or otherwise causing the third person *not
> to perform* the contract, is subject to liability to the other for
> the pecuniary loss resulting to the other from the *failure of
> the third person to perform* the contract.

Restatement (Second) of Torts § 766 (1979) (italics added). The

Restatement mentions that "[t]here is no technical requirement as to the

kind of conduct that may result in interference with the third party's

performance" but describes a range of situations in which the third party

is either induced not to perform, or physically prevented from

performing, the contract. *Id.* cmt. k.

Similarly, the cases in which the South Dakota Supreme Court has

addressed improper interference all deal with situations in which the

third party completely failed to perform the contract. In *St. Onge

Livestock*, the plaintiff corporation sued a former employee, Randy

Curtis, and his new employer, Belle Fourche Livestock Auctions. The

plaintiff alleged that Curtis and Belle Fourche tortiously interfered with

its employment agreement with Curtis, which contained a noncompete

clause, because they knew about the agreement, sought advice of an

attorney regarding the enforceability of the agreement, and made a

conscious decision to break the agreement because they thought the

plaintiff would not enforce it. *St. Onge Livestock*, 650 N.W.2d at 539-40.

Qwest argues that the relationship between Curtis and St. Onge

was not completely terminated because the noncompete clause

"continued in effect with its former manager." There is no question, however, that when Curtis left St. Onge, he completely breached his employment contract and did not render any further performance under it. Contrary to Qwest's assertion, this case does not support its theory that tampering with a relationship in the manner FC did would be an act of interference.

In *Brown*, the Browns and defendant were neighbors and had an agreement to share a common well located on the defendant's property. After learning that the Browns were interested in selling their property, the defendant's daughter offered to purchase the property for an amount substantially below what the plaintiffs were seeking. After the daughter's offer was rejected, the defendant purported to rescind the agreement to share the well and filed a letter with the register of deeds, which clouded the Browns' title to their property. The defendant used his alleged rescission of the well sharing agreement as leverage in his dispute with the Browns and the potential buyer, the Fords. *See Brown*, 798 N.W.2d at 424-27.

Qwest contends that the purchase agreement was not terminated but only delayed. This argument is not persuasive. First, the Browns were unable to sell the property to the Fords at the time they intended, and instead had to lease the property to the Fords for a period of time. *Id.*

at 426-27 ("After Hanson's refusal to work anything out with the Fords, the Fords went to the Browns and entered a Residential Lease Agreement."). Second, although the Browns sold the property to the Fords later, there is no question that Hanson actually prevented the Fords from performing under the contract at the time intended by the parties. The fact that the Fords and Browns were able to reach a subsequent agreement to transfer the property does not mean that Hanson's interference did not completely prevent the original contract from being executed. The type of interference involved in *Brown* is not sufficiently analogous to this case to lend meaningful support to Qwest's position.

In *Raven Industries*, Raven, a manufacturer, sued Clark Lee, a former employee, and Integra Plastics, Inc., a competitor. Raven alleged that Integra hired Lee, who then conveyed proprietary industry knowledge to Integra, in breach of a nondisclosure agreement. Integra's tortious interference with the nondisclosure agreement was the basis of Raven's unfair competition claim. *See Raven Indus.*, 783 N.W.2d at 846-47.

As with *St. Onge Livestock*, the fact that a court found the nondisclosure agreement between Raven and Lee to be enforceable does not mean the interference by Integra was not a breach of the agreement.

Lee breached the nondisclosure agreement and a court provided Raven a remedy. This case does not stand for the proposition that acts which do not result in a breach of contract can be deemed interference for purposes of establishing tort liability.

In this case, Qwest's argument rests on the proposition that Sancom failed to perform its obligations under its tariff when it billed Qwest for calls that were not to end users. But the arrangement between FC and Sancom was premised on a *continued* relationship between Sancom and Qwest. Although Qwest and other IXCs stopped paying certain portions of Sancom's bills related to FC traffic, neither Qwest nor Sancom ever stopped delivering traffic. The fact that the FCC later determined that free calling service traffic fell outside the terms of the tariff, and that Sancom was not entitled to bill under its tariff for calls without an end user, does not mean that Sancom completely failed to perform its obligations.

The language defining "interference" found in the Restatement (Second) of Torts refers only to situations in which a contracting party fails to perform or is prevented from performing. Although Qwest and Sancom disputed the accuracy of a substantial number of Sancom's bills, Sancom continued to deliver Qwest's traffic at all times. Qwest's broad interpretation of nonperformance would encompass every situation

in which two parties had a dispute over billing but continued their relationship while resolving the dispute. South Dakota caselaw has found tortious interference with a contract only in situations where the defendant induced the third party to fail to perform its contractual duties. Sancom's unlawful billing practice does not rise to the level of nonperformance found in other cases. Because South Dakota law limits interference to those situations rather than the tampering urged by Qwest, Qwest has not established that FC interfered with Sancom's tariff relationship with Qwest.

### 2. Improper Interference

Even if the South Dakota Supreme Court would extend its definition of interference to include tampering in addition to inducing nonperformance, Qwest would also have to show that FC's acts were improper. South Dakota has adopted the Restatement test for when an act of interference is improper:[8]

> The following elements . . . should be considered in assessing whether a defendant's interference with a contractual relation was improper: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the societal interests in protecting

---

[8] Although earlier South Dakota cases used the word "unjustified," the South Dakota Supreme Court stated in *Gruhlke* that it "now adhere[s] to the Restatement's term 'improper.'" *Gruhlke*, 756 N.W.2d at 408.

the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actors' conduct to the interference, and (g) the relations between the parties.

*Gruhlke v. Sioux Empire Federal Credit Union*, 756 N.W.2d 399, 408 (S.D. 2008) (citing *St. Onge Livestock Co.*, 650 N.W.2d at 542). That list of factors is "neither exhaustive nor determinative of the issue of improper interference." *Dykstra*, 766 N.W.2d at 500. "[T]he burden is on the plaintiff to plead and prove that the interference was improper."[9] *Gruhlke*, 756 N.W.2d at 408.

In describing what conduct can constitute improper interference, the South Dakota Supreme Court noted that "[a]t least one court has held that the 'motivation of personal gain, including financial gain . . . generally is not enough to satisfy the improper interference requirements.' " *Id.* at 408 n.13 (alteration in original) (quoting *King v. Driscoll*, 638 N.E.2d 488, 495 (Mass. 1994)). Nonetheless, " 'self interest is not a defense where a party's conduct is improper.' " *Brown v. Hanson*, 798 N.W.2d 422, 430 (S.D. 2011) (quoting *Table Steaks v. First Premier Bank, N.A.*, 650 N.W.2d 829, 837 (S.D. 2002)).

---

[9] Qwest argues that a burden-shifting test applies. Docket 388 at 41. Qwest does not cite any authority establishing a burden-shifting test. Even if FC has an obligation to disprove the material facts once Qwest has established a prima facie case, as counsel for Qwest stated at oral argument, Qwest still has the initial burden to show impropriety. *Gruhlke*, 756 N.W.2d at 408.

Qwest advances two main arguments supporting a finding that FC's interference was improper. Qwest argues that "inducing a contracting party to breach so that the defendant would profit . . . is quite similar to the cases in which South Dakota has found interference with a contract was improper." Docket 388 at 41 (citing *Selle*, 786 N.W.2d at 753-54; *Brown*, 798 N.W.2d at 425-26; *St. Onge Livestock*, 650 N.W.2d at 542). In *Selle*, the plaintiffs had a contract to sell the assets of a business to Frank Tozer. Frank's brother James set up a substantially similar business, obtained the franchise rights for a major distributor of Frank's business, and began operating using the assets Frank had purchased. Frank's corporation then declared bankruptcy and had its debt to the plaintiffs discharged. *See Selle*, 786 N.W.2d at 750-52. The South Dakota Supreme Court found that because James had not maintained arms-length dealings with Frank's company—despite the advice of counsel—sufficient evidence supported the jury's verdict that James engaged in intentional, unjustified acts of interference with the ability of Frank's company to pay its debt to the plaintiffs. *Id.* at 753-54.

In *Brown*, the defendant did not argue on appeal that the elements of tortious interference had not been established, so the South Dakota Supreme Court only addressed whether the defendant's desire to protect his interest in preventing camping on the property was sufficient to

justify the interference. *Id.* at 429-30. In *St. Onge Livestock*, the defendants had been told by an attorney that the agreement was valid but they disregarded the attorney's advice and Curtis began working for Belle Fourche immediately and took customers with him. Because the defendants knew of the contract and consciously disregarded it, the South Dakota Supreme Court reversed the trial court's grant of summary judgment to the defendants on the grounds that a jury could find for the plaintiff on its tortious interference claim. *Id.* at 541-42.

The facts here are distinguishable from those in *Selle*, *Brown*, and *St. Onge Livestock*. In each of those cases, the impropriety of the interference was clear at the time the interfering action was taken. In *Selle* and *St. Onge Livestock*, the defendants ignored direct advice from attorneys regarding the impropriety of their conduct, and in *Brown* the defendant was told by attorneys representing the other parties that the agreement was still binding and enforceable.[10] Additionally, the improper nature of the conduct in each case was not a close call or a gray area. Each case involves an improper purpose and improper means that were clear to the inducing party and the third party at the time they acted.

---

[10] In *Selle*, the South Dakota Supreme Court implied that reliance on an attorney's advice might preclude a finding of improper motive necessary for a tortious interference claim to succeed, even if that advice is incorrect. *See Selle*, 786 N.W.2d at 753 (citing *Briesemeister v. Lehner*, 720 N.W.2d 531, 543-44 (Wis. Ct. App. 2006)).

In this case, FC was motivated by a desire to profit, FC knew that profit would come at the expense of the IXCs who were bound to pay a high tariff rate to rural LECs such as Sancom, and FC's business was intentionally designed to take advantage of that arrangement. But even though FC was motivated by profit, that motivation is not per se improper. Furthermore, although the relationship between FC, Sancom, and Qwest was advantageous to FC and Sancom and disadvantageous to Qwest, the improper nature of FC's conduct was not known in 2005. The FCC found the arrangement to be legal in 2007, see *Farmers I*, and did not reverse itself until 2009 when the FCC declared that free calling services were not end users. *See Farmers II*. Erickson credibly testified that he did not know the arrangement was unlawful, he did not have any motivation to operate his business outside the tariffs, and FC would have taken whatever steps were necessary to comply with tariff requirements. Tr. 1191:4-1192:14; Tr. 1216:6-14.

FC was under no legal obligation to ensure that Sancom complied with its tariff. *See Dykstra*, 766 N.W.2d at 500 (finding that the bank's actions were not improper, in part because it was not under a legal obligation to subordinate its interest). Erickson's testimony that he did not intend to enter into an off-tariff relationship or do anything to jeopardize the tariff as his source of revenue is both credible and

consistent with the desire of FC and Sancom to bill IXCs under Sancom's tariff. In sum, although FC was motivated by profit, FC intended to comply with the law and thought it was doing so. Because the impropriety of the arrangement was not clear, FC was not *impermissibly* motivated by its own financial gain.

Qwest also argues that FC's interference was improper because it interfered with the public policy underlying the tariff system, namely Sancom's duty as a common carrier to provide services indiscriminately to all customers. Docket 388 at 41 (citing the filed rate doctrine). Qwest further contends that an erroneous belief of illegality or ignorance of the law does not excuse FC's interference, and that the *Farmers I* decision, issued in 2007, cannot justify a contract signed in 2005. Docket 388 at 42-45. Qwest's arguments miss the point. It is not FC's burden to excuse its conduct or justify its actions. Rather, it is Qwest's burden to prove that FC's conduct was improper.

Qwest is correct that the tariff system represents significant public interests in the efficient, available, and affordable delivery of telephone traffic. But FC had no obligations under any tariff because it is not a carrier. Furthermore, Qwest acknowledged in closing oral arguments that conference calling services still operate under the tariff system, although the LECs have changed how they bill that traffic to the IXCs. *See also* Tr.

1214:25-1216:5 (describing when, under new FCC rules, LECs engaged in access stimulation must re-file tariffs at lower rates). Thus, the free conference calling business model is not incompatible with the regulatory system put in place by Congress and administered by the FCC.

Qwest also argues that FC should have known that its actions were illegal. It bases its argument on the professional advice available to FC and that FC should have been able to easily figure out that its actions would later be found illegal. *See, e.g.*, Docket 388 at 15-18. But that knowledge was speculative before the FCC decided *Farmers II*. FC introduced evidence that FC and Sancom relied on various experts and attorneys when conducting their business. Tr. 1192:16-18 (FC currently uses TMI, a consulting company, for advice on regulatory affairs); Ex. 16 (consulting agreement between PowerHouse and FC); Tr. 563:13-21 (Sancom relied on advice from lawyers and consultants). Reliance on professional or legal advice can be important in determining whether a party acted improperly. *See Selle*, 786 N.W.2d at 753 (citing *Briesemeister v. Lehner*, 720 N.W.2d 531, 543-44 (Wis. Ct. App. 2006), for the proposition that reliance on an attorney's advice can preclude a finding of improper motive, even if the advice was incorrect). Erickson also testified that he participated extensively in the FCC's rulemaking process. Tr. 1209:15-1212:13. Based on the evidence, particularly the

conflicting decisions of the FCC on this topic, FC would not have known that its arrangement with Sancom did not comply with Sancom's tariffs, and FC's actions are not improper on that basis.

FC acted intentionally to maximize its own profits. But that motivation is not improper. *See Dykstra*, 766 N.W.2d at 500 (holding that even though the bank's conduct could be viewed as "hostile," it was not improper). FC introduced credible evidence that it did not intend to violate the law, even though the FCC later determined that it did. After evaluating the factors enumerated in *Gruhlke*, with an emphasis on the nature of FC's conduct, FC's motivation, and the societal interests in the tariff regulatory system, Qwest has not demonstrated that FC acted improperly. Because Qwest has not established that FC acted improperly, Qwest does not prevail on its tortious interference with contract claim.

### B.    Inducement of Regulatory Violations

Qwest urges the court to follow the Restatement (Third) of Unfair Competition and hold that the South Dakota Supreme Court, if presented with the question, would recognize the inducement of regulatory violations as a sufficient underlying basis for Qwest's unfair competition claim. Docket 388 at 46-51. By encouraging Sancom to violate the tariffs, FC committed tortious conduct that should be

actionable as a civil wrong. *Id.* at 48. In response, FC claims that the Restatement does not make inducement actionable, no court has recognized this cause of action, liability would be limitless, and the court should exercise judicial restraint under these circumstances. Docket 392 at 36-43.

South Dakota has not recognized the inducement of regulatory violations as a tort. "When a state's highest court has not addressed the precise question of state law that is at issue, a federal court must decide what the highest state court would probably hold were it called upon to decide the issue." *Lenhardt v. Basic Inst. of Tech., Inc.*, 55 F.3d 377, 379 (8th Cir. 1995) (quotations omitted).

The Restatement provides:

One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:

(a)   the harm results from acts or practices of the actor actionable by the other under the rules of this Restatement relating to:

(1)   deceptive marketing, as specified in Chapter Two;

(2)   infringement of trademarks and other indicia of identification, as specified in Chapter Three;

(3)   appropriation of intangible trade values including trade secrets and the right of publicity, as specified in Chapter Four;

or from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or

(b)     the acts or practices of the actor are actionable by the other under federal or state statutes, international agreements, or general principles of common law apart from those considered in this Restatement.

Restatement (Third) of Unfair Competition § 1 (1995). Qwest contends that because Sancom's billing practices violated both federal and state tariffs, FC should be liable for inducing those violations. It seems unlikely that subsection (b) of the Restatement, even if adopted by South Dakota, would impose liability on FC because FC was not the actor who violated Sancom's tariffs, and therefore FC did not engage in conduct that was actionable under a federal or state statute. Qwest has not shown any statutory violation committed by FC itself. *See* Tr. 1030:12-1032:2 (acknowledging that Sancom, not FC, had statutory obligations as a carrier).

Qwest cites several cases for the proposition that the Restatement (Third) of Unfair Competition § 1 is accepted as a basis for tort liability predicated on inducing statutory violations. But the authorities Qwest cites for support do not apply to statutory violations in this context. *See Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, 990 F. Supp. 2d 953, 974-75 (D. Minn. 2014) ("Qwest's foreign cases—where federal

courts have considered the Restatement in light of unfair competition—
do not address unfair competition claims similar to Qwest's."); *see also*
*C.B.C. Dist. & Marketing, Inc. v. Major League Baseball Advanced Media,*
*LP*, 505 F.3d 818, 822-23 (8th Cir. 2007) (publicity cases); *ID Sec. Sys.*
*Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 688-89
*amended*, 268 F. Supp. 2d 448 (E.D. Pa. 2003) (antitrust,
monopolization, and tortious interference with contract case); E*li Lilly &*
*Co. v. Am. Cyanamid Co.*, No. IP95-0536-C-B/S, 2001 WL 30191, at *6-7
(S.D. Ind. Jan. 8, 2001) (patent and antitrust violations); *ProBatter*
*Sports, LLC v. Joyner Techs., Inc.*, No. C-05-2045-LRR, 2006 WL 140655,
at *3 (N.D. Iowa Jan. 17, 2006) (patent case). Although those cases all
cite the Restatement (Third) of Unfair Competition § 1, they do not
support the proposition that a party that does not directly compete with
the plaintiff could be liable for inducing a third party to violate a statute.

Additionally, existing remedies both under the common law and the
statutory schemes are sufficient. First, Qwest could (and did) bring tort
claims directly against Sancom. Second, Qwest could (and did) seek
redress from Sancom under the applicable statutes and administrative
processes. Qwest has already settled its claims with Sancom relating to
Sancom's tortious conduct and statutory violations. Third, Qwest could
(and does) argue that FC should be liable for Sancom's statutory

violations under a civil conspiracy theory. Qwest's civil conspiracy claim encompasses the same allegedly wrongful conduct and would provide the same remedy.[11] For those reasons, the court believes that if the South Dakota Supreme Court were presented with this case, it would not recognize a new theory of tort liability based on the facts presented here. *See Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 843 (S.D. 1990) (refusing to recognize a new cause of action when it lacked supporting authority and other causes of action existed to protect the plaintiff's rights).

## II.    Civil Conspiracy

Qwest alleges that FC is liable for its agreement with Sancom to engage in access stimulation under a civil conspiracy theory. The elements of a civil conspiracy are:

(1)    Two or more persons;

(2)    An object to be accomplished;

(3)    A meeting of the minds on the object or course of action to be taken;

(4)    The commission of one or more unlawful overt acts; and

(5)    Damages as the proximate result of the conspiracy.

---

[11] In its reply brief, Qwest stated that "inducing violations of the statutes that authorized the tariffs is related to, but not duplicative of, tortious interference with tariffs and civil conspiracy," Docket 397 at 24, but Qwest fails to articulate how those claims are meaningfully distinct.

*Setliff v. Akins*, 616 N.W.2d 878, 889 (S.D. 2000). "Civil conspiracy 'is not an independent cause of action, but is sustainable only after an underlying tort claim has been established.' " *Selle v. Tozser*, 786 N.W.2d 748, 756 (S.D. 2010) (quoting *Kirlin v. Halverson*, 758 N.W.2d 436, 455 (S.D. 2008)).

For the reasons stated with respect to Qwest's unfair competition claim, Qwest cannot establish the underlying tort of tortious interference with contract, and the South Dakota Supreme Court would not recognize inducement of statutory violations as a tort that could be asserted against FC. Apart from those torts, Qwest alleges that FC conspired with Sancom to violate Sancom's tariffs, which violations constitute the underlying tort.[12]

The parties disagree on whether South Dakota law requires a showing of specific intent or general intent as part of a civil conspiracy. Qwest contends that it must only show that FC and Sancom intended to take the actions they did, and that intent to commit an unlawful act is not required. Docket 397 at 26-30. FC responds that a civil conspiracy

---

[12] FC contends that because a breach of contract is not a tort, a plaintiff cannot reframe a breach of contract claim as a conspiracy to commit tortious interference based on an underlying contract claim. *See* Docket 392 at 44 n.21 (citing *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1 (Del. Ch. 2009)). *NACCO* recognizes, however, that a statutory violation is sufficient. *NACCO*, 997 A.2d at 35.

can only be found when the parties enter an agreement contemplating either an unlawful purpose or unlawful means, and a plaintiff must show that the parties had the specific intent to act unlawfully. Docket 402 at 11-14.

The parties agree that the South Dakota Supreme Court has not addressed this issue directly. Docket 397 at 26-27. Therefore, this court must determine whether the South Dakota Supreme Court would require a plaintiff to show that a defendant had the specific intent to agree to commit a tort. *See Lenhardt*, 55 F.3d at 379 (summarizing when and how a district court should resolve unanswered questions of state law).

Several treatises state that a civil conspiracy requires a showing of specific intent:

> Since one cannot agree, expressly or tacitly, to commit a wrong about which he or she has no knowledge, in order for a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the beginning of the combination or agreement. Thus, civil conspiracy is an intentional tort requiring a specific intent to accomplish the contemplated wrong.

16 Am. Jur. 2d *Conspiracy* § 51.

> A civil conspiracy requires a specific intent to accomplish the contemplated wrong. . . . Thus, a specific intent to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means is sufficient. . . . Merely proving the joint intent to engage in conduct that results in an injury is not sufficient to establish a cause of action for civil conspiracy as each participant in a conspiracy must have the specific intent to injure the plaintiff.

15A C.J.S. *Conspiracy* § 15.[13] The court is unaware of any treatise

supporting Qwest's position that general intent is sufficient.

Courts in other jurisdictions have adopted the position that a civil

conspiracy requires a showing of specific intent. *See Wackman v.*

*Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010) (applying Texas law on civil

conspiracy, which contains identical elements to South Dakota law, and

stating that civil conspiracy requires specific intent as part of the

meeting of the minds); *Thomas v. U.S. Airways*, No. 13-6121, 2014 WL

1910245, at *5 (E.D. Pa. May 13, 2014) (applying Pennsylvania law

requiring malice and a showing of specific intent); *Guilbeault v. R.J.*

*Reynolds Tobacco Co.*, 84 F. Supp. 2d 263, 268 (D.R.I. 2000) (applying

Rhode Island law and stating that "[a] civil conspiracy claim requires the

specific intent to do something illegal or tortious"); *Dodson v. Allstate Ins.*

*Co.*, 47 S.W.3d 866, 876 (Ark. 2001) ("Civil conspiracy is an intentional

tort requiring a specific intent to accomplish the contemplated wrong.");

*Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995) ("[C]ivil

conspiracy requires specific intent. For a civil conspiracy to arise, the

parties must be aware of the harm or wrongful conduct at the inception

---

[13] The South Dakota Supreme Court has looked to the C.J.S. in
defining tort issues, including intent. *See Frey v. Kouf*, 484 N.W.2d 864,
868 (S.D. 1992) (citing 6A C.J.S. *Assault & Battery* § 9 (1975)).

of the combination or agreement."). The court is unaware of any court decision that explicitly adopts a general intent requirement for civil conspiracy claims.

Other decisions of the South Dakota Supreme Court are consistent with a requirement of specific intent as part of a civil conspiracy. "A civil conspiracy is, fundamentally, an *agreement to commit a tort.*" *Kirlin v. Halverson*, 758 N.W.2d 436, 455 (S.D. 2008) (emphasis added). This language from *Kirlin* implies that the tort must be part of the agreement and is inconsistent with general intent. Similarly, " '[t]he purpose of a civil conspiracy claim is to impose civil liability for damages on those who agree to join in a tortfeasor's conduct and, thereby, become liable for the ensuing damage, *simply by virtue of their agreement to engage in the wrongdoing.*' " *Selle*, 786 N.W.2d at 756 (emphasis added) (quoting *Macomber v. Travelers Prop. & Cas. Corp.*, 894 A.2d 240, 254-55 (Conn. 2006)). If the court were to impose only a general intent standard, every third party that had an agreement with Sancom during the relevant time period—even parties with no knowledge of Sancom's access stimulation— could potentially be liable as part of a civil conspiracy if the unlawful overt act of billing an IXC could be related to the agreement. Requiring a specific intent to join in an unlawful agreement avoids that overinclusive result.

Qwest cites several cases which, it contends, should guide the court to require only general intent. These cases are not persuasive. *See PFS Dist. Co. v. Raduechel*, 574 F.3d 580, 592 (8th Cir. 2009) (discussing Iowa law and finding that the defendants "did not knowingly and voluntarily enter into a scheme with Raduechel and Spain to breach Raduechel's and Spain's fiduciary duties or misappropriate trade secrets"); *J-R Grain Co. v. FAC, Inc.*, 627 F.2d 129, 133-34 (8th Cir. 1980) (analyzing Nebraska law and upholding the district court's determination that the evidence did not support a conspiracy claim without discussing specific intent); *Rozone Prod'ns, LLC v. Raczkowski*, No. Civ. 09-5015-JLV, 2010 WL 3910170, at *7-8 (D.S.D. Sept. 29, 2010) (finding that plaintiffs had sufficiently alleged a civil conspiracy to survive a motion to dismiss without addressing specific intent). In fact, in *Raduechel* the Eighth Circuit upheld a jury verdict for certain defendants because there was sufficient evidence to support the jury's conclusion that those defendants "lacked the intent to engage in a conspiracy" even though those defendants provided certain professional services in connection with other defendants' breach of fiduciary duties and misappropriation of trade secrets. *Raduechel*, 574 F.3d at 592.

Qwest also cites *Frey v. Kouf*, 484 N.W.2d 864 (S.D. 1992), to argue that South Dakota does not require specific intent. Docket 397 at 29.

*Frey* is not sufficiently similar to this case to lend meaningful support to Qwest's position because *Frey* merely held that, in an assault and battery case, a defendant did not need to intend to cause the specific injury but only needed to intend an act that was substantially certain to cause bodily contact. *Frey*, 484 N.W.2d at 867-68. Additionally, Qwest argues that *Setliff v. Stewart*, 694 N.W.2d 859 (S.D. 2005), impliedly holds that only general intent is required because there was no evidence of specific intent. Docket 397 at 27-29. First, the South Dakota Supreme Court noted that because there was no special interrogatory sent to the jury, it was "impossible to determine whether the jury awarded damages for conspiracy, tortious interference or a combination of the two." *Setliff v. Stewart*, 694 N.W.2d at 867 n.2. More importantly, the court outlined five different categories of evidence that could support a jury's finding that Stewart specifically intended to interfere with the contract at issue. *See id.* at 867-69. This case does not stand for the proposition that only general intent is required for a civil conspiracy.

Qwest relies on a case cited in the *Setliff v. Stewart* opinion, *Kessel v. Leavitt*, 511 S.E.2d 720 (W. Va. 1998), and contends that it found liability based on a civil conspiracy theory for underlying conduct not yet recognized as tortious and therefore without a finding of specific intent. Docket 397 at 28 n.12. But the underlying tort in *Kessel* was fraud.

*Kessel*, 511 S.E.2d at 753 ("In framing his cause of action for fraud, John also has alleged that the defendants' fraudulent conduct constituted a civil conspiracy."). To prove fraud in South Dakota, a plaintiff would have to show among other things "[t]hat a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made[.]" *N. Am. Truck & Trailer, Inc. v. M.C.I. Commc'n Servs., Inc.*, 751 N.W.2d 710, 713 (S.D. 2008) (*quoting Northwest Realty Co. v. Colling*, 147 N.W.2d 675, 683 (1966)). In essence, a plaintiff would have to prove specific intent.

Qwest also cites a criminal case from South Dakota, *State v. Stavig*, 416 N.W.2d 39 (S.D. 1987). Docket 397 at 26. In context, *Stavig* concerned whether certain acts of coconspirators were admissible against Stavig himself. *Stavig*, 416 N.W.2d at 41. This case does not address specific intent in the civil conspiracy context.

All the secondary authority and caselaw from other jurisdictions that address the issue of intent in a civil conspiracy require specific intent. Without specific intent, a defendant could be held liable for merely agreeing to engage in lawful conduct if that agreement could be connected to another party's subsequent unlawful conduct. Based on the weight of authority, the court believes that the South Dakota Supreme Court would require Qwest to prove that FC had the specific intent to

either pursue unlawful ends or to pursue lawful ends by unlawful means.

Turning to the evidence in this case, FC entered into an agreement with Sancom to send minutes to Sancom in exchange for a marketing fee derived from switched access revenue billed under Sancom's tariffs. Ex. 11. But that agreement did not include conduct that had been found to be unlawful at the time. Furthermore, Erickson and Ryan Thompson both testified that they thought the arrangement complied with the law. Tr. 585:18-23 (Ryan Thompson stating that he believed bills were lawful and did not intend to violate the law); Tr. 605:7-14 (Ryan Thompson stating that Sancom believed FC was an end user and a customer under applicable federal and state law). Erickson stated that he had no intention to conduct his business in a manner that would fall outside the tariffs, and that had he known at the time that he would be required to pay Sancom for services and fees or have a key to the cage containing the bridges, he would have done so. Tr. 1191:4-1192:14 (Erickson stating that he did not believe Sancom and FC were acting inappropriately, that he had an incentive to comply with the law, and that he would follow what the law required regarding billing and access to bridge facilities); Tr. 1216:6-14 (Erickson stating that he would do what was required by law). Based on that evidence, the court concludes that FC did not have the

specific intent to agree with Sancom to violate Sancom's tariffs. Because Qwest has not shown that FC intended to do anything unlawful, its civil conspiracy claim fails.

## III.   Unjust Enrichment

Under South Dakota law, "[u]njust enrichment occurs 'when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying.'" *Hofeldt v. Mehling*, 658 N.W.2d 783, 788 (S.D. 2003) (quoting *Parker v. W. Dakota Insurors, Inc.*, 605 N.W.2d 181, 187 (S.D. 2000)). To prove unjust enrichment, a plaintiff must show that the plaintiff conferred a benefit on the defendant, the defendant was aware of the benefit, and that allowing the defendant to retain the benefit without reimbursement would unjustly enrich the defendant. *Parker*, 605 N.W.2d at 187. "[T]he relevant inquiry is whether the circumstances are such that equitably the beneficiary should restore to the benefactor the benefit or its value." *Hofeldt*, 658 N.W.2d at 788.

FC argues that unjust enrichment is not available to Qwest because equitable remedies may only be pursued when no remedy exists at law. Docket 392 at 63-66. "Unjust enrichment is an equitable doctrine." *Mack v. Mack*, 613 N.W.2d 64, 69 (S.D. 2000). "'[A]n essential element to equitable relief is the lack of an adequate remedy at law.'"

*Lamar Adver. of South Dakota, Inc. v. Heavy Constructors, Inc.*, 745
N.W.2d 371, 375 (S.D. 2008) (quoting *Rindal v. Sohler*, 658 N.W.2d 769,
772 (S.D. 2003)).

Under South Dakota law, "unjust enrichment is unwarranted when
the rights of the parties are controlled by an express contract." *Johnson
v. Larson*, 779 N.W.2d 412, 416 (S.D. 2010). In *Johnson*, the plaintiff
sued one defendant, with whom he had a valid contract, for breach of
contract, conversion, constructive trust, and unjust enrichment. *Id.* at
415. The plaintiff also sued a second defendant, with whom he did not
have a contract. *Id.* A jury found against the plaintiff on his breach of
contract and conversion claims, but the trial court awarded restitution
under an unjust enrichment theory. *Id.* at 416. The South Dakota
Supreme Court held that because a valid contract existed with the first
defendant, unjust enrichment was not available as a remedy against that
defendant. *Id.* ("Johnson's remedy lay in a claim for breach of contract.").
Nonetheless, even though the plaintiff asserted a tort claim against the
second defendant, the court found "because there was no express
contract between Johnson and [the second defendant], Johnson had no
remedy at law to recover for the rock removed." *Id.* at 417.

*Johnson* implies that a tort remedy is not an adequate remedy at
law and does not prevent a claim for unjust enrichment. *Johnson* also

analyzed the remedies available against each party separately. Therefore, the fact that Qwest had both a remedy at law and a remedy under the statute against Sancom does not preclude the availability of an equitable remedy against FC. FC argues throughout this case that there was no contract between FC and Qwest and that FC had no obligations under the Communications Act or any applicable tariff. Because Qwest has no contractual or statutory remedy against FC, Qwest may assert an unjust enrichment claim against FC, even though Qwest also asserted a tort claim against FC.

Qwest argues that it is not required to establish that FC acted wrongfully. Docket 388 at 76. A plaintiff can prevail on an unjust enrichment claim even when a defendant is not a wrongdoer. *See Johnson*, 779 N.W.2d at 418 (noting that the defendants were not wrongdoers). Nonetheless, unjust enrichment "implies illegal or inequitable behavior . . . ." *Commercial Trust & Sav. Bank v. Christensen*, 535 N.W.2d 853, 858 (S.D. 1995) (discussing unjust enrichment in a situation where a tenant improves a property to the benefit of the landlord). "The fact that a recipient has obtained a benefit without paying for it does not of itself establish that the recipient has been unjustly enriched." Restatement (Third) of Restitution and Unjust Enrichment § 2(1). *See also id.* cmt. b ("To be the subject of a claim in restitution, the

benefit conferred . . . must be acquired or retained in a manner that the law regards as unjustified. Otherwise, the fact that we derive advantage from the efforts and expenditures of others is not 'unjust enrichment' but one of the advantages of civilization."); *Johnson*, 779 N.W.2d at 416 (citing favorably the Restatement (Third) of Restitution and Unjust Enrichment § 2).

On referral, the FCC found that Sancom and FC engaged in an access stimulation scheme. The evidence at trial showed that FC knew it was taking advantage of Sancom's tariffs by engaging in access stimulation with Sancom. But operating a business in a favorable regulatory environment is not inequitable. FC participated in the FCC's rulemaking process regarding the telecommunications industry in an effort to preserve that favorable regulatory environment, but was not successful and now operates under the new rules. For the reasons discussed above with respect to whether FC improperly interfered with Sancom's tariff and whether FC intended to engage in unlawful activity, the court finds that FC's conduct was neither illegal nor inequitable.

FC established at trial that it provided services to its customers—some of whom were Qwest customers as well—in exchange for the money paid to FC by Sancom. Tr. 1138:13-1145:5. The fact that FC made a profit by providing those services does not establish that it was unjustly

enriched. Allowing FC to keep the money paid to it by Sancom in exchange for FC's services is not inequitable.

Furthermore, Qwest pursued legal remedies against Sancom for the amounts Qwest paid to Sancom. Any money Qwest would be entitled to recover from FC would be money Qwest actually paid to Sancom, and Qwest already settled its claims with Sancom for those amounts. In essence, Qwest is attempting to recover against FC for an injury for which Qwest has already been compensated, simply because FC also made money. Because Qwest already recovered from Sancom, it is not inequitable to decline to give Qwest a second recovery from FC.

FC took advantage of a loophole until the loophole closed. That behavior is neither illegal nor inequitable. Allowing FC to keep money paid to it by Sancom for FC's services is not inequitable. Furthermore, it is not appropriate to allow Qwest to recover from FC in equity after Qwest fully pursued claims for the same conduct against Sancom. For those reasons, the circumstances do not justify an equitable remedy for Qwest.

## CONCLUSION

In the mid-2000s, free calling service companies and various LECs engaged in access stimulation to maximize profits in a favorable regulatory environment. In response, IXCs convinced the FCC to adopt new regulations to prevent access stimulation. The free calling service

companies and LECs still operate, but do so under those new regulations. In this case, Qwest settled its claims stemming from Sancom's access stimulation with Sancom. In its effort to impose liability on FC, however, Qwest has failed to establish tort liability under South Dakota law. Qwest did not show that FC improperly interfered with Qwest's tariff relationship with Sancom. Qwest also has not shown that the South Dakota Supreme Court would recognize the tort theory of inducing regulatory violations. Although FC and Sancom had an agreement to engage in access stimulation, Qwest did not establish that FC intended to act unlawfully. Finally, Qwest has not established circumstances that would justify an equitable remedy. Accordingly, it is

ORDERED that judgment will be entered in favor of third-party defendant, Free Conferencing Corporation, and against third-party plaintiff, Qwest Communications Corporation, in accordance with this memorandum opinion and order.

IT IS FURTHER ORDERED that Qwest's motion to provide supplemental authority (Docket 404) is denied.

Dated November 6, 2014.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE