UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| QWEST COMMUNICATIONS CORPORATION, a Delaware corporation,<br><br>   Third-Party Plaintiff,<br><br>vs.<br><br>FREE CONFERENCING CORPORATION, a Nevada corporation,<br><br>   Third-Party Defendant. | CIV. 07-4147-KES<br><br><br><br>ORDER DENYING MOTION TO VACATE JUDGMENT |

  Pending is a motion by third-party plaintiff, Qwest Communications Corporation, to vacate the court's judgment entered on November 6, 2014, in favor of third-party defendant, Free Conferencing Corporation (FC). FC opposes the motion. For the following reasons, the motion to vacate is denied.

## BACKGROUND

  Qwest is a telecommunications provider known as an interexchange carrier (IXC). As an IXC, Qwest delivers long-distance calls from one local area to another. The call is then connected to the recipient by a local exchange carrier (LEC). In this case, Sancom, an LEC located in the Mitchell, South Dakota, area, filed suit against Qwest based on Qwest's alleged failure to pay certain bills. After the court referred three issues to the Federal Communications Commission (FCC), the FCC ruled on the first issue and

reserved ruling on the other two issues. Sancom and Qwest then settled their dispute.

During the time period involved in the dispute between Sancom and Qwest, Sancom and FC engaged in access stimulation. As part of its litigation with Sancom, Qwest brought a third-party complaint against FC alleging unfair competition, civil conspiracy, and unjust enrichment. Following a court trial on May 13-20, 2014, and oral argument on September 22, 2014, the court issued a memorandum opinion finding in favor of FC on Qwest's claims and entered judgment against Qwest and in favor of FC. Qwest then filed this motion to vacate the court's judgment pursuant to Rule 59(e), or alternatively to amend erroneous findings of fact pursuant to Rule 52(b). Docket 411.

## LEGAL STANDARD

Rule 59(e) allows a court to alter or amend a judgment.[1] Fed. R. Civ. P. 59(e). "[Rule] 59(e) was adopted to clarify a district court's power to correct its own mistakes in the time period immediately following entry of judgment." *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998). Thus, "Rule 59(e) motions serve a limited function of correcting manifest errors of law or fact or [presenting] newly discovered evidence." *Id.* (internal quotations omitted).

---

[1] "Although the words 'alter or amend' imply something less than 'set aside,' a court may use Rule 59(e) to set aside the entire judgment." *Sanders v. Clemco Indus.*, 862 F.2d 161, 169 n.13 (8th Cir. 1988); *see also* 11 Charles Alan Wright, et al., *Federal Practice & Procedure Civil* § 2810.1 (3d ed.) [hereinafter Wright and Miller] ("[Rule 59] also has been interpreted as permitting a motion to vacate a judgment rather than merely amend it.").

> "A motion to alter or amend judgment cannot be used to raise arguments which could have been raised prior to the issuance of the judgment . . . [or] to introduce new evidence that could have been adduced during pendency of the summary judgment motion . . . . Nor should a motion for reconsideration serve as the occasion to tender new legal theories for the first time."

*Concordia College Corp. v. W.R. Grace & Co.*, 999 F.2d 326, 330 (8th Cir. 1993) (final alteration in original) (quoting *Hagerman v. Yukon Energy Corp.*, 839 F.2d 407, 413 (8th Cir. 1988)).

Rule 52(b) states that "the court may amend its findings—or make additional findings—and may amend the judgment accordingly. The motion may accompany a motion for a new trial under Rule 59." Fed. R. Civ. P. 52(b).

> The primary purpose of Rule 52(b) is to enable the appellate court to obtain a correct understanding of the factual issues determined by the trial court as a basis for the conclusions of law and the judgment entered thereon. A party who failed to prove his strongest case is not entitled to a second opportunity to litigate a point, to present evidence that was available but not previously offered, or to advance new theories by moving to amend a particular finding of fact or a conclusion of law. It is said that the motion must raise questions of substance by seeking reconsideration of material findings of fact or conclusions of law to prevent manifest injustice or reflect newly discovered evidence.

9C Wright and Miller § 2582. "Rulings on motions to amend findings are committed to the sound discretion of the district court[.]" *Id.*

### DISCUSSION

In its order on November 6, 2014, the court determined that Qwest's unfair competition claim failed because Qwest had not established either alleged underlying tort liability, tortious interference with contract, or inducement of regulatory violations. Docket 407 at 10-30. The court also found that Qwest had not established the elements of a civil conspiracy. *Id.* at 30-39.

Finally, the court rejected Qwest's claim for equitable relief based on unjust enrichment. *Id.* at 39-43. Qwest asks the court to vacate its decision relating to Qwest's tortious interference with contract claim and its determination that equitable relief for unjust enrichment was not appropriate. Docket 412. The court's discussion of Qwest's motion to vacate the court's judgment will be limited to those issues.

I.  **Tortious Interference**

To prove a claim for tortious interference, a plaintiff must show:

(1) [T]he existence of a valid business relationship or expectancy;[2]
(2) knowledge by the interferer of the relationship or expectancy;
(3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and (5) damage to the party whose relationship or expectancy was disrupted.

*Selle v. Tozser*, 786 N.W.2d 748, 753 (S.D. 2010) (footnote added) (citing *Dykstra v. Page Holding Co.*, 766 N.W.2d 491, 499 (S.D. 2009)). The court held that Qwest had not established either interference or impropriety as required by the third element. Qwest now contends that those determinations were clearly erroneous.[3]

---

[2] The court stated that tortious interference with a contract was one type of tortious interference with a business relationship. Docket 407 at 11 n.5 (citing Restatement (Second) of Torts § 766 cmt. c).

[3] As a threshold matter, FC disputes whether Qwest can properly relitigate these issues in a Rule 59(e) motion. *See* Docket 418 at 5-8. The issues raised now by Qwest were briefed and litigated, and much of the authority presented by Qwest in this motion was also presented by Qwest in its post-trial briefs. The court disagrees with Qwest's arguments that it suffered unfair surprise because it believed the court would not address improper interference. The element of improper interference was litigated throughout this action. *See*

### A.   Interference

Qwest argues that the court's order erroneously required a total breach of contract or complete severance of the relationship between Sancom and Qwest to support the interference element. *See* Docket 412 at 5. Qwest then argues at length that the law does not require a breach as a prerequisite to interference. *Id.* at 5-16.

Qwest's argument is premised on a misreading of the court's opinion. The court did not require that Qwest show a total breach, total nonperformance, or complete severance of its business relationship with Sancom.[4] Rather, the court noted that Sancom continued to perform all

---

Docket 392 at 37-38, 39-41 (FC arguing these points in its post-trial brief). Qwest's position that the court's ruling on the motion to dismiss prevents the court from finding in FC's favor is similarly unpersuasive. When ruling on a 12(b)(6) motion the court accepts all well-pleaded factual allegations as true. Also, the contention that Qwest trusted the court would not manifestly err in its interpretation of the law circularly assumes Qwest will prevail on its motion to vacate as justification for bringing that motion, and such an argument could be pressed by any losing litigant. Nonetheless, the court will consider Qwest's motion because manifest errors of law are a recognized basis for a Rule 59(e) motion. If those errors are present they should be corrected, and if manifest errors are not present, reconsideration will clarify the record and the court's holding for review on appeal.

[4] The court disagrees with Qwest's claim that the court's findings of fact and conclusions of law amount to a sua sponte reconsideration of the court's 2009 order. Qwest initially contended that the claim for tortious interference with a contract brought by Sancom required an actual breach of contract. *See* Docket 51 at 20 (Qwest's argument that "[t]he requisite disruption and harm that is necessary to prove these elements as to an existing contract is an actual breach"). The court rejected that contention, although the court later held that Sancom's tortious interference claim was barred by the filed rate doctrine. Docket 137 at 20 (court's order addressing the elements of tortious interference); Docket 137 at 22-25 (court's order addressing the filed rate doctrine). The question in 2009 was only whether Sancom had pleaded facts which, assumed to be true, would entitle it to relief. The question the court had

aspects of its contract with Qwest relating to non-FC calls. Because Sancom's relationship with Qwest continued, the court had to determine whether FC's actions rose to the level of actionable interference. Here, there was no evidence that Sancom refused to connect any non-FC call that was delivered by Qwest.[5] There was no evidence that people in Mitchell, South Dakota, made or received fewer calls or changed long-distance providers as a result of FC's actions. Thus, FC's actions resulted in additional traffic but did not prevent, hinder, delay, or impede the delivery of the tariffed calls between Sancom and Qwest.

The FCC later ruled that the calls destined for FC's conference bridges did not meet the criteria for Sancom's tariffed services.[6] According to Qwest, the calls to FC's bridges were never a part of the contract between Qwest and Sancom. Thus, if the non-FC traffic was the only contractual service between Sancom and Qwest, and those calls were unaffected, the fact that extra-

---

to determine post-trial was whether Qwest had in fact shown that it was entitled to relief. The law applied was the same, but the burden and facts presented were different.

[5] There was evidence that Sancom turned away Ocean Bay Marketing because its traffic was interfering with FC's traffic. *See, e.g.*, Docket 384-2 at 74-75; Tr. 580:17-581:8 (Ryan Thompson stating that Ocean Bay traffic affected Sancom's network quality). But Qwest did not prove that FC traffic affected any non-access-stimulation traffic. And although Sancom was obligated to continue connecting the calls and Qwest was obligated to keep delivering them, every party to a contract has an obligation to perform that contract, even if that obligation is not imposed by statute.

[6] Qwest repeatedly argues that the FCC found that Sancom breached its tariff. *See, e.g.*, Docket 412 at 7 n.5 (citing Ex. 1 ¶¶ 1, 28). More precisely, the FCC held that "the Free Calling Companies were not 'end users' under the Tariff and, therefore, that Sancom was not entitled to charge Qwest for switched access under the Tariff." Ex. 1 at ¶ 28. If the parties had negotiated a separate contract, Sancom could have charged for those calls under that separate contract.

contractual calls were also delivered would not change the fact that Sancom continued to deliver Qwest's non-FC traffic. Similarly, the fact that Sancom may not have been entitled to compensation for the delivery of non-tariffed traffic would not alter the fact that Sancom was entitled to bill Qwest for all of the contractually delivered traffic. On that basis, the character and nature of the interference alleged by Qwest did not fit the traditional mold of interference with a contract.

The court looked at examples of interference as described in South Dakota case law and the Restatement in an effort to determine whether FC's actions, as shown by the evidence in this case, were sufficiently analogous to other acts of interference to support Qwest's claim. *Id.* at 14-19.[7] The cases the court reviewed, including the cases cited by Qwest, all contained some degree of impairment, disruption, degradation, or breach of the contractual relationship in question.[8] On that basis, FC's actions in this case were distinguishable from the interference in other cases, and Qwest did not persuade the court that an actionable interference had taken place here. *See*

---

[7] Qwest argues that none of the cases discussed by the court required a total breach or permanent severance of the relationship. *See* Docket 412 at 8-13. Qwest misses the court's point. In all of those cases, the alleged act of interference had some negative impact on the contract in question. In this case, the presence of the FC calls did not impact Sancom's delivery of non-FC calls. Thus, the contract itself was unaffected.

[8] Qwest states that "this District has consistently recognized that tortious interference encompasses interference that impairs, disrupts or degrades a continuing contractual relationship." Docket 412 at 9. The court agrees with that description, but for the reasons stated above disagrees that actionable impairment, disruption, or degradation of the contractual relationship was shown in this case.

Docket 407 at 19 (concluding that the agreement between Sancom and FC did not "rise to the level of nonperformance found in other cases").

Similarly, Qwest's newly cited authorities do not convince the court that its previous determination was clearly erroneous. Qwest directs most of its legal authority to the proposition that a partial breach is sufficient to show interference. As discussed above, the court did not hold that a plaintiff must show a total breach to prevail on a tortious interference claim. And the court's ruling would not preclude a plaintiff from showing a breach in the telecommunications context because a plaintiff could still show some type of breach or nonperformance on the part of the entity with the contractual obligation. Ultimately, Qwest failed to show interference by FC, and Qwest's reassertion of its positions and authorities has not convinced the court that it committed clear error in reaching its original conclusion.

**B.     Improper**

Qwest also contends that the court clearly erred when it found that FC's actions, even if deemed interference,[9] were not improper. Docket 412 at 16-30. Specifically, Qwest argues that causing a breach of contract is always improper. Docket 412 at 16. But Qwest overstates the FCC's findings, which only held that Sancom was not entitled to bill Qwest under its tariff for FC traffic. Additionally, as discussed above, FC's traffic did not interfere with the traffic that was the subject of Sancom's tariff.

---

[9] Based on the court's ruling that FC's actions did not amount to interference, it would be unnecessary to reach the issue of whether FC's actions were also improper.

Qwest also argues that a subjective belief of lawfulness is not determinative, and the court's finding that FC and David Erickson, president of FC, believed they were acting lawfully contradicts the court's finding that FC knew it was taking advantage of Sancom's tariff. Docket 412 at 17. The court did not rely solely on a subjective belief of lawfulness, but considered that as one factor among others. Qwest has not shown that it was error to consider that subjective intent, among other factors, under the test set forth in the Restatement[10] for when an act of interference is improper. *See* Docket 407 at 19 (discussing the Restatement test). The court's finding that Erickson intended to act lawfully does not, as Qwest argues, contradict the court's acknowledgement that Erickson intended to design his business to maximize profitability.[11]

Qwest also contends that the FCC found that because FC and Sancom structured their agreement to avoid Sancom's tariff, this is "tantamount to

---

[10] The Restatement test is used in South Dakota. *See Gruhlke v. Sioux Empire Federal Credit Union*, 756 N.W.2d 399, 408 (S.D. 2008).

[11] Qwest argues that a subjective belief of lawfulness is not material when an actor has knowledge of the consequences of its acts. Docket 419 at 23 (citing *ANR W. Coal Dev. Co. v. Basin Elec. Power Co-op.*, 276 F.3d 957, 971-73 (8th Cir. 2002) (interpreting North Dakota law)). But that case notes that tortious interference requires a showing of either a specific intent to interfere or knowledge that the interference would result. *ANR*, 276 F.3d at 972. The facts in *ANR* are distinguishable from the facts in this case because in *ANR* the evidence established that Basin and Dakota Coal knew their actions would directly undercut WCDC's royalty positions. In this case FC knew that Qwest would be charged for the additional calls generated by its services, but it did not intend to interfere with the tariffed calls between Qwest and Sancom, nor did FC know that such interference was substantially likely to result from its actions.

stating that [FC] intended to violate the law." Docket 412 at 19. The FCC held that certain provisions in the agreement between Sancom and FC were structured to avoid the traditional tariffed relationship. This is a more limited finding than Qwest's description. Qwest never rebuts the fact that FC had no legal obligations under the tariff. And even if Sancom could not bill for FC's traffic under its tariff, it could have done so under a contract without violating the law. Thus, the agreement between FC and Sancom was not "tantamount" to a violation of the law, and the court's decision does not contradict the findings of the FCC.

Qwest submits that certain extrinsic evidence—the fact that FC did not pay for services and that FC desired exclusivity and confidentiality—contradicts Erickson's statements that he intended to comply with the law.[12] Qwest presented identical arguments in its post-trial brief. Docket 388 at 17. Notwithstanding Qwest's arguments, the court found Erickson's testimony that he intended to comply with the law credible. The court disagrees that the extrinsic evidence requires the court to reject Erickson's testimony because the evidence cited by Qwest and the findings of the court are not mutually exclusive. The court also disagrees with Qwest's assertion that Erickson's statements contradict the FCC findings. The FCC did not address Erickson's subjective intent, and the fact that the FCC later determined that several aspects of the agreement between FC and Sancom were unlike a traditional

---

[12] It is unclear if Qwest believes this is a clearly erroneous legal conclusion or a finding of fact that Qwest believes should be amended as part of its alternative Rule 52(b) motion.

tariffed service does not inherently contradict Erickson's testimony or the court's finding.

Qwest devotes several pages to arguing that prior FCC rulings did not justify FC's conduct.[13] Docket 412 at 22-26. Qwest's position that FC's conduct was patently and unequivocally illegal at all times benefits from hindsight and is a self-serving interpretation that the court is not bound to accept. Furthermore, Qwest has not established that the court clearly erred when it considered the long, winding, and contentious path of access stimulation litigation. As the court noted, both South Dakota case law and the Restatement consider "the nature of the actor's conduct," among other factors. Docket 407 at 19. The content and timing of prior rulings was not considered in a vacuum or as the only justification, but as part of a larger inquiry into the nature of FC's conduct.[14]

Qwest argues that the court erred when it examined the degree to which FC relied on legal and professional advice. Docket 412 at 27-30. The court did

---

[13] Qwest contends this evidence serves both as proof of a prima facie case and as a rebuttal of the affirmative defense of justification under a burden-shifting analysis. Docket 412 at 25 n.18. The court held that Qwest had not carried its initial burden of establishing that FC's actions were improper. Docket 407 at 20 n.9. Thus, the court never reached the questions of whether FC carried a burden or whether Qwest may rebut FC's justification.

[14] The court's decision does not require a plaintiff to obtain a court order on a breach of contract and then show that the defendant continued to cause the breach after the ruling. *See* Docket 419 at 26. By discussing the history of access stimulation litigation, the court was pointing out that both the illegality and the consequences of access stimulation were topics of substantial debate and uncertainty, even though those questions were ultimately resolved in Qwest's favor.

not give this factor—or any other factor—dispositive weight. Rather, the court noted that FC's consultation with consultants and industry experts, and later with legal counsel, played a role in determining the nature of FC's conduct. That was not a manifest error of law. Nor does the court's order contain clearly erroneous findings of fact. Although FC did not consult TMI or engage in the FCC's rulemaking process until after litigation commenced, FC interacted with and relied on Sancom, Vantage Point, Rohead, and PowerHouse prior to litigation. Again, the fact that FC worked with professionals to structure its relationship with Sancom was part of gauging the nature of FC's conduct. Qwest's arguments that FC did not consult lawyers and Rohead was not specifically a regulatory expert do not change the court's analysis or conclusion on this issue.

Although Qwest relitigates a number of issues relating to whether FC's conduct was improper, it has not shown a manifest error of law. Nor has Qwest shown that the court's decision, taken in context, contains clearly erroneous findings of fact.

## II.    Unjust Enrichment

In support of its position that the court manifestly erred on the issue of unjust enrichment, Qwest argues that the court's ruling contradicts "its prior finding that the FCC found that [FC] acted illegally[.]" Docket 412 at 30. Qwest also contends that the court erroneously imposed a scienter requirement. *Id.* at 31. Qwest characterizes the court's order as internally inconsistent because it noted that a legal remedy does not preclude an equitable remedy but then

relied on Qwest's settlement with Sancom in denying Qwest's claim. *Id.* at 31-32. Finally, Qwest states that the court erred in determining that FC provided services in exchange for the money it received. *Id.* at 32.

Unlike Sancom, FC did not have any tariff obligations. And the FCC found that Sancom violated the law because it did not have a contract under which it could bill for access stimulation traffic. Furthermore, unjust enrichment is not necessarily an appropriate remedy in every case where a defendant can be tied to a regulatory violation through another party. Rather, "the relevant inquiry is whether the circumstances are such that equitably the beneficiary should restore to the benefactor the benefit or its value." *Hofeldt v. Mehling*, 658 N.W.2d 783, 788 (S.D. 2003). Under the circumstances, the court found that Qwest had not met its burden, and Qwest's reassertion of the FCC's findings does not persuade the court that it committed an error.

Qwest's scienter argument fails for a similar reason. The court did not find that every plaintiff attempting to prove an unjust enrichment claim must show intent. Instead, the court included FC's intent as one aspect of the overall equitable determination that unjust enrichment was not an appropriate remedy in this case. Qwest introduces no authority showing that it is a clear error of law for the court to take that factor into consideration.

Qwest's argument that the court's order is internally inconsistent is also flawed. The court held that a remedy at law against Sancom did not prevent Qwest from seeking an equitable remedy from FC. But that holding does not imply that an equitable remedy is required in such cases. The court took all the

circumstances into consideration when determining whether an equitable remedy was appropriate. The fact that Qwest had already settled with one party, even if the amount of that settlement was less than what Qwest would have preferred, was also appropriately considered as part of the circumstances present in this case.[15] Qwest has not shown that the court clearly erred.

Qwest's final argument, that no evidence supported the court's determination that FC provided services in exchange for the money it received from Sancom, is also unpersuasive. Although the payments from Sancom to FC were based on minutes of use flowing to Sancom from FC customers, evidence was presented at trial that FC did provide a number of services to its customers, such as technical support and marketing. *See* Docket 407 at 42. It was not clear error for the court to consider those services in determining that the circumstances in this case did not support an equitable remedy for Qwest.[16]

---

[15] Qwest's argument that its settlement with Sancom was not enough to cover its attorney's fees would justify contentious litigation of every case followed by an attempt to recover attorney's fees under an unjust enrichment theory regardless of the relationship of the fees to actual damages. Also, Qwest's argument relating to joint and several liability among joint tortfeasors overlooks the fact that the court determined FC did not commit a tort.

[16] As part of its argument related to the services provided by FC, Qwest argues that the court erred by not addressing the tracing authorities cited by Qwest in its original brief. Docket 412 at 32. It is unclear how Qwest believes the court erred or how consideration of tracing principles would have changed the court's decision. The court considered all of Qwest's arguments, but did not discuss whether the payments from Qwest could be traced through Sancom to FC because the court found that Qwest was not entitled to a recovery.

Although some facts weighed in Qwest's favor, the court determined that the circumstances in this case did not justify an equitable remedy. Qwest has failed to show that the court's equitable determination based on the circumstances presented in this case was erroneous.

### III. Findings of Fact

Qwest's motion states that "[i]n the alternative [to its motion under Rule 59(e)], Qwest also moves pursuant to Federal Rule of Civil Procedure 52(b) for the Court to amend several erroneous fact findings that Qwest describes in detail in its Brief in Support of this Motion." Docket 411. Qwest's brief never specifically directs the court to any factual findings it believes should be amended pursuant to Rule 52(b). To the extent any factual issues were not already addressed in this motion, Qwest's motion to amend is denied based on Qwest's failure to specifically set forth the challenged findings of fact and the reasons those findings should be amended.

### CONCLUSION

The court applied the proper law to Qwest's tortious interference and unjust enrichment claims. The court did not hold that a plaintiff must show a total breach of contract to prevail on a tortious interference claim, but only held that FC's actions did not amount to improper interference. Similarly, the court did not contradict itself by denying Qwest an equitable remedy, but determined that under the circumstances of this case such a remedy was not justified. Qwest's arguments and authorities do not show that the court

committed a manifest error of law, and Qwest's disagreement with the court's conclusions is insufficient to vacate the court's judgment. Accordingly, it is

ORDERED that Qwest's motion to vacate the judgment of the court (Docket 411) is denied.

Dated June 5, 2015.

BY THE COURT:

*/s/ Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE
